IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 06-186 C |

FILED
MAR - 7 2006
U.S. COURT OF FEDERAL CLAIMS

**Complaint**

Plaintiff Fidelity and Deposit Company of Maryland brings this action against the United States, acting by and through the Department of the Army (Fort Worth District) Corps of Engineers, for damages that F&D incurred under a performance and payment bond issued in connection with a construction project at Lackland Air Force Base, Texas that was performed by F&D's principal, Sedona Contracting, Inc. under a Contract with the Government. Sedona defaulted in its contractual obligations due to financial problems and essentially abandoned the work. By as early as November 2000, F&D requested that the Corps terminate Sedona's Contract and allow F&D to complete the Contract. The Corps, however, failed to take prompt action and allowed the Project to languish before finally terminating Sedona's Contract on June 7, 2001.

Although F&D took over the Project and successfully completed the work following Sedona's default termination, the Corps' improper administration of the Sedona default caused F&D to expend additional sums of money that it

otherwise would not have expended in completing the work. F&D now brings this equitable-subrogation claim, alleging that the Government improperly administered this Contract and breached duties that it owed to F&D under the law of suretyship, duties which include: (i) the Government's duty to administer the bonded Contract in a manner that would not increase the risk undertaken by F&D as surety when it originally issued the bond; and (ii) the Government's duty to properly account for the interests of F&D as surety in reaching its decision to terminate the Contract bonded by F&D. The Government's improper pre-default administration of the Contract and its delayed termination of Sedona caused F&D to incur not less than $1,145,221 in damages.

## PARTIES

1. Plaintiff Fidelity and Deposit Company of Maryland ("F&D") is a corporation organized and existing under the laws of the State of Maryland. F&D is engaged in the surety industry, including the issuance of performance and payment bonds for construction projects.

2. The Defendant is the United States of America.

## JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and this action was filed within the Court's six-year statute of limitations, 28 U.S.C. § 2501.

## BACKGROUND

### F&D's Performance and Payment Bond Obligations on Sedona's Contract with the Government

4. On or about September 23, 1999, the Government, acting by and through the Department of the Army, Fort Worth District, Corps of Engineers ("Corps" or "Government"), entered into Contract No. DACA63-99-C-0039 ("Contract") with Sedona Contracting, Inc. ("Sedona") in the lump-sum amount of $6,077,257.00, for a construction project designated as the Vehicle Operations/Maintenance Complex at Lackland Air Force Base in San Antonio, Texas ("Project").

5. Sedona's scope of work included the construction of a large Maintenance Building for the repair and maintenance of vehicles as well as a smaller Operations Building, where the related clerical work would be performed. Sedona's Contract also included three options: a small storage building, a compressed natural gas site with equipment, and a privately-owned vehicle parking lot.

6. On or about October 25, 1999, F&D issued a Performance Bond in the amount of $6,077,257.00, and a Payment Bond in the amount of $2,500,000.00 for the Project. Both the Performance Bond and Payment Bond named F&D as Surety, Sedona as Principal, and the United States of America as Obligee.

7. The Government received and accepted the Performance and Payment Bonds provided by F&D.

8. Sedona received a Notice to Proceed on November 15, 1999, and began work on the Project, which was scheduled for a duration of 669 calendar days.

**The Government's Improper Administration of Sedona's Contractor Quality Control Plan**

9. The Contract required Sedona to submit a Contractor Quality Control Plan ("CQC Plan") to the Government within five (5) days of the Notice to Proceed. The requirements for this CQC Plan are set forth in the Contract at Specification Section 01451.

10. According to Paragraph 3.2.3 of Specification Section 01451, the Government's acceptance of Sedona's CQC Plan was a prerequisite to the start of construction.

11. Specification Section 01451 sets forth numerous requirements for the CQC Plan. For example, as part of the CQC Plan, the Contractor was required to designate a CQC Systems Manager to oversee all matters pertaining to quality control on the Project. Section 01451 stipulates certain educational and experience requirements for the CQC System Manager. Specifically, the CQC Systems Manager was required to be a graduate engineer, graduate architect, or graduate of construction management.

12. The Government failed to properly administer these and other quality control procedures in the Contract and wrongly allowed Sedona to begin construction without having the proper quality controls in place.

13. For example, F&D ultimately discovered that, over two months after issuing the notice to proceed, the Government notified Sedona that it had several

concerns regarding Sedona's CQC Plan, concerns which precluded the Government from granting unconditional acceptance of the CQC Plan.

14. In a letter dated January 26, 2000, the Government notified Sedona that it could only give conditional acceptance to Sedona's proposed CQC System Manager, Arthur Perez, due to his "marginal performance" on his previous project. The Government's letter also noted "that in the area of Contractor Quality Control several items remain outstanding as of the date of this letter," such as Sedona's revised CQC Plan addressing the Government's review comments on quality control, scheduling, and the submittal register.

15. In addition to Mr. Perez's poor performance on prior projects, he was ineligible to serve as CQC Systems Manager because he lacked the educational requirements set forth in Specification Section 01451.

16. Specifically, Mr. Perez was not a graduate engineer, graduate architect, or graduate construction manager.

17. Despite Sedona's failure to comply with the Contract's CQC requirements, the Government allowed Sedona to proceed with the work and made progress payments to Sedona.

18. Throughout the course of Sedona's performance, the Government allowed Sedona to perform the work without the proper adherence to the Contract's quality control requirements. On several instances, the Government complained of Sedona's quality control problems, but the Government continued to pay for work that was defective, work that F&D later paid to correct.

19. For example, in a letter dated December 22, 2000, the Government noted several instances of Sedona's failure to follow the Contract requirements and quality control procedures. Although this letter specifically noted examples of Mr. Perez's failures as CQC System Manager and threatened to order his removal from the Project, the Government never took any such action to rescind its prior "conditional acceptance" of Mr. Perez as CQC System Manager.

20. The Government was similarly lax in performing its inspection duties on the Project, which resulted in payments made to Sedona for work that was defective.

21. Despite Sedona's failure to comply with the Contract's quality control requirements, the Government continued to make progress payments to Sedona through October 2000.

22. The Government's failure to enforce and administer the CQC requirements resulted in the improper release of funds for work performed by Sedona that was defective and thus increased F&D's risk as Project surety and caused it to incur additional costs in completing the work following its takeover of the Project.

**The Government's Improper Administration of the Contract's Payment Process**

23. The Contract sets forth specific procedures related to the payment process. For example, the Contract incorporated several provisions of the Federal Acquisition Regulations ("FAR"), including FAR 52.232-5, entitled, "Payments Under Fixed-Price Construction Contracts (May 1997)."

24. In accordance with FAR 52.232-5(b)(1), Sedona was required to provide the following accounting of subcontractor payments in its progress payment requests:

(i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.

(ii) A listing of the amount included for work performed by each subcontractor under the contract.

(iii) A listing of the total amount of each subcontract under the contract.

(iv) A listing of the amounts previously paid to each such subcontractor under the contract.

(v) Additional supporting data in a form and detail required by the Contracting Officer.

25. In addition, in accordance with FAR 52.232-5(c), Sedona was required to attest to the propriety of its payment and withholding practices as part of each progress payment request by certifying that:

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract.

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States Code;

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract * * *.

26. Furthermore, the Contract incorporated FAR 52.232-27, entitled "Prompt Payment for Construction Contracts (Jun 1997)." This provision sets forth

specific requirements with which Sedona was required to comply in the event that it withheld payments from subcontractors for amounts that had been previously submitted to the Government in prior payment applications.

27. The FAR provisions also addressed the Government's rights to withhold retainage from its payments to Sedona. In accordance with FAR 52.232-5(e), the Contracting Officer was authorized to withhold as much as 10% retainage from the Government's progress payments to the Contractor for lack of satisfactory progress.

28. F&D ultimately discovered that, during the Preconstruction Meeting held on November 9, 1999, the Government notified Sedona that it would withhold amounts from Sedona's progress payments for several enumerated reasons. For example, the Government notified Sedona that it would withhold 10% retainage when Sedona's progress fell behind schedule by 5% or 15 calendar days and that it would withhold such retainage until it determined that the schedule was regained and that refunding of this money would not adversely affect the Government's interest. The Government also notified Sedona that no payments would be made during the first 60 days of work without an approved preliminary project schedule, nor after the first 60 days without an approved and tested complete project schedule.

29. The Government improperly administered the Contract's payment process in several respects, which ultimately caused F&D to incur substantial monetary losses in the performance of its Bond obligations.

30. Sedona submitted seven applications for payment prior to October 20, 2000. None of these payment requests complied with FAR 52.232-5(b)(1). Specifically, Sedona's Payment Applications did not include any data to verify subcontractor payments. On each of its Payment Applications, Sedona failed to provide a listing of the amount included for work performed by each subcontractor under the Contract, a listing of the total amount of each subcontract under the Contract, or a listing of the amounts previously paid to each such subcontractor under the Contract.

31. The Government has acknowledged that Sedona's payment applications did not satisfy the Contract's payment requirements, but it nevertheless approved payments to Sedona without receiving any subcontractor payment information.

32. For instance, in response to Sedona's Payment Application No. 3, the Government informed Sedona that its payment application was being returned unprocessed for several reasons. One reason provided by the Government was Sedona's failure to provide the required information related to subcontractor payments as set forth in FAR 52.232-5. In addition, the Government noted Sedona's failure to obtain an approved schedule.

33. The Government ultimately approved Payment Application No. 3 and paid Sedona, even though Sedona had not provided all of the information required by the Contract and requested by the Government.

34. The Government similarly approved Sedona's other Payment Applications submitted through October 2000 without requiring any of the

subcontractor cost control information that Sedona was required to submit as part of its progress payment requests.

35. By October 20, 2000, the Government had released $2,361,641 in Contract funds to Sedona.

36. The Government also failed to withhold any retainage from its payments to Sedona.

37. Furthermore, the Government also approved Sedona's first three Payment Applications without an approved construction schedule in place to measure progress.

38. In paying Sedona prior to October 2000, the Government violated the requirements of the Contract related to the payment process.

39. A significant amount of the $2,361,641 in Contract funds released by the Government were intended for the benefit of Sedona's subcontractors and suppliers.

40. Without F&D's knowledge or consent, a substantial amount of the funds paid by the Government to Sedona were diverted by Sedona away from the Project and not paid to the appropriate subcontractors and suppliers.

41. Sedona's failure to pay its subcontractors the amounts approved and disbursed by the Government violated the Contract, including the certification requirements in FAR 52.232-5(c).

**The Government's Notice of Irregularities in Sedona's Progress Payment Requests**

42. The Government was unable to monitor Sedona's failure to pay its subcontractors because the Government had failed to implement the cost control

procedures required under the Contract. Had these procedures been followed, the Government would have been able to verify whether or not Sedona was paying the appropriate amounts from prior progress payments to subcontractors and suppliers before making further payments to Sedona.

43. In or around August 2000, subcontractors began informing the Government of Sedona's failure to pay the amounts that had been released by the Government in progress payments to Sedona.

44. Several of Sedona's subcontractors and suppliers complained to the Government of both Sedona's nonpayment of amounts due for work performed and billed to the Government and of Sedona's unauthorized withholding of retainage.

45. For example, on October 15, 2000, Sedona's structural steel subcontractor notified the Government that it was owed substantial sums by Sedona for prior billings. In addition, Sedona's precast concrete subcontractor similarly notified the Government of nonpayment on November 1, 2000. The unpaid invoices for these two subcontractors totaled over $500,000.

46. The Government continued to receive numerous notices from unpaid subcontractors and suppliers through June 7, 2001, the date on which it terminated Sedona's Contract.

47. In the same timeframe, F&D also notified the Government that Sedona had not been paying its subcontractors the amounts received in progress payments from the Government. On November 8, 2000, for example, F&D notified the Government that it had already received payment bond claims

totaling over $28,000. F&D continued to notify the Government as it received additional payment bond claims.

**<u>The Government's Decision Not to Terminate Sedona's Contract for Default in November 2000 Despite its Knowledge of Sedona's Financial Instability</u>**

48. By November 2000, it became clear that Sedona's financial condition had deteriorated to the point that the Project's completion was jeopardized.

49. By November 2000, the Government had actual notice that Sedona had not been paying its subcontractors the amounts approved in prior payment applications.

50. By November 2000, the Government also had actual notice that certain subcontractors had asserted payment bond claims against F&D.

51. By November 2000, the Government had voiced concerns to Sedona regarding Sedona's billing irregularities.

52. For example, the Government raised concerns related to Sedona's payments to a subcontractor that was a related corporate entity to Sedona.

53. In addition, on November 8, 2000, F&D provided the Government with a voluntary letter of default from Sedona. F&D's letter forwarding Sedona's voluntary letter of default warned the Government that "F&D has become aware of circumstances that indicate that Sedona Contracting, Inc. is financially unable to pay for the completion of the Project."

54. F&D subsequently provided additional information that demonstrated that Sedona was financially imperiled. F&D also demanded that any further payments to Sedona be made to a joint account that was controlled by F&D.

55. F&D also requested that the Government terminate Sedona's Contract for default and allow F&D to takeover and complete the work.

56. F&D took this action to mitigate damages and to complete the work as quickly and cost effectively as possible.

57. On or about November 16, 2000, the Government informed Sedona that it had decided not to terminate Sedona's Contract for default. The Government maintained the position that Sedona's progress was not behind schedule and reiterated this position in a letter to F&D, dated November 20, 2000.

58. Although the Government asserted to F&D that Sedona was not behind schedule as of November 2000, the Government simultaneously threatened to withhold Sedona's progress payments due to its schedule showing unsatisfactory progress.

59. For instance, in a letter to Sedona, dated November 29, 2000, the Government informed the contractor that "[u]pon review of your progress schedule, we noted several construction activities with negative total float indicating that your progress on this project is less than satisfactory."

60. The Government's November 29th letter further notified Sedona that it must correct the deficiencies in the scheduling of its work. The Government concluded that "[i]f these deficiencies are not corrected, we will retain 10% of your November 2000 pay request, in accordance with Contract Clause 79 of Contract Section 00700, due to your schedule showing unsatisfactory progress."

**<u>Forestalling the Inevitable: The Government Allows Sedona to Continue Work from November 2000 until June 2001</u>**

61. Despite the Government's concerns regarding Sedona's failure to make progress and its failure to pay its subcontractors, the Government allowed Sedona to proceed with its work.

62. The Government, however, modified its administration of the payment process beginning with Sedona's Application for Payment No. 8, originally submitted on or about November 21, 2000.

63. In response to Sedona's Application for Payment No. 8, on or about November 27, 2000, the Government notified Sedona that this request was being returned unprocessed due to Sedona's failure to provide the subcontractor cost control information required under FAR 52.232-5(b)(1)(ii), (iii), and (iv).

64. Beginning with Application Payment No. 8, the Government now insisted that Sedona was required to submit the detailed subcontractor cost control information required under FAR 52.232-5(b)(ii), (iii), and (iv), which includes a listing of the amount included for work performed by each subcontractor under the contract, a listing of the total amount of each subcontract under the contract, and a listing of the amounts previously paid to each such subcontractor under the contract.

65. The Government rejected Sedona's Payment Application Nos. 8, 9, and 10 because Sedona had failed to submit payment applications that were in compliance with the Contract requirements.

66. As a result, the Government ceased making payments to Sedona on the Project following its Payment Application No. 7, approved on October 20, 2000.

67. Between October 2000 and May 2001, the Government approved a portion of one additional payment request, approving a partial payment of $45,851 in Contract Funds for Payment Application No. 8 on December 19, 2000.

68. The Government knew that Sedona was unable to provide the required subcontractor information and certifications because it had diverted funds away from the Project. Nevertheless, the Government allowed Sedona to remain under Contract.

69. After November 2000, the Government refused to release Project funds until Sedona could remedy the irregularities in its prior payment requests and provide a payment application that complied with the FAR and included the subcontractor cost control information required under FAR 52.232-5(b)(ii), (iii), and (iv).

70. Sedona was unable to make progress following November 2000 because the Government belatedly insisted that Sedona meet the subcontractor cost control requirements that the Government had previously ignored and/or waived and suspended Project funding, halting progress on the Project.

71. In December 2000, the Government continued to express concern regarding Sedona's lack of progress and financial inability to complete the work.

72. For example, in a letter dated December 22, 2000, the Government notified Sedona of its concerns regarding Sedona's ability to complete the work. The Government notified Sedona that "[w]e have been advised by your structural steel supplier that Sedona has billed the Government $233,000.00 for structural

steel and has failed to make payment to the supplier after receiving payment from the Government. We have further been advised by F&D that they have paid the structural steel supplier $200,000.00 under their Miller Act Payment Bond." The Government further requested that Sedona provide "documentation that your company has sufficient financial resources to complete the project and that your company intends to complete the project."

73. On February 5, 2001, the Contracting Officer's Representative notified Sedona that he was "very concerned with the news that two of your [Sedona] main subcontractors have walked off the project . . . ."

74. At around the same time, in a letter to F&D's counsel, dated February 8, 2001, the Government asserted that Sedona was in breach of its contractual obligations for its failure to pay subcontractors. Nevertheless, the Government noted that "other than the failure to pay subcontractors, they are not in breach of their contractual obligations."

75. Sedona acknowledged that its subcontractors remained unpaid, yet it continued to request that the Government release Contract funds. For example, on February 12, 2001, Sedona notified the Government that several of its subcontractors were refusing to work until they received payment.

76. In or around February 2001, the Government acknowledged in an internal memorandum that based upon his experience, "Sedona will not complete the project." This memorandum noted that "Sedona has no assets other than the unpaid contract balance to finance the Lackland job," which the Government was not releasing to Sedona. Despite the Government's accurate assessment of the

Project's status, the Government continued to ignore F&D's takeover request, instead remaining content to stand by while the Project continued to deteriorate.

77. Similarly, on or about March 28, 2001, the Government's Resident Engineer completed a Project Performance Evaluation for Sedona in which he acknowledged the current status of the Project: "[Sedona] had not paid his subcontractors for work performed from 1 November 2000 through 28 February 2001, therefore, forcing the subcontractors to leave the jobsite and not come back until they get paid. This is impacting the progress and delaying the project."

**The Government's Show Cause Notice and Default Termination of Sedona's Contract**

78. On May 7, 2001, the Government again notified Sedona that it was in default of its obligations under the Contract.

79. In its letter to Sedona dated May 7, 2001, the Government notified Sedona that "[t]he failure of Sedona to make timely payment to its subcontractors and suppliers is a breach of Sedona's contractual obligations."

80. The Government's May 7th letter also noted that little work was being performed at the site, which it attributed to subcontractors that left the project due to Sedona's failure to make payment.

81. The Government's May 7th letter asserted that the then-current Contract Completion Date was September 29, 2001, less than five months away. According to the Government, Sedona's ability to complete the remaining work within the remaining Contract duration was doubtful.

82. In the final paragraph of its May 7th letter, the Government directed Sedona to show cause as to why its Contract should not be terminated for

default, providing Sedona with five (5) working days to present, in writing, any facts bearing on the Contracting Officer's decision on the matter.

83. One month later, on June 7, 2001, the Government terminated Sedona's Contract for default, citing Sedona's "failure to employ subcontractor's [sic] who are critical to the completion of key activities, their failure to obtain critical equipment which has a long lead time, and their failure to man the project with a work force which is capable of completing the project in a timely manner." The Government further noted that "[n]umerous subcontractors have abandoned the site and refused to perform further work due to Sedona's failure to make subcontractor payments."

84. Following Sedona's termination, the Government demanded that F&D takeover and prosecute the work to its completion in accordance with its Bond obligations.

85. The Government had been on notice of Sedona's failure to make payments to its subcontractors for many months, dating back to the first notices that it had received in or around August 2000.

86. Nevertheless, the Government allowed Sedona to remain under Contract, but without any income stream to perform the work. The Project languished from November 2000 until Sedona's default termination in June 2001.

**<u>F&D's Takeover of the Project</u>**

87. In response to the Government's default notice and demand on the Bond, F&D immediately commenced performance of Sedona's obligations.

88. F&D entered into a Takeover Agreement with the Government on June 26, 2001, pursuant to its obligations under the Performance Bond, in order to complete the work remaining on the Contract.

89. In accordance with the Takeover Agreement, F&D contracted with W.G. Yates & Sons Construction Co. to complete the work on the Project.

90. F&D incurred substantial additional costs in completing the work as a result of the Government's failure to properly administer the Contract and failure to terminate the Contract until June 7, 2001.

91. With respect to its Takeover Agreement with the Government, F&D has submitted a certified claim to the Contracting Officer in order to receive a final decision on those claims which are deemed by the Contracting Officer to be covered by the CDA. The Corps has notified F&D that it intends to issue a Contracting Officer's final decision by July 2006.

92. F&D has satisfied all conditions precedent required to assert its equitable subrogation claims against the Government in the present action.

**Count I**
(Impairment of Suretyship: The Government's Improper Administration of the Quality Control and Payment Process)

93. All of the allegations set forth above, which are set forth in paragraphs 1 through 92, are incorporated herein by reference.

94. The Government, as Bond obligee and Contract stakeholder, had a duty to administer the Contract during the course of Sedona's performance in a manner that would not increase the risk undertaken by F&D as surety when it originally issued the Bond.

95. The Government breached its contractual duties and its duties to F&D as surety by its improper administration of the Contract during the time of Sedona's performance, including by its improper administration of the Contract's quality control and payment procedures.

96. The Government breached its contractual duties and its duties to F&D as surety by making progress payments to Sedona despite Sedona's failure to comply with the Contract's quality control requirements. The Government further breached its duties as Contract administrator and Bond obligee by failing to withhold any retainage on its progress payments to Sedona.

97. The Government also breached its duties as Contract Administrator and Bond obligee by its mishandling of the payment process.

98. The Government breached its duties as Contract Administrator and Bond obligee by making progress payments to Sedona despite Sedona's failure to provide complete and accurate cost control information pertaining to the payment status of its subcontractors as required by the Contract and applicable regulations. The Government further breached these duties by failing to withhold any retainage on those progress payments.

99. The Government also breached its duties as Contract Administrator and Bond obligee by allowing Sedona to proceed with the Contract from in or around November 2000 until June 7, 2001, after receiving notice that Sedona was not current on its payments to subcontractors and had misused Project funds previously paid by the Government.

100. F&D's performance bond risk was materially altered by the Government's maladministration of the Quality Control and Payment procedures.

101. F&D was prejudiced by the Government's breach of its duty to properly administer the Contract in a manner that would not alter F&D's risk, and F&D incurred substantial additional costs as a result of the Government's actions.

**Count II**

(Impairment of Suretyship: Failure to Exercise Reasonable Discretion in Administering the Terminating Process)

102. All of the allegations set forth above, which are set forth in paragraphs 1 through 101, are incorporated herein by reference.

103. The Government, as Bond obligee and Contract stakeholder, had a duty to account for the interests of F&D, as surety, in deciding whether to terminate Sedona's Contract for default.

104. The Government breached this duty by failing to terminate Sedona's Contract for default until June 7, 2001.

105. By November 2000, the Government had notice that Sedona was not paying its subcontractors in accordance with its obligations under the Contract and had misused Project funds previously paid by the Government.

106. By November 2000, the Government had been notified by F&D that Sedona was financially unable to complete the work and had no revenue stream to complete the Project other than through its progress payments.

107. By November 2000, the Government was also aware that Sedona was not making progress in accordance with the Project Schedule.

108. By February 2001, the Government acknowledged in an internal memorandum that Sedona would not complete the Project and that Sedona had no assets other than the Contract Balance to finance the Project. The Government also acknowledged that it would not release additional funds to complete the Project until Sedona's prior progress payment irregularities were resolved.

109. The Government failed to issue a show cause notice to Sedona until May 7, 2001, and it failed to terminate Sedona's Contract for default until June 7, 2001.

110. In both its show cause notice and its default termination notice, the Government cited Sedona's failure to pay its subcontractors as the primary reason for Sedona's lack of progress on the Project.

111. The Government had notice of the irregularities in Sedona's progress payments to its subcontractors in November 2000, but it waited approximately seven months before terminating Sedona's Contract. As of November 2000, the Government cut off Sedona's revenue stream by rejecting Sedona's Payment Application Nos. 8, 9, and 10 due to Sedona's failure to provide the required information related to its subcontractors.

112. The Government improperly allowed Sedona to remain under Contract, making no progress in the work from November 2000 until June 2001 without any revenue stream and with unresolved irregularities in its prior payment applications, outstanding subcontractor claims for nonpayment by Sedona, notice

from F&D that Sedona was financially unable to complete the work, and concerns regarding Sedona's unsatisfactory progress.

113. F&D's performance bond risk was materially altered by the Government's maladministration of the default process.

114. F&D was prejudiced by the Government's failure to exercise reasonable discretion in making its decision to terminate Sedona's Contract for default, and F&D incurred substantial additional costs as a result of the Government's actions.

WHEREFORE, Plaintiff F&D respectfully requests that judgment be entered in its favor against the United States on Counts I and II in the amount of not less than $1,145,221, plus interest and costs, any other recoverable costs, and F&D requests any such further relief as is deemed proper by this Court.

Dated: March 7, 2006

Respectfully Submitted,

Christopher J. Brasco, Esquire
Christopher M. Anzidei, Esquire
8405 Greensboro Drive, Suite 100
McLean, VA 22102
(703) 749-1000
Counsel for the Plaintiff