IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff, | ) No. 06-186C |
| v. | ) (Judge Block) |
| THE UNITED STATES, Defendant. | ) |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits these proposed findings of uncontroverted fact in support of defendant's motion for summary judgment.

A. Sedona Awarded Construction Contract

1. Sedona Contracting Incorporated ("Sedona") was awarded a contract by the US Army Corps of Engineers ("the Corps") on September 23, 1999, (DACA63-99-C-0039) to construct vehicle operations and maintenance facilities at Lackland Air Force Base, Texas. Appendix ("App.") 1-2. The total contract lump-sum price was initially $6,077, 257.00. Id.

2. On October 25, 1999, Sedona secured a performance bond in the amount of $6,077,257.00 and a payment bond in the amount of $2,500,000.00 from Fidelity & Deposit Company of Maryland ("Fidelity" or "F & D"), which named F & D as surety, Sedona as principal and the United States as obligee. App. 3-8.

3. Notice to proceed with construction was acknowledged by Sedona on November 15, 1999. App. 9.

4. The contract, section 01451, para 3.2.1, required Sedona to submit a contractor's

Quality Control Plan ("CQC Plan") for review within five days of the notice to proceed. App. 53-54. Construction could only begin after acceptance of the CQC Plan or acceptance of an interim plan, available for the first 60 days of operations. Id.

5. Sedona submitted its initial CQC Plan on December 2, 1999. App. 55-76.

6. The Corps, by letter dated December 8, 1999, gave Sedona's plan interim acceptance, noting program deficiencies that required correction. App. 55-76. One deficiency noted the inability to determine if the proposed CQC Plan systems manager, Mr. Harrell, had the requisite experience. Id.

7. The contract, section 01451, para 3.4.2, specified education and/or work experience requirements for the CQC Plan system manager, to include being a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work. App. 77-78.

8. The duration of the contract was set at 669 days. App. 10.

9. The contract with Sedona was modified nineteen times between March 2, 2000 and June 7, 2001. App. 11-52. The final modification was the termination of the contract for default. Id.

B. Sedona's Quality Control Issues

10. By letter dated January 26, 2000, Sedona substituted Mr. Arthur Perez for Mr. Harrell as its CQC Plan manager. Mr. Perez satisfied the requirement of five years of construction experience in related work. App. 82-85.

11. On January 26, 2000, the Corps conditionally accepted Mr. Perez as CQC Plan

manager and contemporaneously notified Sedona that the Corps was still awaiting a reply to the CQC Plan deficiencies noted in its December 8, 1999 letter. App. 79-80.

12. On February 4, 2000, Sedona provided the Corps with its revised CQC Plan program, which the Corps approved in a letter dated February 25, 2000. App. 86.

13. Sedona was responsible for inspection of work and quality control under the contract, however, the Corps had the right to reject any nonconforming work. App. 98. The contractor remained liable for replacing or correcting work found not to conform to the contract. App. 99-121.

14. The Government did not have a contractual obligation to inspect the work in progress. App. 98. The Corps performed a quality assurance function under the contract, making periodic inspections of the project. Id.

15. On December 22, 2000, the Corps notified Sedona by letter of several quality control issues found to be unacceptable, including failure to protect the concrete foundation for the vehicle maintenance facility from freezing temperatures; conducting a masonry preparatory inspection without the appropriate foreman and the absence of follow-up inspection; the failure to schedule and conduct initial inspections; scheduling preparatory inspections without approved submittals; work being performed without a preparatory phase; the CQC Plan manager not spending adequate time in the field; and the CQC Plan manager performing administrative duties inconsistent with his primary duties. The Corps advised that it would consider recommending removal of the superintendent and/or the CQC Plan manager unless performance improved. App. 122-125.

C. Payment of Contract Proceeds

16. Payment of contract proceeds is governed by contract section 0700, ¶ 79 and FAR 52-232-5, "Payments Under Fixed-Price Construction Contracts", and contract section 0700, ¶ 82 FAR 52.232-27, "Prompt Payment for Construction Contracts." App. 129-137. Generally, progress payments are made monthly to the contractor as the work proceeds. Id. The contract required Sedona to provide a list of the amount of work performed by each subcontractor, a list of the total amount of each subcontract and a list of the amount of previous payments to the subcontractors. App. 346; FAR 52.232-5(b)(1)(ii)-(iv). In addition, each request for payment required Sedona to certify that the amounts requested were only for performance in accordance with the contract; that payments to subcontractors and suppliers had been made from previous payments received; that timely payments would be made from the proceeds covered by the present certification; and that the request for progress payments did not include any amount Sedona intended to withhold or retain from a subcontractor or supplier. App. 129-137; FAR 52.232-5(c)(1)-(3).

17. Contract section 0700, ¶ 70, FAR 52.232-5(e), provides the contracting officer with the discretion to withhold up to 10% of the amount of the authorized progress payment if unsatisfactory progress has been made during that period. App. 130-31. "The contracting officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." App. 130 (emphasis added).

18. The Corps received and processed for payment seven progress payment applications from Sedona between December 27, 1999 and October 20, 2000. App. 138-152. With each application package Sedona included a certification pursuant to FAR 52.232-5(c)(1)-(3), which

required Sedona to properly use funds distributed to it by the Corps. Id. However, information regarding the amount owed and amount paid subcontractors, required by FAR 52.23205(b)(1)(ii)-(iv), was not provided by Sedona and the Corps did not initially require its submission before making payment. Id.

19. A total of eleven numbered progress payment applications were received from Sedona while the contract was in effect. App. 138-177. Beginning with progress payment application number eight, the Corps notified Sedona that it would begin enforcing the contractual requirement to provide the subcontractor payment information breakdown. App. 153. For progress payment number eight, Sedona was only paid $45,851.00. Id. The Corps deducted $238,307.00 for non-payment of subcontractors. Id. A joint bank account was set up for payment to Sedona and Fidelity on February 12, 2001. App. 493. Payment estimate numbers 9 and 10 were paid out to the joint bank account. App. 166, 493, 494. Payment estimate number 11 was paid solely to Fidelity. App. 177, 492, 493.

D. Adversarial Relationship Between Sedona and F & D

20. In October 2000, the Corps received a year-old letter, dated October 25, 1999, from Sedona advising it was voluntarily defaulting and terminating the contract. App. 178, 181.

21. In October 2000, the Corps received a year-old letter, dated October 25, 1999, from Sedona requesting that any remaining monies due under the contract be deposited in a joint account with F & D. App. 179, 181.

22. The Corps received a letter dated October 30, 2000, from F & D requesting compliance with the Sedona October 25, 1999 letter on payment of contract funds. App. 181.

23. Sedona subsequently notified the Corps that the October 25, 1999 voluntary default

letter was obtained from it by F & D under duress and that it intended to continue performance on the contract. App. 181-182; See e.g. 495 - 497.

24. The U.S. District Court for the Western District of Texas issued an order, dated December 6, 2000, for Sedona to pay into a joint bank account with F & D all proceeds from various Federal projects Sedona was engaged in with F & D as surety. App. 183-89. Although the Corps was not a party to the litigation, the Corps determined that it would comply with the direction of the district court, even though not specifically addressed to do so, and made payments to the joint account. App. 193-95.

E. Sedona Fails to Pay Subcontractors and Fidelity Demands that the Corps Stop Payment of Contract Proceeds

25. As early as May 2000, the Corps was notified by a subcontractor that Sedona had not paid for materials acquired for use on the contract. App. 196. The Corps responded that it could not directly provide recovery, as no privity of contract exists between subcontractors and the Corps. App. 197, 203, 233. Further, under the Miller Act, 40 U.S.C. 270, the subcontractor must seek redress through Sedona's surety on its payment bond if Sedona refuses to pay. App. 5-8, 197, 203, 233. Although the Corps did not make any direct payments to subcontractors, in September and December 2000, the Government did deduct the amount owed subcontractors from payments made to Sedona. App. 153-54, 498. Approximately 11 subcontractors contacted the Corps about non-payment by Sedona for materials and/or services provided for the contract. App. 196-245.

26. F & D negotiated a compromise payment of $200,000.00 for subcontractor H & M Steel. App. 245. Fidelity does not allege that it settled the claims of any other subcontractors. Compl.

27. On November 8, 2000, Fidelity demanded that the Corps not release any other funds to Sedona without the advance written consent of Fidelity. App. 495. Fidelity stated that Sedona was financially unable to pay for the completion of the project and that subcontractors on the project had asserted claims under the payment bond totaling $443,550.63. Id. Again, by a letter dated December 1, 2000, F & D demanded that the Corps stop payment of contract funds to Sedona, and honor the letter of default submitted by Sedona on October 25, 1999, in order to permit F & D to avail itself of the doctrine of equitable subrogation as a surety. App. 268-73. Fidelity asserted that the Corps had abused its discretion by "the Corps' failure to honor the voluntary letter of default and its attendant failure to escrow contract funds." App. 268.

28. The Corps informed F & D's counsel by letter dated December 8, 2000, that Sedona was then on contract schedule (37% complete) and that the Government's right to terminate the contractor's right to proceed with a contract for default is limited to those circumstances wherein the contractor is not making sufficient progress to insure that the contract will be completed by the contract completion date. App. 274-280. By permitting Sedona to continue, the Corps was balancing both contractual obligations to Sedona and F & D's rights as surety. Id.

29. Fidelity responded on December 12, 2000, asserting that Sedona had failed to make subcontractor payments in excess of $550,000.00, its financial situation continued to deteriorate, and that it would be unable to complete the contract with remaining funds. App. 281-82. Fidelity asserted that the Corps, after notice, took no steps to investigate the alleged nonpayment of subcontractors. App. 285. F & D notified the Corps of its intent to setoff bond losses on this contract against other projects it had bonded with the Federal Government. App. 286.

F. Sedona's Capacity To Complete The Contract

30. On December 20, 2000, F & D provided to the Corps an accountant's summary evaluation of the financial condition of Sedona. App. 288-89. The summary stated that Sedona would not be able to meet its obligations because its short term liabilities exceeded liquid assets by nearly $400,000.00. App. 289

31. The Corps, by letter dated December 22, 2000, notified Sedona of F & D's assertions concerning capacity to complete the contract and nonpayment of subcontractors. App. 294. The Corps requested a meeting with Sedona in order to address the assertions. App. 294.

32. Sedona, by letter dated January 8, 2001, asserted that it had sufficient financial resources and was committed to completing the contract. App. 295-99. Specifically, Sedona stated it has sufficient financial assets to complete the project because all payments to Sedona would be made through a joint account on which both F&D and Sedona were signatories. App. 295. Sedona provided the Government with a cash flow projection which indicated that "a positive cash flow [existed] for this project." App. 296.

G. Sedona's and Fidelity's Joint Bank Account

33. Attached to a letter dated January 11, 2001, was a copy of a January 3, 2001 letter from Sedona to the Corps that requested future payments under the contract be made to a joint bank account with F & D. App. 300-302. Sedona informed the Corps, on January 22, 2001, about the manner in which F & D was administering their joint bank account, specifically accusing F & D of sabotage by the surety's refusal to sign checks for payments. App. 181. As a result, Sedona requested that the Corps make direct payments to it. App. 182.

34. The Corps decided to make contract payments to the joint Sedona and F & D bank account in accordance with the district court order setting up the account. App. 193-95. The Corps began making payments to the joint account after it was set up in February 2001. App. 493.

35. By letter dated March 5, 2001, F & D defended its decision not to countersign checks submitted by Sedona for payment based upon an alleged lack of accompanying adequate information to evaluate the propriety of the payments. App. 308-310. F & D also asserted that Sedona failed to provide a proper project budget. App. 309.

H. Subcontracting Supervision of the Contract

36. F & D provided notice to the Corps, by a letter dated February 14, 2001, that Sedona had further breached the contract and violated FAR 52.236-6, Superintendence by the Contractor, by subcontracting responsibility for supervision of the contract to 3TI, Inc. App. 305-306.

37. The Corps responded to F & D on March 20, 2001 by stating that the subcontracting of the supervision of the contract was authorized under the contract clause. App. 312. "The superintendence of construction clause requires the project to be superintended by the contractor or a competent superintendent who is satisfactory to the [c]ontracting [o]fficer and who has authority to act for the contractor." Id. "The clause does not require the superintendent to be a direct employee of the contractor." Id.

I. Sedona's Termination & Fidelity's Takeover

38. Sedona demanded that the Corps either force F & D to pay subcontractor invoices or pay the invoices itself. App. 314. On March 22, 2001, the Corps notified Sedona that it would not comply with a request that placed responsibility upon the Corps to assure payment of

subcontractors. Id. The Corps also informed Sedona that the Government was aware that several of Sedona's subcontractors were either refusing to work or threatening to walk off the job due to nonpayment. Id. The Corps expressed concern that Sedona's ability to complete the project in a timely manner was being adversely affected. Id. The Government posed the possibility of a no-cost termination of the contract, noting that the surety would be interested in taking over the project. App. 315.

39. Sedona, by letter dated March 30, 2001, notified the Corps of several checks F & D had refused to sign for job costs, indicating that the Corps had to either force F & D to pay or pay the vendors itself. App. 316. Otherwise, the services would be terminated by April 9, 2001. Id.

40. The Corps issued a letter on May 7, 2001, directing Sedona to show cause why the contract should not be terminated for default. App. 318-321. The Corps noted the departure of subcontractors from the job site due to Sedona's failure to make timely payments, the small amount of work currently in progress, and the fact that only 63% of the contract work was completed with 79% of the duration elapsed. App. 318.

41. On May 16, 2001, Sedona responded to the Corps show cause letter. App. 322. Sedona asserted that it was entitled to a time extension of at least 144 days, and therefore was not behind schedule. App. 338. Sedona noted the Corps had not made any payments to Sedona since November 2000, impacting the ability to pay subcontractors, and impacting the subcontractors' ability to continue work on the job. App. 322.

42. The Corps responded to counsel for Sedona on May 30, 2001. App. 342-351. The Government determined that Sedona's claims of Corps' delay and failure to make timely

payments were meritless. Id. Specifically, delays to the project resulted from "delays caused by Sedona in not starting and completing activities on the maintenance building as required under their schedule." App. 342.

43. The Takeover Agreement became effective in June 2001. App. 44-50. At that time, a total of $2,886,371 had been paid to Sedona. App. 45. The balance on the contract (including change orders that increased the original contract price) amounted to $2,945,715.51. Id.

44. By the time the contract was completed in September 2003, the total contract price had been increased, through several modifications, to $6,235,880.21. App. 11-51, 492. Fidelity was paid almost all of the remaining balance on the contract, except for $100. App. 492.

J. Procedural History

45. The Corps notified Sedona on June 7, 2001, that it terminated the contract for default. App. 352-360.

46. The Corps notified F & D of the contract default termination, on June 7, 2001, and demanded the surety takeover the project. App. 361-62.

47. F & D and the Corps entered into a takeover agreement on June 26, 2001. App. 44 The contract was modified in August 2001 to reflect the agreement. App. 50.

48. Sedona provided the Corps, on July 24, 2001, with a $1,347,793.00 claim for work performed but not paid as a result of the contract termination. App. 364, 372.

49. Sedona submitted to the Corps, on July 25, 2001, a second claim for $303,600.83 for delays experienced under the contract. App. 374-377.

50. On August 14, 2001, counsel for Sedona filed a complaint with the Armed Services Board of Contract Appeals ("ASBCA"), appealing the Corps termination of the contract for default. App. 378-399.

51. The Corps answered the ASBCA complaint. App. 400-419.

52. The Corps notified counsel for Sedona on August 15, 2001 that, due to workload, staffing, and the approaching fiscal year end, it did not anticipate issuing a final decision on the unpaid work and delay claims until December 21, 2001. App. 420

53. On September 18, 2001, counsel for Sedona notified the Corps that Sedona had filed for bankruptcy on August 31, 2001. App. 421.

54. The ASBCA was advised of the Sedona bankruptcy and ordered the production of related documents. App. 424. Sedona agreed to dismiss the appeal and the ASBCA so ordered on November 20, 2001. Id. Sedona also agreed to suspend processing of its two claims until the bankruptcy trustee made an authorization determination. App. 425.

55. Fidelity moved for relief from the automatic stay in bankruptcy with respect to the contract funds. App. 426-31. On November 13, 2001, the bankruptcy court issued an order allowing Fidelity to take control of remaining contract balances, and permitting the Government to terminate the Sedona contract. App. 489.

56. Fidelity began negotiations with counsel for the Corps, by letter dated August 21, 2003, for its entire bond losses. App. 440. Fidelity alleges that the Corps fundamentally altered the risk assumed as surety, and all losses were caused by the Corps alleged failure to timely terminate Sedona in late 2000. App. 440.

57. By letter dated August 22, 2003, Fidelity requested $938,391.32 as owed for contract performance. App. 448.

58. The Corps, by letter dated September 16, 2003, informed Fidelity that a pay estimate for $781,667.68 was being processed for contract performance, and indicated that the Corps complied with its duty to consider the surety's interests in the administration of this contract. App. 450 -456.

59. By letter dated March 4, 2004, F & D maintained that the Corps had impaired its suretyship in the contract. App. 457-464.

60. By letter dated June 1, 2004, F & D requested that the dispute be submitted to a mediator. App. 465-466.

61. On June 17, 2004, the Corps declined mediation because of the parties' drastic divergence in positions. App. 467-475.

62. By letter dated August 19, 2004, F & D requested the Corps to reconsider its June 17, 2004 decision. App. 476-480.

63. On October 20, 2005, F & D agreed to a modification to settle one of the claims (soil disposal). App. 481-84.

64. By letter dated January 13, 2006, counsel for F & D filed a claim with the contracting officer under the Contract Disputes Act against the Corps in the amount of $1,416,179.37. App. 485-88.

65. The Corps informed Fidelity that due to the complexity of the claim, office staffing and workload, it anticipated providing a contracting officer's final decision on the claim in July 2006. Complaint ("Compl.") ¶ 91.

66. On March 7, 2006, F & D filed the instant case in the United States Court of Federal Claims. Compl.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Elizabeth Thomas
ELIZABETH THOMAS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
tel: (202) 353-4175
fax: (202) 307-0972

June 23, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2006 a copy of the foregoing "**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**" was filed electronically. I understand that the notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth Thomas