No. 06-186C
(Judge Block)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FIDELITY AND DEPOSIT COMPANY OF MARYLAND,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Elizabeth Thomas
ELIZABETH THOMAS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street
Washington, D.C. 20530
tel: (202) 353-4175
fax: (202) 307-0972
Attorneys for Defendant

June 23, 2006

TABLE OF CONTENTS

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Statement Of The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. The Corps' Exercise Of Its Discretion Did Not Impair Fidelity' Rights As Surety Under The Contract With Sedona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

American Insurance Company v. United States,
62 Fed. Cl. 151 (2004) . . . . . 5

Anderson v. Liberty Lobby, Inc,
477 U.S. 242 (1986) . . . . . 4

Appeal of Technocratica,
1993 WL 556853 (A.S.B.C.A. No. 44134, 1993) . . . . . 10

Argonaut Insurance Co. v. United States,
434 F.2d 1362 (Cl. Ct. 1970) . . . . . passim

Balboa Insurance Co. v. United States,
775 F.2d 1158 (Fed. Cir. 1985) . . . . . 4, 11, 12, 17

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . 4

Curtis v. United States,
144 Ct. C 168 F. Supp 213 (1958), cert. denied 361 U.S. 843 (1959) . . . . . 4

Fireman's Fund Insurance Company v. United States,
909 F.2d 495 (Fed. Cir. 1990) . . . . . 7, 8, 12, 15

Insurance Company of the West v. U.S.,
55 Fed. Cl. 529 (2003) . . . . . 16, 17, 18

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. (1987) . . . . . 10

National Surety Corporation v. United States,
118 F.3d 1542 (Fed Cir, 1997) . . . . . 5, 7, 8, 9

Pearlman v. Reliance Insurance Company,
371 U.S. 132 (1962) . . . . . 16

**TABLE OF AUTHORITIES**
**-continued-**

**CASES** **PAGE(s)**

Royal Indemnity Co.,
529 F.2d at 1320-21 . . . . . . . . . . 12, 13

Sweats Fashions, Inc. v. Pannill Knitting, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 4

Transamerica Insurance Company v. United States,
989 F.2d 1188 (Fed. Cir. 1993) . . . . . . . . . . 16

US Fidelity and Guaranty Company v. United States,
201 Ct. C 475 F.2d 1377 (1973) . . . . . . . . . . 5, 12, 13

United Electric Company v. United States,
647 F.2d 1082 (Ct. Cl. 1981) . . . . . . . . . . 16

US Fidelity and Guaranty Co. v. United States,
676 F.2d 622 (Ct. Cl. 1982) . . . . . . . . . . 11, 12, 13

United States v. Munsey Trust Co.,
332 U.S. 234 (1947) . . . . . . . . . . 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-186C |
| | ) | (Judge Block) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests the Court to grant summary judgment upon behalf of the Government because there is no genuine issue of material fact and the United States is entitled to judgment as a matter of law. In support of this motion, we rely upon plaintiff's complaint, the accompanying defendant's proposed findings of uncontroverted fact, and the following brief and appendix.

**DEFENDANT'S BRIEF**

**STATEMENT OF THE ISSUE**

(1) Whether the Corps' conduct in the exercise of its discretion impaired Fidelity & Deposit Company of Maryland's rights as surety under the contract with Sedona..

**STATEMENT OF THE CASE**

I. Nature Of The Case

Fidelity & Deposit Company of Maryland ("Fidelity" or "F & D") brings an equitable subrogation claim based upon the Government's alleged improper pre-default administration of the contract with Sedona Contracting Incorporated ("Sedona") and the Government's decision to terminate the contract with Sedona in June 2001, instead of in November 2000. Compl. 2.

Sedona was awarded a contract by the US Army Corps of Engineers ("the Corps") on September 23, 1999, to construct vehicle operations and maintenance facilities at Lackland Air Force Base, Texas. Appendix ("App.") 1-2. On October 25, 1999, Sedona secured a performance bond in the amount of $6,077,257.00 and a payment bond in the amount of $2,500,000.00 from Fidelity, which named Fidelity as surety, Sedona as principal and the United States as obligee. App. 3-8. Fidelity is not entitled to recovery under the theory of equitable subrogation because it appears that Fidelity has not discharged all of its outstanding subcontractors claims. See Insurance Company of the West v. United States, 55 Fed. Cl. 529, 538 (2003). Furthermore, upon assuming the rights of the contractor through subrogation, the surety is only entitled to payment of the existing contract balance from the Government. Balboa Insurance Co. v. United States, 775 F.2d 1158, 1163 (Fed. Cir. 1985). Fidelity completed the contract after Sedona's termination for default and has already been paid the balance of the contract proceeds. App. 45, 492. Because no unpaid balance exists, Fidelity is not entitled to any recovery. Apparently, Fidelity seeks to recover monies paid to Sedona before Sedona defaulted on the contract based upon the Government's alleged abuse of discretion in paying out those funds and alleged inexcusable delay in terminating the contract. The Corps exercised reasonable discretion in its administration of the contract and in its eventual decision to terminate the contract. Therefore, the Government's motion for summary judgment should be granted.

## II. Statement Of The Facts

For a detailed statement of the facts, defendant respectfully refers the Court to the accompanying Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF").______

**SUMMARY OF THE ARGUMENT**

Fidelity asserts under its equitable subrogation claim that the Corps improperly administered Sedona's Contractor Quality Control ("CQC") Plan, mishandled the contract payment process and failed to timely terminate the contract with Sedonna to Fidelity's financial detriment. However, in order to bring an equitable subrogation claim, the surety must first resolve any outstanding subcontractor claims. Fidelity does not allege in its complaint to have done this. Furthermore, although Fidelity asserts a damage claim of "no less than $1,145,221" Fidelity is not entitled to recover any further proceeds from the contract because Fidelity has already received the remaining balance on the defaulted contract, pursuant to the Takeover Agreement it entered into with the Corps. Apparently, Fidelity believes it is entitled to recover monies the Corps paid to Sedona before the contract was terminated because the Corps allegedly abused its discretion in the administration and termination of the contract with Sedona. But the Corps acted reasonably within its discretion in the administration of the CQC Plan. Specifically, the contract specifications permitted the Corps to accept an interim CQC Plan from Sedona; the systems manager chosen for the project met the requirements for the position; and the Corps made periodic inspections of the project. The Corps also acted reasonably within its discretion in the handling of the contract payment process. Although the Corps initially permitted Sedona to submit payment applications without the required subcontractor reporting information, once Fidelity put the Corps on notice that subcontractors were not being paid the Corps enforced that term of the agreement and refused to make any other payments to Sedona, without the subcontractor breakdown information. Finally, the decision to terminate Sedona's contract in June 2001, instead of earlier, was justified and in no way an abuse of discretion, given the competing rights and interests that existed and had to be weighed.

## ARGUMENT

I. Standard Of Review

The procedure of summary judgment is properly regarded not as a disfavored shortcut, but rather as an integral part of the Court rules as a whole, designed to secure a just, speedy and inexpensive determination of every action. Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)); accord Sweats Fashions, Inc. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987). "The focus in determining whether summary judgment is appropriate is the lack of disputed material facts. A material fact has been defined as a fact that will make a difference in the outcome of a case." Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp 213, 216 (1958), cert. denied 361 U.S. 843 (1959). Stated differently, only disputes over facts that might affect the outcome of a suit will properly prevent an entry of judgment. Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986).

"Where the Government is entitled to exercise its discretion, 'the plaintiff has an unusually heavy burden of proof in showing that the determination made ... was arbitrary and capricious.'" Balboa Insurance Co. v. United States, 775 F.2d 1158, 1163 (Fed. Cir. 1985) (citing Royal Indemnity Co. v. United States, 529 F.2d 1312, 1320 (Ct .Cl. 1976)). However, this discretion and flexibility is limited by the Government's duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract. Argonaut Insurance Co. v. United States, 434 F.2d 1362, 1368 (Cl. Ct. 1970).

II. The Corps' Exercise Of Its Discretion Did Not Impair Fidelity' Rights As Surety Under The Contract With Sedona

A. Fidelity Can Not Prevail Upon It's Claim Of Equitable Subrogation

Fidelity brings an equitable subrogation claim based upon the Government's alleged improper administration of the Sedona contract and the alleged delayed termination of the Sedona contract. Compl. page 2. Equitable subrogation is based upon the common law concept that the surety, who pays the debt of the contractor, is entitled to the rights of that contractor to be reimbursed. Transamerica Insurance Company v. United States, 989 F.2d 1188, 1194 (Fed. Cir. 1993) (quoting Pearlman v. Reliance Insurance Company, 371 U.S. 132, 137 (1962)). Thus, the surety "steps into the shoes" of the contractor when it takes over the contract. United Electric Company v. United States, 647 F.2d 1082, 1086 (Ct. Cl. 1981).

However, Fidelity can not prevail on a claim of equitable subrogation without first showing that it has resolved all subcontractors claims. "When a surety, after financing or completing the performance of a defaulted contractor, discharges the outstanding claims of the subcontractors, it may subrogate to the rights of both the defaulted contractor and the subcontractors." Insurance Company of the West, 55 Fed. Cl. at 538 (emphasis added) (citation omitted). The surety must show that it fully paid the claims of the laborers and materialmen arising out of the contract before it can share in the unexpended sums retained under the contract. Id. at 541 (emphasis added). Although Fidelity negotiated a compromise payment of $200,000.00 for subcontractor H & M Steel, it has failed to allege in its complaint that it settled the claims of any other subcontractors. App. 245; Compl. Because Fidelity has not shown that it has satisfied the outstanding claims of all of the subcontractors involved in the project it cannot lay claim to contract funds not expended by the Government. Id. Therefore, Fidelity can not prevail upon a claim of equitable subrogation.

If this Court somehow determined that Fidelity could prevail upon an equitable subrogation claim, the surety would only be entitled to a nominal amount in damages. It is an elementary law of suretyship "that one cannot acquire by subrogation what another whose rights he claims did not have." United States v. Munsey Trust Co., 332 U.S. 234, 242 (1947); See also Globe Indem. Co. v. United States, 84 Ct. Cl. 587, 595 (1937) ("The party for whose benefit the doctrine of subrogation is exercised can acquire no greater rights than those of the party for whom he is substituted"). Under a Government contract, of course, the contractor is only entitled to be paid the balance of the contract. Accordingly, upon assuming the rights of the contractor through subrogation, the surety is only entitled to payment of the existing contract balance from the Government. Balboa Insurance Company, 775 F.2d at 1161 (when the surety finances the contract to completion, it is subrogated to the contractor's property rights in the *contract balance*). At that time Fidelity took over the contract, pursuant to a Takeover Agreement with the Corps, the total contract price had increased to $6,142,111.51. App. 45. Sedona earned $3,196,396 under the contract, however, the Government did not pay Sedona that entire amount. Id. Sedona was paid $2,886, 371 and the Government withheld $310, 025. App. 45. The balance on the contract amounted to $2,945,715.51. Id. By the time the contract was completed in September 2003, the total contract price had been increased, through several modifications, to $6,235,880.21. App. 11-51, 492. Fidelity has been paid almost all of the remaining balance on the contract. App. 492. The only amount that remains unpaid on the contract is $100.[1] Id. Therefore, the most that Fidelity could recover under this cause of action is $100.

[1] For administrative purposes, the Corps will commonly reserve a nominal amount, such as $100, under a contract in order to keep the contract technically "open" or "active."

Apparently, Fidelity asserts that the Government's alleged improper administration of the Sedona contract and decision to terminate the contract no earlier than June 2001, entitles it to recover some of the funds paid out to Sedona before the contract was terminated. Compl. 2. However, as established below, the Corps acted reasonably in the exercise of its discretion in administering Sedona's CQC Plan, handling the contract payment process, and terminating the contract with Sedona in June 2001.

B. The Corps Exercised Reasonable Discretion In Its Administration Of Quality Control Procedures

Fidelity asserts that the Corps improperly administered Sedona's Contractor Quality Control ("CQC") Plan, specifically, in relation to the approval process for the CQC Plan, the designation of the CQC Plan system manager and with an alleged "lax" approach to inspections. Complaint ("Compl.") page 4, 6. The Government has a duty to administer Government contracts, during the course of its performance in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. United States Fidelity and Guaranty Company v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1384 (1973). The Government also has a duty to exercise its discretion responsibly by considering the surety's interest in conjunction with other problems encountered in the administration of the contract. National Surety Corporation v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

Fidelity states that "the Government's acceptance of Sedona's CQC Plan was a prerequisite to the start of construction." Compl. page 4 ¶ 10. However, paragraph 3.2.1 of specification section 01451, states that construction could begin upon approval of the CQC Plan or acceptance of an interim plan. App. 53-54. The Corps approved Sedona's initial submission as an interim plan on December 8, 1999, thereby enabling Sedona to begin construction. App. 55. The interim plan was valid for a 60-day period. App. 54. On February 4, 2000, within that

60-day window, Sedona submitted to the Corps a CQC Plan, which was eventually approved as the final CQC Plan on February 25, 2000. App. 86-87. When the terms of the contract are permissive or if they provide the contracting officer with discretion, the Government's duty to the surety lessens. American Insurance Company v. United States, 62 Fed. Cl. 151 (2004). While Sedona did not comply with the strict terms of the contract relative to the CQC Plan submittal, i.e. Sedona did not submit its plan within five days after receipt of the notice to proceed, the terms of the contract provided the Corps with the discretion to accept an interim plan. Therefore, the Government did not abuse its discretion during the approval process for the CQC Plan.

Fidelity also asserts in its complaint that the Government improperly accepted Mr. Perez as Sedona's CQC Plan system manager. Compl. page 5-6. However, the plain meaning of the contract language clearly establishes that Mr. Perez met the requirements for the position. Section 01451, para 3.4.2, clearly indicates that the individual must either have a graduate degree with two years experience **or** be "a construction person with a minimum of five years in related work." App. 77-78. The documents submitted by Sedona established that Mr. Perez had the requisite experience as a construction person. App. 82-85. Fidelity's allegation that Mr. Perez was ineligible to serve as the CQC Plan system manager is without merit.

Fidelity also alleges laxity on the part of the Government in its inspection duties but also references a letter, dated December 22, 2000, where the Corps placed Sedona on notice of quality control deficiencies and demanded corrective action. Compl. page 6; App. 122-125. The contract, section 01451, clause 111 52.246-12, states that "[t]he [c]ontractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed

under the contract conforms to contract requirements." App. 98. All work is also subject to Government inspection before acceptance. Id. The Government did not have a contractual obligation to inspect the work in progress. Id. The Corps performed a quality assurance function under the contract, making periodic inspections of the project. Id. When either the work or the management of the quality control system was found not to be in compliance with contract requirements, these deficiencies were brought to Sedona's attention and were required to be corrected, as evidenced by the letter, dated December 22, 2000, from the Corps. App. 122-125. The Corps' administration of the quality control process did not impair Fidelity' rights as a surety.

### C. The Corps Exercised Reasonable Discretion In Its Administration Of The Contract's Payment Process

Fidelity argues that the Government breached its duties as contract administrator and bond obligee by mishandling of the payment process. Compl. page 20. Several subcontractors performed work but were not paid by Sedona. App. 196-245. It is undisputed that for pay estimates 1 through 7 the Corps did not enforce the contractual requirement that Sedona provide information regarding the payment of subcontractors pursuant to FAR 52.232-5(b)(1)(i), specifically: (i) an itemization of the requested amounts; (ii) a listing of the amount included for work performed by each subcontractor; (iii) a listing of the total amount of each subcontract; and (iv) a listing of the amounts previously paid to each subcontractor. App. 130. In National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997), the Federal Circuit held that a surety could sue the Government for its failure to comply with contractual provisions which required it to withhold specified amounts of funds until contractually specified milestones had been reached.

118 F.3d at 1547. The basis of National Surety was that, when the contract gave the Government no discretion to depart from a retainage requirement, the surety relied upon such a mandatory contract provision in its assessment of risk. Id. This is consistent with Fireman's Fund, which held that "only the contract" could limit the Government's flexibility in resolving payment disputes. Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 499 (Fed. Cir. 1990). Unlike National Surety, the contract here does not limit the Government's flexibility in making contract payments. Although the contract contains two provisions relating to payments upon the contract, only the first is relevant, for it applies to "Payments Under Fixed Price Construction Contracts." App. 129-137. This provision (from Federal Acquisition Regulation 52.232-0005) provides a maximum retainage of 10 percent, but does not require the contracting officer to retain any of the progress payments. App. 129-130. The Government's responsibility to retain contract funds is only triggered by a request by a surety to do so, see Fireman's Fund Ins. Co., 909 F.2d at 499, or by contract provisions dictating such retention. National Surety Corp., 118 F.3d at 1542. Thus, because no contract provision in this case gives rise to a governmental duty to protect contract funds, the Government's responsibility is not triggered until the surety makes such a request.

On November 8, 2000, Fidelity demanded that the Corps not release any other funds to Sedona without the advance written consent of Fidelity. App. 495. Fidelity stated that Sedona was financially unable to pay for the completion of the project and that subcontractors on the project had asserted claims under the payment bond totaling $443,550.63. Id. Again, by a letter dated December 1, 2000, F & D demanded that the Corps stop payment of contract funds to

Sedona, and honor the letter of default submitted by Sedona on October 25, 1999[2], in order to permit F & D to avail itself of the doctrine of equitable subrogation as a surety. App. 268-73.

The Corps informed Fidelity, by letter dated December 8, 2000, that Sedona was on contract schedule (37% complete) and that the Government's right to terminate a contract for default is limited to those circumstances wherein the contractor is not making sufficient progress to insure that the contract will be completed by the contract completion date. App. 274-280. By permitting Sedona to continue, the Corps was balancing both contractual obligations to Sedona and F & D's rights as surety. Id. Fidelity responded on December 12, 2000, asserting that Sedona had failed to make subcontractor payments in excess of $550,000.00, that Sedona's financial situation continued to deteriorate, and that Sedona would be unable to complete the contract with remaining funds. App. 281-82. Fidelity asserted that the Corps, after notice, took no steps to investigate the alleged nonpayment of subcontractors. App. 285.

However, the Corps did take prompt and decisive action to protect the interests of F & D with respect to instances of subcontractor nonpayment after being notified by the surety.
A total of eleven numbered progress payment applications were received from Sedona while the contract was in effect. App. 138-177. Fidelity requested, on November 8, 2000, that the Corps stop payment to Sedona and on, December 19, 2000, the Corps notified Sedona that it would begin enforcing the contractual requirement to provide the subcontractor payment information breakdown. App. 153, 346; FAR 52.232-5(b)(1)(ii)-(iv). For progress payment number eight,

---

[2] Sedona notified the Corps that the October 25, 1999 voluntary default letter was obtained from it by F & D under duress and that it intended to continue performance on the contract. App. 181-182; See e.g. 495 - 497.

Sedona was only paid $45,851.00 because the Corps deducted $238,307.00 for non-payment of subcontractors. Id. Based upon a district court order dated December 6, 2000, a joint bank account was set up for payment to Sedona and Fidelity. App. 183-89, 493. Although the Corps was not a party to the district court litigation, the Corps determined that it would comply with the direction of the district court, even though not specifically addressed to do so, and made payments to the joint account. App. 193-95. By February 12, 2001, the Corps was making payments directly to the joint account, which protected the interests of Fidelity. App. 493. Progress payment numbers 9 and 10 were paid to the joint bank account. App. 166, 493, 494. Payment estimate number 11 was paid solely to Fidelity after the takeover agreement took effect. App. 44-50, 177, 492, 493. In sum, once Fidelity provided notice in November 2000 that payment to Sedona should cease the Corps only made one other payment directly to Sedona for $45,851.00, which did not include any monies owed subcontractors. App. 153, 495. Therefore, the Corps did not abuse its discretion in its administration of the contract's payment process.

D. The Corps Exercised Reasonable Discretion in its Administration of the Terminating Process

Fidelity asserts that the Government breached its duty, "a duty to account for the interests of F & D, as surety," by failing to terminate Sedona's contract for default until June 7, 2001. Compl. page 21 ¶ 104. The Corps contract with Sedona (at clause 117, FAR 52.229-10) stated that if the contractor failed to perform the work with the diligence that would insure its completion within the time specified in the contract, including any extension, the Government could terminate the contract. App. 499. The termination provision is a discretionary act of the contracting officer, subject to *de novo* review. Aptus Co. v. United States, 61 Fed. Cl. 638

(2004). A default termination is a "drastic sanction" which should be imposed only for good grounds and on solid evidence. Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987); Appeal of Technocratica, 1993 WL 556853 (A.S.B.C.A. No. 44134, 1993).

In a letter dated November 8, 2000, Fidelity demanded that the Corps terminate the contract with Sedona, approximately 10 months before the contract completion date. App. 1-2, 495, 10. In a letter, dated December 1, 2000, Fidelity repeated its demand that the Corps stop further payments to Sedona and terminate the contract for default. There is a significant difference between the Government's role before and after completion of performance on the contract. Argonaut Insurance Co., 434 F.2d at 1367. During performance the Government has a vital interest in the timely and efficient completion of the work. Id.; See United States Fidelity and Guaranty Co., 676 F.2d at 628 (the decision of a Government contracting officer that a progress payment to a financially strapped contractor should not be withheld will be accorded deference by this Court, and the surety's burden of proving to the contrary is high). The Government contracts for a broad range of rights "which are designed to promote continuation of the contract work." Argonaut Insurance Co., 434 F.2d at 1367-68. "These provisions give the Government considerable discretion and flexibility in administering the contract." Id. at 1368. In light of the various unforeseen circumstances which may hinder performance, public policy promotes this discretion and flexibility. Id. "Where the Government is entitled to exercise its discretion, the 'plaintiff has an unusually heavy burden of proof in showing that the determination made . . . was arbitrary and capricious.'" Balboa Insurance Co., 775 F.2d at 1164 (citation omitted). However, this discretion and flexibility is limited by the Government's duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other

problems encountered in the administration of the contract. Argonaut Insurance Co., 434 F.2d at 1368.

In the November 8, 2000 letter written by Fidelity to the Corps demanding that the Corps terminate the contract with Sedona, Fidelity stated that Sedona was financially unable to pay for the completion of the project and that subcontractors on the project were not being paid. App. 495. "It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract." Fireman's Fund Ins. Co., 909 F.2d at 498. Thus, the Government had no legal obligation to suspend a progress payment merely upon the unsupported request of a contractor's surety. U.S. Fidelity and Guaranty Co. v. United States, 676 F.2d at 628.

However, when a surety has informed the Government that the contractor is in default, the Government has an obligation to take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job. Fireman's Fund Ins. Co., 362 F. Supp at 848. The Court in Balboa Insurance Co. v. United States, 775 F.2d 1158 (Fed. Cir. 1985), listed factors to consider in determining whether the Government has exercised reasonable discretion in distributing funds. Those factors are:

> (1) attempts by the Government after notification by the surety, to determine that the contractor had the capacity and intent to complete the job; (2) percentage of contract performance completed at the time of notification by the surety; (3) efforts of the Government to determine the progress made on the contract after notice by the surety; (4) whether the contract was subsequently completed by the contractor; (5) whether the payments to the contractor subsequently reached the subcontractors and materialmen; (6) whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government; (7) whether the Government's action violates one of its own statutes or regulations;

> (8) evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

United States Fidelity & Guaranty Co. v. United States, 676 F.2d at 631; Royal Indemnity Co., 529 F.2d at 1321; Argonaut Ins. Co., 434 F.2d at 1366, 1369; Fireman's Fund Ins. Co., 362 F.Supp. at 848.

In consideration of those factors, the Corps responded to Fidelity's December 1, 2000 letter on December 8, 2000. App. 268-280. In applying each of the eight factors to Sedona's performance at that point, with the exception of number 4 (subsequent completion) which was inapplicable at the time, the Corps concluded that it was reasonable to allow Sedona to attempt to complete the contract, with the Corps closely monitoring Sedona's progress on the project. App. 274-280. As to factor one, determining whether the contractor has the capacity and intent to complete the project, the Government contacted Sedona and the Sedona stated an unequivocal intent to continue performance on the project and to complete it. App. 276. Also, "[t]he expressed intent to complete the project [wa]s evidenced through their manning of the project and continued performance of the work required under the contract." Id. In considering the second factor, percentage of contract performance completed at the time of notification by the surety, the Corps determined that Sedona was on schedule. App. 277. The project was scheduled to be 37 percent complete and Sedona had completed 37 percent of the contract. App. 274. At the time, subcontractors were continuing to work on the project. Id. As for the third factor, efforts to determine progress subsequent to notice by the surety, the Government determined that it would monitor the progress of the project on a daily basis. Id. The fourth factor, whether the contract was subsequently completed by the contractor, was not relevant at

the time because the contract had not yet been completed. Id. Regarding the fifth factor, whether payments to the contractor subsequently reached the subcontractors, the Corps was aware of one supplier that had not been paid but the Corps reasoned that if any other payments were not made subsequent payments to Sedona would be reduced by the amount that the contractor had not paid to its subcontractors. Id. That is exactly what the Corps ended up doing --- the Corps deducted $238,307.00 for non-payment of subcontractors. App. 138-177. As for the sixth factor, whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification, the Government stated that no performance problems had been previously noted. Id. at 278. In relation to the seventh factor, the Government stated that its actions did not violate any statutes or regulations. Id. As for the final factor, the Corps indicated that because Sedona was on schedule the Government had no evidence that other contractors could complete the contract as cheaply or quickly. Id. The Corps concluded that it had no contractual basis upon which to sustain a termination for default. Id. Furthermore, the Corps did not find Sedona's voluntarily letter of default to be valid or binding in light of the fact that it was written one year before it was submitted and because Sedona had since renounced the letter and had continued to work on the project. App. 279-280.

As Sedona's situation changed over time it became apparent that the contract needed to be terminated. Conflict developed between Sedona and F & D over the administration of the joint control trust account. App. 181-182, 308-310, 314. Specifically, Sedona accused Fidelity of sabotage by the surety's refusal to sign checks for payments. App. 181. The apparent tug-of-war between Sedona and F & D could and may have significantly contributed to delays in payment to subcontractors and exacerbated stop-work threats and actual subcontractor walk-offs.

By late March 2001, the Corps was concerned that Sedona's ability to complete the project in a timely manner was being adversely affected. App. 314-15. In May 2001, the Corps noted the departure of subcontractors from the job site due to Sedona's failure to make timely payments, the small amount of work currently in progress, and the fact that only 63% of the contract work was completed with 79% of the duration elapsed. App. 318. It was at that point that the Corps correctly concluded that termination of the contract was appropriate. Id. The Takeover Agreement became effective in June 2001. App. 44-50.

When placed upon notice by Fidelity that Sedona had failed to make payments to subcontractors, the Corps acted deliberately and appropriately to protect its own interests in completion of the project, as well as the rights of Sedona and the interests of Fidelity. The time between the initial notice given by Fidelity, in November 2000, and the notification of termination in May 2001 was necessary, justified and in no way an abuse of discretion, given the competing rights and interests that existed and had to be weighed. Furthermore, any claims made by Fidelity for funds disbursed prior to Fidelity's assertion of rights (i.e. notice) in 2000 are without merit. See Fireman's Fund Insurance Company, 909 F.2d at 499 (the Government's responsibility to retain contract funds is only triggered by a request by a surety to do so; that some subcontractors and suppliers had informed the Government of the contractor's payment deficiencies prior to the release of the retainage does not substitute for notice by the surety and does not trigger the Government's equitable duty to act with reasoned discretion toward it.).

## CONCLUSION

For the foregoing reasons, defendant respectfully requests the Court to grant summary judgment in favor of defendant._____

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Elizabeth Thomas
ELIZABETH THOMAS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
tel: (202) 353-4175
fax: (202) 307-0972

June 23, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2006 a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that the notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth Thomas