**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P. O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF:

June 7, 2001

Office of Counsel

SUBJECT: Termination for Default; Contract No. DACA63-99-C-0039, Vehicle Operations-Maintenance Complex, Lackland Air Force Base

Mr. Darrell Leonard
Claims Counsel
Fidelity and Deposit Company of Maryland
3910 Keswick Road, 5ht Floor
Baltimore, MD 21211

Dear Mr. Leonard:

Fidelity Deposit Company of Maryland issued Miller Act performance and payment bonds on behalf of Sedona Contracting, Inc. (Sedona), under Contract No. DACA63-99-C-0039, Vehicle Operations-Maintenance Complex, Lackland Air Force Base, Texas. Sedona has failed to pursue the work, employ critical subcontractors at the site, and man the project with sufficient workers to insure that the project would be complete by the contract completion date. Although Sedona did not completely abandon the project, they are currently employing only one subcontractor at the site. Numerous subcontractors have abandoned the site and refused to perform further work due to Sedona's failure to make subcontractor payments. The number of prime contractor employees at the site did not begin to approach the minimal number needed for a project of this magnitude. Progress during the last 60 days has been totally insufficient to complete the project by the contract completion date. Since Sedona failed to prosecute the work with sufficient diligence to insure that the work required under the project would be completed by the contract completion date, their right to proceed with the remaining uncompleted work has been terminated for default.

Under the Miller Act performance bond issued by the Fidelity and Deposit Company, demand is herein made that the surety takeover and prosecute the work to its completion in fulfillment of your performance bond obligations. I request that you advise me by June 13, 2001, as to whether the surety will takeover and complete the project. If the Fidelity and Deposit Company declines to takeover and complete the project, the Government will have the uncompleted work performed by contract. The Government will hold Sedona and the Fidelity and Deposit Company responsible for any costs incurred in the completion of the project that exceed the remaining contract balance. Further be advised that the Government reserves any and all other rights and remedies provided for by law or under the contract in addition to the charging of excess completion costs, including the assessment of liquidated damages.

Sincerely,

John H. Rodgers
Contracting Officer

Copy Furnished:

Theodore M. Bailey, Esq.
Milam Building, Suite 711
115 E. Travis Street
San Antonio, Texas 78205-1611

Elizann Carroll, Esq.
Strausberger & Price, LLP
Suite 4300
901 Main Street
Dallas, Texas 76202-3784

Claim # 209659

THEODORE M. BAILEY, P.C.
MILAM BUILDING, SUITE 711
115 EAST TRAVIS STREET
SAN ANTONIO, TEXAS 78205-1611
TELEPHONE NO. (210) 225-7747
FACSIMILE NO. (210) 225-8246
E-MAIL: TMBPC@IDWORLD.NET

FAXED

THEODORE M. BAILEY
JOHNATHAN M. BAILEY
JACQUELINE Z. NIKODYM

# TELEFAX COVER SHEET

**DATE/TIME:** July 24, 2001 (5:20PM)

**TO:** Mr. John Rodgers **COMPANY:** U.S. Army Engineer District

**FROM:** Theodore M. Bailey

**INCLUDING THIS COVER SHEET, THERE WILL BE 11 PAGES TRANSMITTED.**

**RE:** Sedona Contracting, Inc.

**MATTER:** Contract No. DACA63-99-C-0039

**MESSAGE:** Attached please find the claim regarding the above referenced matter.

**SENDING TO TELEFAX NUMBER:** ~~703-614-8846~~
(817) 978-4547

**IF ALL PAGES ARE NOT RECEIVED, PLEASE CALL OUR TELEFAX OPERATOR AT (210) 225-7747**

THE INFORMATION CONTAINED IN THIS TELEFAX MESSAGE IS ATTORNEY PRIVILEGE AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT 115 EAST TRAVIS, SUITE 711, SAN ANTONIO, TEXAS 78205, BY UNITED STATES POSTAL SERVICE. THANK YOU.

THEODORE M. BAILEY, P.C.
MILAM BUILDING, SUITE 711
115 EAST TRAVIS STREET
SAN ANTONIO, TEXAS 78205-1611
TELEPHONE NO. (210) 225-7747
FACSIMILE NO. (210) 225-8246
E-MAIL - TMBPC@IDWORLD.NET

THEODORE M. BAILEY
JOHNATHAN M. BAILEY
JACQUELINE Z. NIKODYM

July 24, 2001

**[TELEFAXED 07/24/01]**

Mr. John H. Rodgers, Contracting Officer
U.S. Army Engineer District,
Fort Worth (CESWF-OC)
Department of the Army
Post Office Box 17300
Fort Worth, Texas 76102-0300

Re: Sedona Contracting, Inc. Claim for Work Performed
Contract No. DACA63-99-C-0039
Vehicle Operations - Maintenance Complex, Lackland Air Force Base
File No. 533.03

Dear Mr. Rodgers:

This is a claim for the payment for performed but unpaid work on the above contract. The Government improperly terminated the contract for default since Sedona was entitled to time extensions for various Government delays and because the Government's failure to pay was the cause of Sedona having difficulty in getting subcontractors to work and suppliers to deliver material. The amount of unpaid for work is $1,347,793.20. Ex. 1. A claim certification in that amount is enclosed.

<u>Progress Payment History Summary</u>

Mr. John H. Rodgers, Contracting Officer
FWCOE
July 24, 2001
Page 2

1. On November 15, 2000, Progress Payment Request No. 8 was submitted for the work done in October, 2000. Sedona billed $284,158, but was only paid $45,851. The Corps stated on December 9, 2000 that it was deducting $238,307 because a steel erector had not been paid, even though in actuality it had been paid, since the Surety decided to pay with its own funds, instead of the joint control trust account funds.

2. On December 6, 2000, Pay Request No. 9 was submitted for work performed during November, 2000. A payment was requested in the amount of $239,498. No amount of money has been paid to date for this work.

3. On December 22, 2000, the Corps stated that it agreed with the percentages being billed, but would not make payment because it needed a list of subcontractors and a change in the narrative report. A list of subcontractors and the change in the narrative report were telefaxed to the Corps on January 5, 2001. No response was received after that date to this pay request.

4. On January 6, 2001, Pay Request No. 10 for work performed during December, 2000 was submitted in the amount of $1,024,667. This pay request had the subcontractor list and other information that had previously been requested. No response has been received to this pay request.

5. On February 15, 2001, Pay Request No. 11 for work performed in January, 2001, was submitted in the amount of $373,701. No response has been received to this pay request.

6. On February 23, 2001, Sedona send a fax in to withdraw its previous requests because of a mistake. This was done because Sedona understood it was going to be required to make changes in the previous pay requests.

7. As a result of various discussions, a meeting was held on March 8, 2001. Sedona understood it had been directed at that meeting to submit a combined pay request for the outstanding pay invoices.

8. On March 8, 2001, Sedona submitted a "preliminary" pay request showing a combined pay request for November through February, as directed. Sedona wanted certain assurances for this pay request as a result of the meeting on March 8, 2001. There was no specific written response to this pay request. Tom Armstrong did call and said he was not going to pay it. Hector Trinidad talked to Mr. Armstrong and was told that the pay request would not be paid because a later schedule for a later period was needed to be gone over, but the Corps would never agree to meet until April 23, 2001.

9. On April 2, 2001, Sedona resubmitted a November through February 28, 2001, invoice in the amount of $3,741,469, with no qualifications. No response has been received to this pay request.

10. On April 23, 2001, Tom Armstrong told Sedona that he had not yet "touched" or reviewed the December, 2000, pay request.

11. On May 4, 2001, as a result of not getting any response to previous requests, Sedona resubmitted Pay Request No. 9 for $391,440.15. This request was received by the Corps on May 7, 2001.

12. On May 10, 2001, Sedona received a response. Tom Armstrong stated he wanted a recalculation of the request based on stored materials to be handled differently than it had previously been handled on all previous pay requests.

13. On May 10, 2001, the requested information and changes was faxed by Sedona to Tom Armstrong.

14. On May 14, 2001, a letter from Tom Armstrong indicated he was still evaluating Pay Request No. 9 and that he had decided to start his review time over because of the supplemental information that he had requested.

15. On May 16, 2001, Sedona submitted a new Pay Request No. 10 for December, 2000, in the hope that this would finally obtain some results, so Sedona can pay its subcontractors and suppliers.

This summary shows that the payment process was unreasonably long under any standard. The Corps, of course, could have always paid whatever amount it felt was appropriate out of the $3.7 million in billed work. The Corps, instead, paid nothing for work performed since the November 1, 2000 to date.

The Corps itself has used the failure of subcontractors to man the job as a basis for termination, so obviously the Corps determined that progress was being delayed by the failure of certain subcontractors to work. Since the Government's wrongful failure to pay for work it knew it had been performed is the cause of certain subcontractors not working, the Government is responsible for this delay of the project.

The Corps has also improperly withheld $200,000 for work performed. The steel fabricator mis-fabricated some of the steel delivered to the job. This was discovered after the payment application was made. Sedona initially determined there should be a backcharge in order to insure that the corrective work would be made and that the steel fabricator was owed only approximately $200,000. Pursuant to the request of the Surety and pursuant to the JCTAA Sedona deposited the check received from the

Government into a joint control trust account. The Surety, for its own reasons, decided to make the payment to the steel fabricator with its own funds, instead of using the funds that were then in the JCTAA. Sedona had no control over this decision of the Surety. Sedona did everything it could do to pay the steel fabricator directly with the funds it had deposited in the JCTAA.

Sedona had no control and cannot be at fault because the Surety elected to pay with its own funds. The supplier, the steel fabricator, was, in fact, paid. Since Sedona lost control of the money and the subcontractor was properly paid, so Sedona properly carried out its contractual obligation.

Other than that one payment where the subcontractor was paid, Sedona has, itself, or through the JCTAA, paid off subcontractors and suppliers all monies received from the Government for their work. In this regard you should note that the last payment received from the Government was in the amount of $43,000.00 for October, 2000. There have been a number of complaints by subcontractors and suppliers for lack of payment, but that has to do with the fact that the Government failed to make any payments since the last one for October, 2000.

The problem with the subcontractors that did not manage the job is a direct result of the Corps not releasing any payments after the payment for October, 2000. It

is within the Government's control whether these payments are released, not Sedona's control.

Before F&D got involved, Sedona and the Government had established and were following certain pay request procedures and turning in the same documentation for Pay Request Nos. 1 through 8. All of a sudden, on Pay Request No. 9, the Corps changed the procedure. The parties had clearly established a contemporaneous interpretation of what the proper payment procedures were and what proper payment documentation was needed in order to get the Government to make payment. One example is that Sedona was not required to turn in a list of subcontractors and a list of payments that have been made to the subcontractors on each prior payment request, but then the Government decided that it wanted additional information. Sedona promptly furnished the additional information, but Pay Request No. 9 has still not been paid. It is unreasonable first, to make changes to the agreed payment procedures under which payments 1 through 8 were made.

The Corps also made several changes with regards to the CPM schedule as reasons for withholding the November, 2000, and later payments to Sedona. The specifications in section 01320, para. 3.8, requires a periodic progress meeting with the Contracting Officer or his Representative and, importantly, the Government CPM scheduler to discuss progress, payment, and the schedule. Neither the Contracting



PAGE 08 BAILEY 9478522012 08:41 07/25/2001

Officer nor his Representative, Tom Armstrong, ever were present at any of these meetings. Initially, Gary Strangeland with the Corps was present at the monthly meetings. Under Gary Strangeland, the parties would:

a. go over the percentage of completion on each activity;

b. review the logic of out-of-sequence work to see if the logic needed to be changed;

c. review the logic of work started that month to insure that the logic was correct for the work activities that started that month;

d. if there was out-of-sequence work being performed that month, agree whether it was logical to proceed as Sedona was from a construction point of view;

e. agreeing whether a change in logic was necessary; and

f. discuss delays as an explanation of why out-of-sequence work was being performed.

After going through those steps, out-of-sequence work was routinely approved, as a recognition of either the work was logical to be performed in that order from a construction point of view, and/or it was a reaction to trying to overcome and work around delays on the project.

When George Cardenas took over Gary Strangeland's role with regards to the review and approval of the schedule. George Cardenas has changed how the monthly schedule meetings have worked. After George Cardenas took over, the only action accomplished at the meetings was to go over the percentage of completion. The rest of what had previously been done, activities 2 through 6 listed above, were no longer performed. The Corps has waived and/or refused to have the required meetings since December, 2000.

Thus, the Government wrongfully failed to pay for the work performed. Since the termination for default was invalid and has been appealed, Sedona claims $1,347,793.00. A final decision is requested in 60 days.

Sincerely,

THEODORE M. BAILEY, P.C.

Theodore M. Bailey

TMB/kh

THEODORE M. BAILEY, P.C.
MILAM BUILDING, SUITE 711
115 EAST TRAVIS STREET
SAN ANTONIO, TEXAS 78205-1611
TELEPHONE NO. (210) 225-7747
FACSIMILE NO. (210) 225-8246
E-MAIL: TMBPC@IDWORLD.NET

THEODORE M. BAILEY
JOHNATHAN M. BAILEY
JACQUELINE Z. NIKODYM

July 25, 2001

Mr. John H. Rodgers, Contracting Officer
Contracting Officer Mr. Rex Crosswhite
Engineer Trial Attorney
U.S. Army Engineer District,
Fort Worth (CESWF-OC)
Department of the Army
Post Office Box 17300
Fort Worth, Texas 76102-0300

Re: Sedona Contracting, Inc. Delay Claim
Contract No. DACA63-99-C-0039
Vehicle Operations - Maintenance Complex, Lackland Air Force Base
File No. 533.03

Dear Mr. Rodgers:

This is the delay claim of Sedona Contracting, Inc.

<u>Sedona Originally Projected an Early Finish</u>

The "as-approved" schedule showed Sedona finishing early on the project. This is shown by the fact that the final inspection was shown to be 199 days earlier than the scheduled contract completion date. Sedona used this technique to show an early finish, since the contract required the approved schedule to show the scheduled contract completion date on the contract completion date in the contract, rather than the intended contract completion date. In effect, Sedona had an early finish schedule that was approved and was being used by both the Corps and Sedona on this project.

As a result of Government delays for which it had not yet received a contract extension, Sedona, in February, 2001, deleted the early finish by moving the final inspection back to the contract completion date. This was done only because the Government was insisting that Sedona was late when it actually was not. In effect, Government delays had caused Sedona to lose its early finish. The February 28, 2001 CPM showed that Sedona was dead even with where it should be in the contract schedule, that is, finishing on the contract completion date, without any additional time for the pending modifications. Sedona incorrectly was being claimed to be behind schedule on activities that were, in fact, on time as far as the contract completion.

Sedona is entitled to calculate its delay damages based on an early finish. In <u>Oneida Construction, Inc.</u>, ASBCA No. 44194, 94-3 BCA ¶ 27,237, the Board upheld a claim for delay damages for prevention of early finish, stating:

> The Government argues that should appellant prevail on the merits, that it did not suffer any damages because of no paving operations between 14 December 1990 and 8 January 1991. It argues that appellant's schedule indicated this phase of the contract would be completed on 12 January 1991 and that it was, in fact, completed by 14 January 1991, so that there was no real delay. It focuses on the failure of appellant to inform the Government that it intended to finish this phase of its contract early. None

hereby submitted for such assessment. Any liquidated damages assessed are also claimed on the basis that they are a penalty.

SUMMARY

| | |
|---|---|
| Unabsorbed home office overhead | $100,192.38 |
| Extended Jobsite costs | 203,408.45 |
| Total Claim | $303,600.83 |

A final decision is requested in 60 days. A claim certification is being sent by separate cover.

Sincerely,

THEODORE M. BAILEY, P.C.

Theodore M. Bailey

TMB/ll
Law Offices of Garreth E. Shaw
Mr. Gary Shaw
411 Heimer Road
San Antonio, Texas 78232

## CLAIM CERTIFICATION

I certify that the delay claim made in connection with Contract No. DACA63 99-C-0039 in the amount of $303,600.83 is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustments for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of Sedona Contracting, Inc..

Dated this 25th day of July, 2001.

Sedona Contracting, Inc.

Hector Trinidad, President

THEODORE M. BAILEY, P.C.

MILAM BUILDING, SUITE 711
115 EAST TRAVIS STREET
SAN ANTONIO, TEXAS 78205-1611
TELEPHONE NO. (210) 225-7747
FACSIMILE NO. (210) 225-8246
E-MAIL: TMBPC@MAIL.TXDIRECT.NET

AUG 16 2001
CESWF-OC

THEODORE M. BAILEY
JOHNATHAN M. BAILEY
JACQUELINE Z. NIKODYM

August 14, 2001

ASBCA Recorder
Skyline Six
5109 Leesburg Pike, 7th Floor
Falls Church, Virginia 22041

Re: ASBCA No. 53429
Appeal of Sedona Contracting, Inc.
Under Contract No. DACA63-99-C-0039, Vehicle Operations

Dear Sir:

Enclosed find the original and two copies of Appellant's Complaint in the above appeal.

Sincerely,

THEODORE M. BAILEY, P.C.

Theodore M. Bailey

TMB/jeb
Enclosure
cc: Sedona Contracting, Inc.
6800 Park Ten Boulevard, Suite 135 East
San Antonio, Texas 78213
[with enclosure]

Mr. Albert C. Proctor
Engineer Trial Attorney
U.S. Army Engineer District,
Fort Worth (CESWF-OC)
Post Office Box 17300
Fort Worth, Texas 76102-0300
[with enclosure]

BEFORE THE ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| In the Matter of the Appeal of<br>SEDONA CONTRACTING, INC.<br><br>Under Contract No.<br>DACA63-99-C-0039 | )<br>)<br>)<br>)<br>)<br>)<br>) | ASBCA No. 53429 |

APPELLANT'S COMPLAINT

Now comes Appellant, by and through its attorney, and for its complaint would state as follows:

1. Contract No. DACA63-99-C-0039 was awarded to Sedona Contracting for the maintenance to the Vehicle Operations Center.

2. On May 7, 2001, Sedona received the Government's Show Cause letter.

3. Sedona responded that, there were two reasons that explain all of the issues raised in the Show Cause notice. The first was that there had been a number of delays on the project, some of which relate to then pending or executed modifications and some of which did not, for which Sedona has yet not been given a time credit. When given credit for these delays, Sedona was not in danger of failing to complete within the properly extended contract completion date.

4. The second reason was somewhat related to the first, in that the Corps of Engineers has unreasonably refused to pay the November, 2000, and subsequent invoices which had, in turn, delayed the submittal and payment of subsequent invoices.

5. To some extent the problem is circular: Government delays caused slowed progress and caused out-of-sequence work which, in turn, caused billing

problems which, in turn, resulted in slow pay which, in turn, caused some subcontractors to slow down or stop work.

6. Sedona replaced some subcontractors who were refusing to work. Release of payment would have helped to eliminate any problem caused by previous hold ups in payment, but the Corps still refused to do so up to the time of termination.

7. Work never stopped. Various portions of the work were delayed or slowed down because of changes, differing site conditions, and other delays, as well as payment delays by the Government.

8. Sedona is entitled to calculate its delay damages based on an early finish, since the initially approved schedule showed an early finish.

Progress Payment History Summary

9. On November 15, 2000, Progress Payment Request No. 8 was submitted for the work done in October, 2000. Sedona billed $284,158, but was only paid $45,851. The Corps stated on December 9, 2000 that it was deducting $238,307 because a steel erector had not been paid, even though in actuality it had been paid, since the Surety decided to pay with its own funds, instead of the joint control trust account funds.

10. On December 6, 2000, Pay Request No. 9 was submitted for work performed during November, 2000. A payment was requested in the amount of $239,498. No amount of money has been paid to date for this work.

11. On December 22, 2000, the Corps stated that it agreed with the percentages being billed, but would not make payment because it needed a list of

subcontractors and a change in the narrative report. A list of subcontractors and the change in the narrative report were telefaxed to the Corps on January 5, 2001. No response was received after that date to this pay request.

12. December, 2000 was submitted in the amount of $1,024,667. This pay request had the subcontractor list and other information that had previously been requested. No response has been received to this pay request.

13. On February 15, 2001, Pay Request No. 11 for work performed in January, 2001, was submitted in the amount of $373,701. No response has been received to this pay request.

14. On February 23, 2001, Sedona send a fax in to withdraw its previous requests because of a mistake. This was done because Sedona understood it was going to be required to make changes in the previous pay requests.

15. As a result of various discussions, a meeting was held on March 8, 2001. Sedona understood it had been directed at that meeting to submit a combined pay request for the outstanding pay invoices.

16. On March 8, 2001, Sedona submitted a "preliminary" pay request showing a combined pay request for November through February, as directed. Sedona wanted certain assurances for this pay request as a result of the meeting on March 8, 2001. There was no specific written response to this pay request. Tom Armstrong did call and said he was not going to pay it. Hector Trinidad talked to Mr. Armstrong and was told that the pay request would not be paid because a later schedule for a later period was needed to be gone over, but the Corps would never agree to meet until April 23, 2001.

17. On April 2, 2001, Sedona resubmitted a November through February 28, 2001, invoice in the amount of $3,741,469, with no qualifications. No response has been received to this pay request.

18. On April 23, 2001, Tom Armstrong told Sedona that he had not yet "touched" or reviewed the December, 2000, pay request.

19. On May 4, 2001, as a result of not getting any response to previous requests, Sedona resubmitted Pay Request No. 9 for $391,440.15. This request was received by the Corps on May 7, 2001.

20. On May 10, 2001, Sedona received a response. Tom Armstrong stated he wanted a recalculation of the request based on stored materials to be handled differently than it had previously been handled on all previous pay requests.

21. On May 10, 2001, the requested information and changes was faxed by Sedona to Tom Armstrong.

22. On May 14, 2001, a letter from Tom Armstrong indicated he was still evaluating Pay Request No. 9 and that he had decided to start his review time over because of the supplemental information that he had requested.

23. On May 16, 2001, Sedona submitted a new Pay Request No. 10 for December, 2000, in the hope that this would finally obtain some results, so Sedona can pay its subcontractors and suppliers.

24. This summary shows that the payment process was unreasonably long under any standard. The Corps, of course, could have always paid whatever amount it

felt was appropriate out of the in billed work. The Corps, instead, paid nothing for work performed since the November 1, 2000 to date.

<u>Delay in Payment Delay</u>

25. Since the November, 2000, pay request was submitted, a number of issues came up with regards to the CPM schedule that have not previously been raised with prior pay requests. These questions represented either, one a misunderstandings of the schedule, or two, were changes in previous policies and procedures agreed to by the parties and put into effect. One of the principal problems was that the Corps insisted on analyzing the schedule in the project as if the schedule reflects the current reality in the project when the schedule has not yet been adjusted for the pending modifications because the Government had refused to meet with /// to negotiate these modifications.

26. The project schedule has been used as an excuse by the Corps to delay payment. As stated by Sedona's CPM expert in response to the Government letter Serial 0065:

> The reason the update of the project schedule was not provided within seven days of the project progress meeting is that Tom Armstrong called me with questions regarding the value of bid items on last month's schedule. This was about seven working days after the jobsite meeting. He was to e-mail me with the numbers he felt were the correct amounts for each bid item. The COE e-mail system went down and he was unable to do that. After not receiving any e-mail from Mr. Armstrong, I called the area office one or two days later to attempt to get the amounts corrected. Mr. Armstrong was not in. My questions brought the response that the project Engineer had this information and to call him. I called Mr. Cardenas that day. He told me that he was generally aware that there was a discrepancy but did not

know the specifics. He was going to get the information to me. After receiving no information from him I called again on Tuesday, March 27. He still did not know the answer, however, he informed me that the meeting that had been scheduled at the jobsite for Wednesday, March 28 to discuss the schedule had been postponed until Tuesday, April 3. (On April 3, the meeting was postponed indefinitely. As of April 11, 2001 it has still not been rescheduled.) I again called Mr. Armstrong, who said that he had thought that there was no problem with the bid item totals, but rather the problem was that the amounts of the resources did not match the bid items. He then gave me the COE bid item totals which he had been unable to e-mail for over a week and that Mr. Cardenas was not able to ascertain. I now have COE totals to compare with the NAS in order to correctly update the schedule. One significant item which caused problems in balancing the bid item totals was the fact that the NTP to change the foundation of the Vehicle Operations building apparently was funded in two different bid items, yet the modification did not state the bid items through which it was funded.

While the above scenario was unfolding, letters were received from the Lackland resident office with additional statements asserting schedule discrepancies. As stated above, these were to be discussed and/or resolved at the meeting scheduled for Wednesday, March 28, and again on Tuesday, April 2, 2001. Additional time used to address these issues raised in that letter has further slowed processing the schedule update.

As stated in paragraph c. of the referenced letter, the contract does require submission of a logic diagram, however it requires a printed logic diagram only in the event that the diagram is not legible in its electronic format. In this regard see paragraph 3.3.2. Additionally, the Government have requested and we have agreed to follow the requirements set forth in paragraph 3.3 in lieu of 3.2. Please let us know if you want to revert to 3.2. We have discussed this with Mr. Cardenas and told him that we could provide a printed logic diagram whenever he wanted to go over one.

The above shows how scheduling "issues" have been used as an excuse to delay payments which, in turn, delayed work because subcontractors refused to work when they were not paid.

27. The CPM expert also addressed scheduling issue as follows in response to Government letter Serial 0066:

> a. The approved initial schedule which showed that the Vehicle Maintenance and the Vehicle Operations buildings being completed over 190 days prior to contract completion. This comment seems untimely. The schedule reflects that Sedona Contracting is 193 days behind its original schedule. The work has always been shown to be complete within the contract period. To avoid confusion the schedule now shows the project completion being the same as the completion of the work constrained by the time allowed in section 01000 as modified by approved change orders. A fragnet was presented to Mr. Cardenas showing that the contaminated/explosive soils issue delayed the vehicle operations building significantly and delayed the overall project by 144 days. I have not received any modification incorporating this time into the contract.
>
> b. The seventeen items that showed late completion beyond the contract completion date because they were logically linked to turfing and landscaping activities (which are not bound by a specific completion date)[1]. Sedona originally showed this work in its logical sequence, however serial letter 0026 required that this work be constrained by the proper season rather than logical construction sequence. The additional activities were due to Sedona's intent to do related work like final grading and placing any topsoil in a sequence logically (immediately prior) tied to turfing and landscaping. The schedule has been changed recently to constrain all work except turfing and landscaping by the project completion date. It would seem that Sedona will not be responsible for erosion if it is required to place topsoil a significant amount of time ahead of turfing and landscaping. The constraint dates for this work may need to be revisited

[1] By contract these activities can only be performed during a certain season.

because of the soil delays, mentioned elsewhere in this letter, have delayed activities which must precede the turfing and landscaping.

c. Only one activity in the initial schedule should have no predecessor which is the contract NTP. Updates are to reflect actual conditions of the project. The activities without predecessors were modifications which generally reflected work which was logically preceded by action in and by the Government rather than any task in the schedule. Regardless, these activities were logically tied to existing schedule activities for the February 28 update.

d. The activities started prior to completion of the predecessor generally reflect an attempt to work around waiting for modifications or problem resolutions such as the contaminated/explosive problems with the soil. In all cases all progress whether in sequence or ahead of sequence was approved by persons the Lackland Resident Office has stated represent the contracting officer. The February 28 update is submitted without change pending completion of the review meeting scheduled for March 28, [then] April 3, 2001, and now postponed until rescheduled. You told me that you have discussed deleting tasks from the schedule (such as drilled piers at the operations building) which have been replaced by modification redesign, but the Government's representative has refused to allow these changes and your being able to recover these costs (cost of the replacement design). Your [Sedona's] only option was to complete the work out-of-sequence as required by the various modifications. To now be penalized because you accelerated the work is not equitable.

e. Per comments to item a. above, and government comments in this paragraph, the schedule showed Sedona being significantly behind its plan to finish the project early. Sedona's progress is significantly behind its schedule. It is not behind the contract completion date. As stated above, the early finish logic has been removed to avoid confusing the reviewers. Please note that the period between May 9, and August 11, 2000 is a little over 90 days. Per the fragnet presented to the Government in an attempt to resolve P00002, progress on the Vehicle Operations foundation was

> delayed 144 days by resolution of the contaminated/explosive soil issue.

28. For some time there had been a problem in getting contract-required monthly progress meetings to take place, where the Corps and Sedona's CPM scheduler, Sidney Whitehead, will meet to go over the things required to be resolved, as had previously been done with Gary Strangeland throughout most of the contract. This failure on the part of the Government was used as part of the excuse by the Corps to delay payment. A portion of Sedona's scheduler's report sets forth these problems:

> As stated above we have tried to have a meeting to discuss discrepancies in the several serial letters addressed herein. We assume that this letter, along with changes made in our February 28, 2001 schedule update are acceptable as Sedona's plan of action. With exception of work not constrained by the "contract completion date" that schedule is "proof" that you are on track to complete this project within the time constraints of the contract. Once the 144 days are added for the soil delay, you will again be completing the project well ahead of schedule. With exception of a few additional tasks logically tied to turfing and landscaping rather than the contract completion date, all updated schedules showed the work being completed by the contract completion date.
>
> Let me know when the meeting to discuss the schedule and the issues raised in these letters originally scheduled for March 28, is rescheduled. Do not hesitate to call me if you have questions or need additional information.

29. In a supplement to his report, the CPM scheduler noted:

> On April 10, 2001 Sedona received yet another letter rejecting its pay request. I have not seen it but I understand that one of the reasons for this is that the schedule still shows out-of-sequence work. Please refer to the paragraph above discussing this and the fact that paragraph 3.8 [of section 1320] requires the Contracting Officer or Representative be at each periodic progress meeting to

> "approve activity progress, proposed revisions, and adjustments as appropriate." Mr. Strangeland specifically reviewed the logic on out-of-sequence work during the meetings he attended. After each meeting to date schedules were submitted, and payment was made on all progress shown. Something is out of balance here. Please continue in your attempts to schedule a meeting with the Representative of the Contracting Officer who can explain why the previous approvals are not unacceptable.

30. The Sedona CPM scheduler also responded to the Corps' April 18, 2001 letter (serial 0069):

> The logic in place was approved by the Government. There are no hollow metal doors in the area to receive gypsum board in the vehicle maintenance building. In addition, water resistant gypsum board can be used if there were such areas. I do not see a schedule flaw here.
>
> There are no exterior metal doors in the area to receive tape and float treatment. See comments above. Logic will be added pursuant to approval at the above referenced progress meeting [that the Government refuses to hold] to constrain paint finish with the metal door installation, as Sedona's current plan is to paint these doors after installation.
>
> The work described was intended to be done by the same workers. "Exterior sheathing" ***is*** specified in division 9. In this regard see section 09250 paragraph 2.4. There is no contract requirement for activity ID numbers to reference construction divisions. Sedona did intend to have the roof substantially completed prior to starting any gyp board work. Logic changes to reflect Sedona's current sequence should be approved at the April progress meeting whenever the Government will agree to hold it. We do not agree that the work is improperly grouped, but can divide it if that is the agreement reached or direction received if the Government will ever hold [a meeting].
>
> Final paragraph: A meeting was held on May 1, 2001 (after this letter was received and a meeting was held at the Area Office were guidelines for resolution of these issues were

set) wherein the Government's representative agreed to a time extension of 144 days for pending modification definitization. Whether the contractor was to receive compensation for 51 of these days was to be addressed by Mr. Fano and Mr. Hector Trinidad as Mr. Cardenas did not have authority to agree to this and Jake Trinidad did not have authority to agree to non payment for these days. Due to Mr. Cardenas' busy schedule, this meeting was adjourned after only two hours. The follow up meeting scheduled for May 5, 2001 was canceled by the government. Mr. Fano informed me that he would not reschedule the meeting since he had now determined that negotiations were at an impasse and all modifications (including the ones Mr. Cardenas did not have time to discuss) would be issued unilaterally. There was no impasse as to the time extension. There was a disagreement, again not an impasse, over compensable time.

31. Another delay in getting payments was the refusal of the Corps to have progress meetings to approve the progress on the job for payment purposes. All progress shown on the schedule through December 2001, whether in sequence or out-of-sequence, had been approved at a monthly joint progress meeting. The Government representatives responsible for the review of the progress had also approved progress through February 28, 2001 at a meeting with the QAE. Since February 28, 2001, there had been a formal monthly meeting because the Corps had refused to hold such meetings.

32. During the last portion of the contract, there was no regular monthly meeting and the Government has refused to review the progress completed until the schedule was "fixed". Schedule "fixes", of course, are supposed to be discussed and agreed to at the monthly meeting. The Corps has thus created a problem without an end. Sedona continued to request progress meetings to clear up this issue to comply

with the contract scheduling requirements. In this regard, see contract Section 01320, paragraph 3.8 and all subparagraphs. This meeting was the required forum for review of the progress, out-of-sequence work, and discussion and approval of logic changes and approval of out-of-sequence work.

33. Mr. Armstrong, COE, agreed at an April 23, 2001 meeting that out-of-sequence progress would not affect pay requests for work through December, 2000. The Corps, however, did not agreed to release the November and December payments.

34. The Government had also paid for stored material using the CPM all along. That procedure was changed as of Pay Request No. 9. The directed revisions were shown in the update which was e-mailed to George Cardenas on May 15, 2001. The Government waived the progress meeting to review progress for the period ending February 28, 2001. Then the Government objected to the payment, but never would agree to hold the progress meeting for that period. Sedona attempted to schedule the meeting in March and in April, 2001.

35. A considerable amount of work was done since February, 2001, as shown by the jointly agreed percentages which were agreed to on April 25, 2001. Sedona had planned to input the actual progress and make the agreed logic changes at the April, 2001 progress meeting, but the Government refused to schedule the meeting.

36. Correction of the out-of-sequence logic and revision of the data date to April 26, 2001 results in the CPM showing the completion was only 36 days behind without updating the progress since February and without inputting the delays.

37. The Corps itself used the failure of subcontractors to man the job as a basis for termination, so obviously the Corps determined that progress was being delayed by the failure of certain subcontractors to work. Since the Government's wrongful failure to pay for work it knew had been performed was the cause of certain subcontractors not working, the Government was responsible for this delay of the project.

38. The Corps also withheld $200,000 for work performed. The steel fabricator mis-fabricated some of the steel delivered to the job. This was discovered after the payment application was made. Sedona initially determined there should have been a backcharge in order to ensure that the corrective work would be made and that the steel fabricator was owed only approximately $200,000. Pursuant to the request of the Surety and pursuant to the Joint Control Trust Account Agreement ["JCTAA"] with the surety, Sedona deposited the check received from the Government into a joint control trust account. The Surety, for its own reasons, decided to make the payment to the steel fabricator with its own funds, instead of using the funds that were then in the JCTAA. Sedona had no control over this decision of the Surety. Sedona did everything it could do to pay the steel fabricator directly with the funds it had deposited in the JCTAA. Sedona had no control and cannot be at fault because the Surety elected to pay with its own funds. The supplier, the steel fabricator, was, in fact, paid. Since Sedona lost control of the money and the subcontractor was properly paid, so Sedona properly carried out its contractual obligation. The Government had no right to withhold payments to Sedona because of how the Surety elected to make payment.

39. Other than that one payment where the subcontractor was paid, Sedona has, itself, or through the JCTAA, paid off subcontractors and suppliers all monies received from the Government for their work. In this regard the last payment received from the Government was in the amount of $43,000.00 for October, 2000. There were a number of complaints by subcontractors and suppliers for lack of payment, but that has to do with the fact that the Government failed to make any payments since the last one for October, 2000.

40. The problem with the subcontractors that have not been manning the job is a direct result of the Corps not releasing any payments after the payment for October, 2000. It is within the Government's control whether these payments are released, not Sedona's control.

41. Before F&D got involved, Sedona and the Government had established and were following certain pay request procedures and turning in the same documentation for Pay Request Nos. 1 through 8. All of a sudden, on Pay Request No. 9, the Corps changed the procedure. The parties had established a contemporaneous interpretation of what the proper payment procedures were and what proper payment documentation was needed in order to get the Government to make payment. One example is that Sedona was not required to turn in a list of subcontractors and a list of payments that have been made to the subcontractors on each prior payment request, but then the Government decided that it wanted additional information. Sedona promptly furnished the additional information, but Pay Request

No. 9 was still not been paid. It is unreasonable to make changes to the agreed payment procedures under which payments 1 through 8 were made.

42. The Corps has also made several changes with regards to the CPM schedule as reasons for withholding the November, 2000, and later payments to Sedona. The specifications in section 01320, para. 3.8, requires a periodic progress meeting with the Contracting Officer or his Representative and, importantly, the Government CPM scheduler to discuss progress, payment, and the schedule. Neither the Contracting Officer nor his Representative, Tom Armstrong, have ever been present at any of these meetings. Initially, Gary Strangeland with the Corps was present at the monthly meetings. Under Gary Strangeland, the parties would:

a. go over the percentage of completion on each activity;
b. review the logic of out-of-sequence work to see if the logic needed to be changed;
c. review the logic of work started that month to insure that the logic was correct for the work activities that started that month;
d. if there was out-of-sequence work being performed that month, agree whether it was logical to proceed as Sedona was from a construction point of view;
e. agreeing whether a change in logic was necessary; and
f. discuss delays as an explanation of why out-of-sequence work was being performed.

43. After going through those steps, out-of-sequence work was routinely approved, as a recognition of either the work was logical to be performed in that order from a construction point of view, and/or it was a reaction to trying to overcome and work around Government delays on the project.

44. When George Cardenas took over Gary Strangeland's role with regards to the review and approval of the schedule. George Cardenas changed how the monthly

schedule meetings have worked. After George Cardenas took over, the only action accomplished at the meetings was to go over the percentage of completion. The rest of what had previously been done, activities 2 through 6 listed above, were no longer performed. The Corps has waived and/or refused to have the required meetings since December, 2000.

45. For all of the reasons stated above, the Government unjustifiably withheld payment from Sedona in the amount of $1,347,793.00 which materially imopacteed Sedona's ability to perform the contract and justified a time extension.

<u>Sedona Originally Projected an Early Finish</u>

46. The "as-approved" schedule showed Sedona finishing early on the project. This is shown by the fact that the final inspection was shown to be 199 days earlier than the scheduled contract completion date. Sedona used this technique to show an early finish, since the contract required the approved schedule to show the scheduled contract completion date on the contract completion date in the contract, rather than the intended contract completion date. In effect, Sedona had an early finish schedule that was approved and was being used by both the Corps and Sedona on this project.

47. As a result of Government delays for which it had not yet received a contract extension, Sedona, in February, 2001, deleted the early finish by moving the final inspection back to the contract completion date. This was done only because the Government was insisting that Sedona was late when it actually was not. In effect, Government delays had caused Sedona to lose its early finish. The February 28, 2001

CPM showed that Sedona was dead even with where it should be in the contract schedule, that is, finishing on the contract completion date, without any additional time for the pending modifications. Sedona incorrectly was being claimed to be behind schedule on activities that were, in fact, on time as far as the contract completion.

Contaminated Soil Delay

48. For change MJ006/DO-F1349, Redesign Vehicle Ops Building Slab, Sedona has asked for an additional 144 days, which are justified by its CPM. At a meeting on April 23, 2001 Mr. Armstrong and Mr. Trinidad agreed that the requested time extensions for the pending changes would be addressed in an upcoming meeting to be held between the contractor's scheduler, Sidney Whitehead, Jake Trinidad, and Mr. Cardenas. After this was done, a progress meeting attended by these parties and Mr. Fano was to be scheduled to review the progress and the CPM sequencing. The first meeting was stopped after two hours and the Government has refused to resume the meeting. Mr. Whitehead, Mr. Jake Trinidad, and Mr. Cardenas had agreed on a 144-day extension for modification P00003, but could not agree on compensable time. After two hours, Mr. Cardenas stated he had to go and rescheduled the meeting for Friday, May 5, 2001. He subsequently cancelled the meeting without explanation. The other project delays connected to the contract modifications were not discussed. Sedona later learned that Manual Fano was characterizing the meeting as an impasse.

49. As a result of the delays relating to contaminated soil at the vehicle operations building site, which resulted in the change to the building foundation in MJ006/DO-F349, the vehicle operations building became the critical path, instead of the

maintenance building. Originally, the critical path would have remained in the maintenance building, but this changed with the delays.

Relocate Communication Lines Delay

50. In addition, Sedona is entitled to additional time for MJ013/DO-F1645, Relocate Comm. Lines. Sedona is entitled to 60 days for the south end. There are two communication lines in the way of the storm drain lines. Only the one at the south end is dealt with in RFP MJ013. A separate RFP and modification need to be issued for the communication line that interferes with the north end. This was a continuing delay that still needed to be resolved at the time of termination.

Relocate Hydraulic Lifts Delay

51. Next is MJ002/DO-F1005, Relocate Hydraulic Lifts. This was an open delay at the time of termination, since no notice to proceed had been issued on this change.

Relocate Monitoring Wells at Area A Delay

52. Next is MJ015/DO-F1923, Modify Monitoring Wells at Area A. This has been a long standing delay which was never resolved. This delay was impacting the other work because all of the monitoring wells to not be deleted under this modification had not yet been identified by the Government, which was impacting other work waiting to start. The plans show three, but there was supposed to be five wells. This delay, which had not ended at the time of termination, impacted the completion date between 235 to 321 days. Part of the out-of-sequence work performed by Sedona is because of this delay and the delay in the Corps to agreeing to the schedule changes to reflect the

deleted work. Work is obviously being done "out-of-sequence" if predecessor activities have been deleted, but Sedona has not been allowed to change the schedule logic to reflect the changes.

Excusable Weather Delay

53. There are other smaller delays on the project. For example, the Corps in determining excusable weather delays has not taken into account "mud" days when critical work cannot proceed because of previous rains. Such days are as much excusable delay as the day it actually rains. There is also an issue of converting workdays to calendar days.

Summary of Delays

54. Sedona is entitled to a contract extension of over 243 days of which 144 has already been negotiated but not made part of the contract or the CPM. This extension is in addition to the extension due for the delay in payment by the Government.

55. Based on the time extension to which Sedona is entitled, it was not in default at the time of termination.

WHEREFORE, Appellant respectfully requests the Board sustain its appeal.

Dated: August 14, 2001

Respectfully Submitted,

THEODORE M. BAILEY, P.C.
115 East Travis, Suite 711
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

By: Theodore M. Bailey
Theodore M. Bailey
SBN 01536800

Attorney for Appellant
SEDONA CONTRACTING, INC.

BEFORE THE
ARMED SERVICES BOARD OF CONTRACT APPEALS
Falls Church, Virginia

| | | |
|---|---|---|
| Appeal of | § | |
| | § | |
| Sedona Contracting, Inc. | § | ASBCA No. |
| | § | 53429 |
| Contract No. DACA63-99-C-0039 | § | |

ANSWER

COMES NOW, Respondent, and for its Answer to Appellant's Complaint herein admits, denies, and avers as follows:

1. Admits the allegations contained in paragraph No. 1 of the Complaint, except to deny that the contract was awarded for "the maintenance to the Vehicle Operations Center." Respondent avers that the contract was for the construction of a Vehicle Operations Building and the Construction of a Vehicle Maintenance building with associated site work.

2. Admits the allegations contained in paragraph No. 2 of the Complaint.

3. Admits the allegations in paragraph No. 3 of the Complaint that Sedona responded to the show cause notice. Denies the validity of the reasons set forth in Sedona's response for delays to the project. Denies that Sedona was not in danger of failing to complete the project by the contract completion date.