Smith/1148

7000 0520 0024 0286 52



Mr. Darrell Leonard
Claims Counsel
The Fidelity and Deposit Companies
P.O. Box 17069
Baltimore, MD 21297-1089

Elizann Carroll, Esq.
Strasburger and Price, L.L.P.
901 Main Street, Suite 4300
Dallas, TX 75202-3794

Garreth E. Shaw, Esq., P.C.
411 Heimer Road
San Antonio, TX 78232

Bob Watts, Esq.
Watts, Tieder, Hoffar and Fitzgerald, L.L.P.
7929 Westpark Drive, Suite 400
McLean, VA 22102-4224

CESWF-OC/CROSSWHITE

CESWF-EC-A/BOLAND

CESWF-CT/RODGERS

RETURN

CESWF-OC

THEODORE M. BAILEY, P.C.
MILAM BUILDING, SUITE 711
115 EAST TRAVIS STREET
SAN ANTONIO, TEXAS 78205-1611
TELEPHONE NO. (210) 225-7747
FACSIMILE NO. (210) 225-8246
E-MAIL: TMBPC@IDWORLD.NET

THEODORE M. BAILEY
JOHNATHAN M. BAILEY
JACQUELINE Z. NIKODYM

May 16, 2001

**[TELEFAXED 05/16/01]**

Mr. John H. Rodgers, Contracting Officer
c/o Mr. Charles W. Crosswhite
Engineer Trial Attorney
U.S. Army Engineer District,
Fort Worth (CESWF-OC)
Department of the Army
Post Office Box 17300
Fort Worth, Texas 76102-0300

Re: Sedona Contracting, Inc.
Contract No. DACA63-99-C-0039
Vehicle Operations - Maintenance Complex, Lackland Air Force Base
File No. 533.03

Dear Mr. Rodgers:

I am responding on behalf of Sedona Contracting, Inc. to your May 7, 2001 Show Cause letter. The overall response is that, there are two reasons that explain all of the issues raised in your Show Cause notice. The first is, there are and have been a number of delays on the project, some of which relate to pending or executed modifications and some of which do not, for which Sedona has yet not been given a time credit. When given credit for these delays, Sedona is not in danger of failing to complete within the properly extended contract completion date. The second reason is somewhat related to the first, in that the Corps of Engineers has unreasonably refused to pay the November, 2000, and subsequent invoices which has, in turn, delayed the submittal and payment of subsequent invoices. To some extent the problem is circular: Government delays cause slowed progress and caused out-of-sequence work which, in turn, cause billing problems which, in turn, has resulted in slow pay which, in turn, has caused some subcontractors to lose interest. Sedona is in the process of replacing some subcontractors who are refusing to work. Release of payment will obviously help to eliminate any problem caused by previous hold ups in payment. I will discuss in

detail each of the points you raised in the Show Cause notice, but all of the items you identified are traceable to one or both of these two problems.

While your letter makes it sound as if all work has ceased, that is not true. Work has never stopped, although various portions of the work have been delayed or slowed down because of changes, differing site conditions, and other delays, as well as more recently by payment delays.

First, I will discuss the problems Sedona is having with its schedule since these problems have impacted Sedona getting credited for additional time for delays, as well as having slowed down payments

Sedona Originally Projected an Early Finish

As you know, the "as-approved" schedule showed Sedona finishing early on the project. This is shown by the fact that the final inspection was shown to be 199 days earlier than the scheduled contract completion date. Sedona used this technique to show an early finish, since the contract required the approved schedule to show the scheduled contract completion date on the contract completion date in the contract, rather than the intended contract completion date. In effect, Sedona had an early finish schedule that was approved and was being used by both the Corps and Sedona on this project.

As a result of Government delays for which it had not yet received a contract extension, Sedona, in February, 2001, deleted the early finish by moving the final inspection back to the contract completion date. This was done only because the Government was insisting that Sedona was late when it actually was not. In effect, Government delays had caused Sedona to lose its early finish. The February 28, 2001 CPM showed that Sedona was dead even with where it should be in the contract schedule, that is, finishing on the contract completion date, without any additional time for the pending modifications. Sedona incorrectly was being claimed to be behind schedule on activities that were, in fact, on time as far as the contract completion.

CPM Issues

Since the November, 2000, pay request, a number of issues have come up with regards to the CPM schedule that have not previously been raised with prior pay requests. These questions represent either, one a misunderstandings of the schedule, or two, were changes in previous policies and procedures agreed to by the parties and put into effect. One of the principal problems is that the Corps insists on analyzing the schedule in the project as if the schedule reflects the current reality in the project when

the schedule has not yet been adjusted for the pending modifications because the Government has not yet met with the contractor to negotiate these modifications.

The Government cannot reasonably ignore the delays represented by these pending modifications, and then state that the contractor is behind schedule. Some of these scheduling/progress issues are set forth below, as stated by the Sedona's outside scheduling expert in an April 18, 2001 letter to Sedona, responding to the Corps letter, serials 0055, 0065, and 0066:

<u>Response to Serial 0055</u>

1. I explained to Mr. Cardenas that the schedule clearly showed that work was progressing in a manner as to not jeopardize substantial completion at the contract completion date as of the time of the referenced meeting. Review of the current schedule shows that the work will finish near the contract completion date. We also discussed that the items listed as being on the critical path in your letter were in fact not on the critical path. Please note that the referenced September 29, 2000 update showed that the critical path was not in any of referenced items, but was in the Operations building activities which were delayed by resolving problems caused by the contaminated/explosive soils at that location.

* * * *

3. The contractor QCSM has reviewed the submittals shown in the project schedule and all which have only FIO submittals in a particular division have either been removed or the Government review of the submittal constraint has been eliminated.

4. The activities noted did indeed show negative float. NAS data was entered in accordance with the applicable contract provisions and percentages of completion approved by the Government. These items were not in the critical path as discussed in statement one above.

* * * *

<u>Response to Serial 0065</u>

The reason the update of the project schedule was not provided within seven days of the project progress meeting is that Tom Armstrong called me with questions regarding the value of bid items on last month's schedule. This was about seven working days after the jobsite meeting. He was to e-mail me with the numbers he felt were the correct amounts for each bid item. The COE e-mail system went down and he was unable to do that. After not receiving any e-mail from Mr. Armstrong, I called the area office one or two days later to attempt to get the amounts corrected. Mr. Armstrong was not in. My questions brought the response that the project Engineer had this information and to call him. I called Mr. Cardenas that day. He told me that he was generally aware that there was a discrepancy but did not know the specifics. He was going to get the information to me. After receiving no information from him I called again on Tuesday, March 27. He still did not know the answer, however, he informed me that the meeting that had been scheduled at the jobsite for Wednesday, March 28 to discuss the schedule had been postponed until Tuesday, April 3. (On April 3, the meeting was postponed indefinitely. As of April 11, 2001 it has still not been rescheduled.) I again called Mr. Armstrong, who said that he had thought that there was no problem with the bid item totals, but rather the problem was that the amounts of the resources did not match the bid items. He then gave me the COE bid item totals which he had been unable to e-mail for over a week and that Mr. Cardenas was not able to ascertain. I now have COE totals to compare with the NAS in order to correctly update the schedule. One significant item which caused problems in balancing the bid item totals was the fact that the NTP to change the foundation of the Vehicle Operations building apparently was funded in two different bid items, yet the modification did not state the bid items through which it was funded.

While the above scenario was unfolding, letters were received from the Lackland resident office with additional statements asserting schedule discrepancies. As stated above, these were to be discussed and/or resolved at the

> meeting scheduled for Wednesday, March 28, and again on Tuesday, April 2, 2001. Additional time used to address these issues raised in that letter has further slowed processing the schedule update.
>
> As stated in paragraph c. of the referenced letter, the contract does require submission of a logic diagram, however it requires a printed logic diagram only in the event that the diagram is not legible in its electronic format. In this regard see paragraph 3.3.2. Additionally, the Government have requested and we have agreed to follow the requirements set forth in paragraph 3.3 in lieu of 3.2. Please let us know if you want to revert to 3.2. We have discussed this with Mr. Cardenas and told him that we could provide a printed logic diagram whenever he wanted to go over one.

The above shows how scheduling "issues" have been used as an excuse to delay payments.

In the same report, Sedona's CPM scheduler responded to Serial 0066:

> a. The approved initial schedule which showed that the Vehicle Maintenance and the Vehicle Operations buildings being completed over 190 days prior to contract completion. This comment seems untimely. The schedule reflects that Sedona Contracting is 193 days behind its original schedule. The work has always been shown to be complete within the contract period. To avoid confusion the schedule now shows the project completion being the same as the completion of the work constrained by the time allowed in section 01000 as modified by approved change orders. A fragnet was presented to Mr. Cardenas showing that the contaminated/explosive soils issue delayed the vehicle operations building significantly and delayed the overall project by 144 days. I have not received any modification incorporating this time into the contract.
>
> b. The seventeen items that showed late completion beyond the contract completion date because they were logically linked to turfing and landscaping activities (which

are not bound by a specific completion date)[1]. Sedona originally showed this work in its logical sequence, however serial letter 0026 required that this work be constrained by the proper season rather than logical construction sequence. The additional activities were due to Sedona's intent to do related work like final grading and placing any topsoil in a sequence logically (immediately prior) tied to turfing and landscaping. The schedule has been changed recently to constrain all work except turfing and landscaping by the project completion date. It would seem that Sedona will not be responsible for erosion if it is required to place topsoil a significant amount of time ahead of turfing and landscaping. The constraint dates for this work may need to be revisited because of the soil delays, mentioned elsewhere in this letter, have delayed activities which must precede the turfing and landscaping.

c. Only one activity in the initial schedule should have no predecessor which is the contract NTP. Updates are to reflect actual conditions of the project. The activities without predecessors were modifications which generally reflected work which was logically preceded by action in and by the Government rather than any task in the schedule. Regardless, these activities were logically tied to existing schedule activities for the February 28 update.

d. The activities started prior to completion of the predecessor generally reflect an attempt to work around waiting for modifications or problem resolutions such as the contaminated/explosive problems with the soil. In all cases all progress whether in sequence or ahead of sequence was approved by persons the Lackland Resident Office has stated represent the contracting officer. The February 28 update is submitted without change pending completion of the review meeting scheduled for March 28, [then] April 3, 2001, and now postponed until rescheduled. You told me that you have discussed deleting tasks from the schedule (such as drilled piers at the operations building) which have been replaced by modification redesign, but the

[1] By contract these activities can only be performed during a certain season.

> Government's representative has refused to allow these changes and your being able to recover these costs (cost of the replacement design). Your [Sedona's] only option was to complete the work out-of-sequence as required by the various modifications. To now be penalized because you accelerated the work is not equitable.
>
> e. Per comments to item a. above, and government comments in this paragraph, the schedule showed Sedona being significantly behind its plan to finish the project early. Sedona's progress is significantly behind its schedule. It is not behind the contract completion date. As stated above, the early finish logic has been removed to avoid confusing the reviewers. Please note that the period between May 9, and August 11, 2000 is a little over 90 days. Per the fragnet presented to the Government in an attempt to resolve P00002, progress on the Vehicle Operations foundation was delayed 144 days by resolution of the contaminated/explosive soil issue.

For some time now there has been a problem in getting contract-required monthly progress meetings to take place, where the Corps and Sedona's scheduler, Sidney Whitehead, will meet to go over the things required to be resolved, as had previously been done with Gary Strangeland throughout most of the contract. A portion of Sedona's scheduler's report sets forth these problems:

> As stated above we have tried to have a meeting to discuss discrepancies in the several serial letters addressed herein. We assume that this letter, along with changes made in our February 28, 2001 schedule update are acceptable as Sedona's plan of action. With exception of work not constrained by the "contract completion date" that schedule is "proof" that you are on track to complete this project within the time constraints of the contract. Once the 144 days are added for the soil delay, you will again be completing the project well ahead of schedule. With exception of a few additional tasks logically tied to turfing and landscaping rather than the contract completion date, all updated schedules showed the work being completed by the contract completion date.

> Let me know when the meeting to discuss the schedule and the issues raised in these letters originally scheduled for March 28, is rescheduled. Do not hesitate to call me if you have questions or need additional information.

In a supplement to his report, the CPM scheduler noted:

> On April 10, 2001 Sedona received yet another letter rejecting its pay request. I have not seen it but I understand that one of the reasons for this is that the schedule still shows out-of-sequence work. Please refer to the paragraph above discussing this and the fact that paragraph 3.8 [of section 1320] requires the Contracting Officer or Representative be at each periodic progress meeting to "approve activity progress, proposed revisions, and adjustments as appropriate." Mr. Strangeland specifically reviewed the logic on out-of-sequence work during the meetings he attended. After each meeting to date schedules were submitted, and payment was made on all progress shown. Something is out of balance here. Please continue in your attempts to schedule a meeting with the Representative of the Contracting Officer who can explain why the previous approvals are not unacceptable.

At a meeting on April 23, 2001 Mr. Armstrong and Mr. Trinidad agreed that the requested time extensions for the pending changes would be addressed in an upcoming meeting to be held between the contractor's scheduler, Sidney Whitehead, Jake Trinidad, and Mr. Cardenas. After this was done, a progress meeting attended by these parties and Mr. Fano was to be scheduled to review the progress and the CPM sequencing. As discussed, the first meeting was stopped after two hours and the Government has refused to resume the meeting. Mr. Whitehead, Mr. Jake Trinidad, and Mr. Cardenas had agreed on a 144-day extension for modification P00003, but could not agree on compensable time. After two hours, Mr. Cardenas stated he had to go and rescheduled the meeting for Friday, May 5, 2001. He subsequently cancelled the meeting without explanation. The other project delays connected to the contract modifications were not discussed. Sedona later learned that Manual Fano was characterizing the meeting as an impasse. The fact that Mr. Cardenas said he had no authority to negotiate compensable time does not mean the parties were at an impasse. *Whether or not the parties can agree on compensable delay, while ultimately necessary, is not crucial. The crucial point is that Sedona is entitled to a 144-day contract extension. That extension alone (and Sedona is entitled to others) means that Sedona is not projected to complete late, even with the current slow down in work,*

*some of which is still being caused by ongoing delays. Failure by the Government to release all or a significant portion of the $3.7 million earned is what will prevent Sedona from finishing on time.*

The Sedona CPM scheduler also responded to the Corps' April 18, 2001 letter (serial 0069):

> The logic in place was approved by the Government. There are no hollow metal doors in the area to receive gypsum board in the vehicle maintenance building. In addition, water resistant gypsum board can be used if there were such areas. I do not see a schedule flaw here.
>
> There are no exterior metal doors in the area to receive tape and float treatment. See comments above. Logic will be added pursuant to approval at the above referenced progress meeting [that the Government refuses to hold] to constrain paint finish with the metal door installation, as Sedona's current plan is to paint these doors after installation.
>
> The work described was intended to be done by the same workers. "Exterior sheathing" ***is*** specified in division 9. In this regard see section 09250 paragraph 2.4. There is no contract requirement for activity ID numbers to reference construction divisions. Sedona did intend to have the roof substantially completed prior to starting any gyp board work. Logic changes to reflect Sedona's current sequence should be approved at the April progress meeting whenever the Government will agree to hold it. We do not agree that the work is improperly grouped, but can divide it if that is the agreement reached or direction received if the Government will ever hold [a meeting].
>
> Final paragraph: A meeting was held on May 1, 2001 (after this letter was received and a meeting was held at the Area Office were guidelines for resolution of these issues were set) wherein the Government's representative agreed to a time extension of 144 days for pending modification definitization. Whether the contractor was to receive compensation for 51 of these days was to be addressed by Mr. Fano and Mr. Hector Trinidad as Mr. Cardenas did not

have authority to agree to this and Jake Trinidad did not have authority to agree to non payment for these days. Due to Mr. Cardenas' busy schedule, this meeting was adjourned after only two hours. The follow up meeting scheduled for May 5, 2001 was canceled by the government. Mr. Fano informed me that he would not reschedule the meeting since he had now determined that negotiations were at an impasse and all modifications (including the ones Mr. Cardenas did not have time to discuss) would be issued unilaterally. There was no impasse as to the time extension. There was a disagreement, again not an impasse, over compensable time.

One of the modifications Mr. Cardenas did not have time to review was related to the monitoring wells. Analysis of this modification shows a 335 day government delay. This information was submitted to him prior to the May 1, 2001 meeting.

Some of the deleted work the Government has refused so far to allow Sedona to remove from the schedule relates to the foundation design modification for the vehicle operations and some of the Sedona out-of-sequence work which the government is now refusing to pay for is the result of the Government not allowing the schedule to be changed to reflect this modification. A contract extension of well over 200 days will eventually be agreed to by the Government.

All schedules with approved progress, which have been submitted, showed completion of all the components of the project not related to landscaping and turfing is projected to be completed prior to the current contract completion date. The Government has either been too busy or refused to attend any progress meetings after the February 28, 2001 progress was approved. This, along with the justifiable time extensions to which Sedona has shown it is entitled, should be sufficient to show the Contracting Officer that termination is not justified at this point.

Until these issues are cleared up, the Corps cannot realistically:

a. re-evaluate and refuse to pay progress on the contract [since it is now questioning formerly approved progress];

b. re-evaluate and refuse to pay for out-of-sequence work [since it is now questioning formerly approved out-of-sequence work]; or

c. assert that Sedona is behind schedule.

<u>Progress Has Been Approved for Pending Pay Requests</u>

? 2000

All progress shown on the schedule through December 2001, whether in sequence or out-of-sequence, had been approved at a monthly joint progress meeting. The Government representatives responsible for the review of the progress have also approved progress through February 28, 2001 at a meeting with the QAE since February 28, 2001, although not a formal monthly meeting because the Corps has refused to hold such meetings.

Recently, there have been no regular monthly meeting and the Government has refused to review the progress completed until the schedule is "fixed". "Fixes", of course, are supposed to be discussed and agreed to at the monthly meeting. The Corps has thus created a problem without an end unless the Corps is going to agree to hold the contractually required meetings. Since the recent Government letters began to arrive regarding out-of-sequence work, Sedona has also requested progress meetings to clear up this issue to comply with the contract scheduling requirements. In this regard, see contract Section 01320, paragraph 3.8 and all subparagraphs. This meeting is the required forum for review of the progress, out-of-sequence work, and discussion and approval of logic changes and approval of out-of-sequence work.

Mr. Whitehead has met with Sedona and addressed the list of out-of-sequence work described in Mr. Armstrong's letter. Sedona is waiting for the Government's agreement to meet with Sedona for the April progress meeting in order for Sedona's changes to be approved. A copy of the revised schedule was forwarded to Mr. Cardenas on May 5, 2001. It shows that Sedona has picked up 13 days. This undated schedule does not include the delays discussed above.

Mr. Armstrong agreed at an April 23, 2001 meeting that out-of-sequence progress would not affect pay requests for work through December, 2000. The Corps, however, has not agreed to release the November and December payments.

The Government has also paid for stored material using the CPM all along. That procedure was changed as of Pay Request No. 9. The directed revisions are shown in the update which was e-mailed to George Cardenas on May 15, 2001. The Government waived the progress meeting to review progress for the period ending February 28, 2001. Then the Government objected to the payment, but never would agree to hold the progress meeting for that period. Sedona attempted to schedule the meeting in March and in April, 2001.

A considerable amount of work has been done since February, 2001, as shown by the jointly agreed percentages which were agreed to on April 25, 2001. Exhibit 1. Sedona will input the actual progress and make the agreed logic changes at the April, 2001 progress meeting which the Government so far has refused to schedule and submit that update to the Government as soon as possible. Correction of the out-of-sequence logic and revision of the data date to April 26, 2001 shows a " -36 days" without updating the progress since February and without inputting the delays. A "work together" attitude should result in a revised CPM that addresses all outstanding issues within a short period of time.

<u>Progress Payment History Summary</u>

1. On November 15, 2000, Progress Payment Request No. 8 was submitted for the work done in October, 2000. Sedona billed $284,158, but was only paid $45,851. The Corps stated on December 9, 2000 that it was deducting $238,307 because a steel erector had not been paid, even though in actuality it had been paid. (See later discussion of Surety deciding to pay with its own funds, instead of the joint control trust account funds.)

2. On December 6, 2000, Pay Request No. 9 was submitted for work performed during November, 2000. A payment was requested in the amount of $239,498. No amount of money has been paid to date for this work.

3. On December 22, 2000, the Corps stated that it agreed with the percentages being billed, but would not make payment because it needed a list of subcontractors and a change in the narrative report. A list of subcontractors and the change in the narrative report were telefaxed to the Corps on January 5, 2001. No response was received after that date to this pay request.

4. On January 6, 2001, Pay Request No. 10 for work performed during December, 2000 was submitted in the amount of $1,024,667. This pay request had the subcontractor list and other information that had previously been requested. No response has been received to this pay request.

5. On February 15, 2001, Pay Request No. 11 for work performed in January, 2001, was submitted in the amount of $373,701. No response has been received to this pay request.

6. On February 23, 2001, Sedona send a fax in to withdraw its previous requests because of a mistake. This was done because Sedona understood it was going to be required to make changes in the previous pay requests.

7. As a result of various discussions, a meeting was held on March 8, 2001. Sedona understood it had been directed at that meeting to submit a combined pay request for the outstanding pay invoices.

8. On March 8, 2001, Sedona submitted a "preliminary" pay request showing a combined pay request for November through February, as directed. Sedona wanted certain assurances for this pay request as a result of the meeting on March 8, 2001. There was no specific written response to this pay request. Tom Armstrong did call and said he was not going to pay it. Hector Trinidad talked to Mr. Armstrong and was told that the pay request would not be paid because a later schedule for a later period was needed to be gone over, but the Corps would never agree to meet until April 23, 2001.

9. On April 2, 2001, Sedona resubmitted a November through February 28, 2001, invoice in the amount of $3,741,469, with no qualifications. No response has been received to this pay request.

10. On April 23, 2001, Tom Armstrong told Sedona that he had not yet "touched" or reviewed the December, 2000, pay request.

11. On May 4, 2001, as a result of not getting any response to previous requests, Sedona resubmitted Pay Request No. 9 for $391,440.15. This request was received by the Corps on May 7, 2001.

12. On May 10, 2001, Sedona received a response. Tom Armstrong stated he wanted a recalculation of the request based on stored materials to be handled differently than it had previously been handled on all previous pay requests.

13. On May 10, 2001, the requested information and changes was faxed by Sedona to Tom Armstrong.

14. On May 14, 2001, a letter from Tom Armstrong indicated he was still evaluating Pay Request No. 9 and that he had decided to start his review time over because of the supplemental information that he had requested.

15. On May 16, 2001, Sedona submitted a new Pay Request No. 10 for December, 2000, in the hope that this would finally obtain some results, so Sedona can pay its subcontractors and suppliers.

This summary shows that the payment process has been unreasonably long under any standard. The Corps, of course, could have always paid whatever amount it felt was appropriate out of the $3.7 million in billed work. The Corps, instead, has paid nothing for work performed since November 1, 2000 to date.

Set forth below are the discussions of the specific points raised in the Show Cause letter:

1. <u>Timely Payments to Subcontractors and Suppliers</u>

The first factor you listed was the failure of Sedona to make timely payments to subcontractors and suppliers. To the extent it was within its power, Sedona has made timely payments to subcontractors and suppliers consistent with its contractual obligations. As you know, on this contract there is a joint control trust account agreement ["JCTAA"] with the Surety which began to be used by the Surety and Sedona in the late summer or early fall of 2000 to make payments under the contract. Later disagreements developed and there was a period of time the Surety was not making payments.

It is believed that the "non payment" you are referring to is a single incident concerning a single payment that was made to the steel fabricator. The steel fabricator mis-fabricated some of the steel delivered to the job. This was discovered after the payment application was made. Sedona initially determined there should be a backcharge in order to insure that the corrective work would be made and that the steel fabricator was owed only approximately $200,000. Pursuant to the request of the Surety and pursuant to the JCTAA Sedona deposited the check received from the Government into a joint control trust account. The Surety, for its own reasons, decided to make the payment to the steel fabricator with its own funds, instead of using the funds that were then in the JCTAA. Sedona had no control over this decision of the Surety. Sedona did everything it could do to pay the steel fabricator directly with the funds it had deposited in the JCTAA. Sedona had no control and cannot be at fault because the Surety elected to pay with its own funds. The supplier, the steel fabricator, was, in fact, paid. Since Sedona lost control of the money and the subcontractor was properly paid, so Sedona properly carried out its contractual obligation.

Other than that one payment where the subcontractor was paid, Sedona has, itself, or through the JCTAA, paid off subcontractors and suppliers all monies received from the Government for their work. In this regard you should note that the last

payment received from the Government was in the amount of $43,000.00 for October, 2000. There have been a number of complaints by subcontractors and suppliers for lack of payment, but that has to do with the fact that the Government has failed to make any payments since the last one for October, 2000. It is now some seven months later.

2. Subcontractors Refusing to Continue Work

The second factor identified in the Show Cause notice was that certain subcontractors are refusing to continue work on the project. Subcontractors have been working and are still working. A new steel erector, Alvarez Metal Building & Steel started steel erection on the vehicle operations building on May 15, 2001. Exhibit 2. Mike's Backhoe Service will start the removal of contaminated soil from the site on May 21, 2001. Exhibit 3. The masonry subcontractor was working up to last Friday, May 11, 2001, completing block work on the maintenance building. On May 17, 2001, he will send his sample for the brick work to be approved. Genz Electric has continued to work.

The problem with the subcontractors that have not been manning the job is a direct result of the Corps not releasing any payments after the payment for October, 2000. It is within the Government's control whether these payments are released, not Sedona's control.

Before F&D got involved, Sedona and the Government had established and were following certain pay request procedures and turning in the same documentation for Pay Request Nos. 1 through 8. All of a sudden, on Pay Request No. 9, the Corps has changed the procedure. The parties had clearly established a contemporaneous interpretation of what the proper payment procedures were and what proper payment documentation was needed in order to get the Government to make payment. One example is that Sedona was not required to turn in a list of subcontractors and a list of payments that have been made to the subcontractors on each prior payment request, but then the Government decided that it wanted additional information. Sedona promptly furnished the additional information, but Pay Request No. 9 has still not been paid. It is unreasonable first, to make changes to the agreed payment procedures under which payments 1 through 8 were made.

The Corps has also made several changes with regards to the CPM schedule as reasons for withholding the November, 2000, and later payments to Sedona. The specifications in section 01320, para. 3.8, requires a periodic progress meeting with the Contracting Officer or his Representative and, importantly, the Government CPM scheduler to discuss progress, payment, and the schedule. Neither the Contracting Officer nor his Representative, Tom Armstrong, have ever been present at any of

these meetings. Initially, Gary Strangeland with the Corps was present at the monthly meetings. Under Gary Strangeland, the parties would:

1. go over the percentage of completion on each activity;

2. review the logic of out-of-sequence work to see if the logic needed to be changed;

3. review the logic of work started that month to insure that the logic was correct for the work activities that started that month;

4. if there was out-of-sequence work being performed that month, agree whether it was logical to proceed as Sedona was from a construction point of view;

5. agreeing whether a change in logic was necessary; and

6. discuss delays as an explanation of why out-of-sequence work was being performed.

After going through those steps, out-of-sequence work was routinely approved, as a recognition of either the work was logical to be performed in that order from a construction point of view, and/or it was a reaction to trying to overcome and work around delays on the project.

Recently, as late 2000, George Cardenas took over Gary Strangeland's role with regards to the review and approval of the schedule. George Cardenas has changed how the monthly schedule meetings have worked. After George Cardenas took over, the only action accomplished at the meetings was to go over the percentage of completion. The rest of what had previously been done, activities 2 through 6 listed above, were no longer performed. The Corps has waived and/or refused to have the required meetings since December, 2000.

3. <u>Installation of Electrical Work Only Work Being Performed</u>

The third point raised in your letter was that the allegation that the only work currently being performed on the project is the installation of electrical work. This statement is incorrect. Sedona has been working, too. Sedona is performing the following:

1. structural and site pouring and forming of concrete;
2. metal studs;
3. framing;

4. site work;
5. installing bollards (miscellaneous steel); and
6. gyp sheeting and cementitious board

In addition, the utility subcontractor has been doing some excavation and asphalt work. Sedona has done some steel erection work and forming and reinforcing for concrete work. In addition, the mason has been performing work until last Friday. Thus, the only work currently being performed is not just electrical work. The new steel erector started work on May 15, 2001, also. In fact, work has never stopped. At various times throughout the job various trades have been prevented from working. At this time the delays in paying the $3.7 million owed for work performed is also impacting the job.

4. Interior Finish Work Cannot Proceed Due to No Roof Installed

The fourth item you mention is the assertion that the interior finish work on the project cannot proceed due to the fact that the roof has not been installed. While it is true that the permanent roof has not yet been installed, the roof deck is in. Sedona is in the process of arranging for a new roofing contractor to complete the work. The delays in payments have been the problem.

5. Contract Completion Date

The fifth point you make is that the current contract completion date is September 29, 2001. Related to that, is the statement that the original contract had a performance period was 669 calendar days and that the contract has only been extended 15 contract days so far. That statement is true as far as it goes, but what is omitted from that statement is far more important than that statement itself. The Government is fully aware that Sedona is entitled to a significantly greater number of days than the 15 days for which it has been given credit so far.

For example, for change MJ006/DO-F1349, Redesign Vehicle Ops Building Slab, Sedona has asked for an additional 144 days, which are justified by its CPM. The May 1, 2001 negotiations between Jake Trinidad and George Cardenas were conducted as per the agreement of Tom Armstrong and Hector Trinidad at the April 23, 2001 meeting. On May 1, they agreed that there was 144 days of project delay for which the contract completion date must be extended. They were not able to reach a final agreement on that day because Mr. Cardenas could only meet for two hours and they could not reach an agreement on how much of that time was going to be compensable delay. Of course, whether or not the parties can agree on compensable delay has nothing to do with establishing the 144 days of contract extension to which Sedona is entitled. The meeting was supposed to be rescheduled for the May 4, 2001, and then was cancelled by the Government.

In addition, Sedona is entitled to additional time for MJ013/DO-F1645, Relocate Comm. Lines. Sedona is entitled to 60 days for the south end. There are two communication lines in the way of the storm drain lines. Only the one at the south end is dealt with in RFP MJ013. A separate RFP and modification need to be issued for the communication line that interferes with the north end. This is a continuing delay that still needs to be resolved.

Next is MJ002/DO-F1005, Relocate Hydraulic Lifts. This is an open delay, since no notice to proceed has been issued on this change.

Next is MJ015/DO-F1923, Modify Monitoring Wells at Area A. This has been a long standing delay which has not yet been resolved. This delay is impacting the other work because all of the monitoring wells to not be deleted under this modification have not yet been identified by the Government, which is impacting other work waiting to start. The plans show three, but there is supposed to be five wells. This delay, when it ends, will probably impact the completion date between 235 to 321 days. Part of the out-of-sequence work performed by Sedona is because of this delay and the delay in the Corps to agreeing to the schedule changes to reflect the deleted work. Work is obviously being done "out-of-sequence" if predecessor activities have been deleted, but Sedona has not been allowed to change the schedule logic to reflect the changes.

There are other smaller delays on the project. For example, the Corps in determining excusable weather delays has not taken into account "mud" days when critical work cannot proceed because of previous rains. Such days are as much excusable delay as the day it actually rains. There is also an issue of converting workdays to calendar days.

The Show Cause letter asserts that the project was approximately 63 percent complete with critical activities unable to progress because the buildings are not dried in, but that 79 percent of the contract duration had expired. This 79 percent duration expired was erroneously based on several things. First, it did not take into account any of the pending modifications which would add substantial time to the contract, including 144 days first presented to the Government in November, 2000, and agreed to at the May 1, 2001, meeting. Second, as a result of the delays relating to contaminated soil at the vehicle operations building site, which resulted in the change to the building foundation in MJ006/DO-F349, the vehicle operations building became the critical path, instead of the maintenance building. Originally, the critical path would have remained in the maintenance building, but this changed with the delays. Since, as discussed below, the Government has refused to continue negotiations of time extensions or to meet to approve logic changes in the schedule, the Government is using an unreasonable figure for the percent of contract time expired.

Summary

1. Sedona is entitled to a contract extension of over 300 days of which 144 has already been negotiated but not made part of the contract or the CPM.

2. Sedona has payments of $3.7 million owed to it for November, 2000 through April, 2001. A variety of reasons have caused the payment delays. The Corps could have quickly resolved these issues and started the flow of money which would have put additional subcontractors back to work.

3. Sedona and other subcontractors never stopped work and new subcontractors have started work in the key areas.

As I am sure that your local personnel are aware, Sedona has been working on another project, the Troop Mall, at Lackland Air Force Base for AAFES. That project has not had the delays and problems that this contract has and Sedona is very near to completing the building with the remainder of the site work to follow. This fact shows that Sedona can do the work, if the problems and issues discussed in this letter are promptly resolved. Successful contracts need both sides to work together and cooperate. Sedona is willing. Will the Government do its part?

Since Sedona is entitled to significant additional time, Sedona will still finish on or ahead of schedule. Sedona is still committed to finishing this job. A termination for default is not warranted. Sedona, its CPM scheduler, and its project manager are ready, willing, and able to meet to get the project moving and back on track for an early finish.

Sincerely,

THEODORE M. BAILEY, P.C.

Theodore M. Bailey

TMB/jeb
Enclosures
VIA Telefax and U. S. Mail

cc: Sedona Contracting, Inc.
6800 Park Ten Boulevard, Suite 135 East
San Antonio, Texas 78213
[with enclosures]