**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P. O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF:

May 30, 2001

Office of Counsel

SUBJECT: Contract No. DACA63-99-C-0039, Vehicle Opertaions/Maint. Complex, Lackland Air Force Base

Theodore M. Bailey, Esq.
Milam Building, Suite 711
115 East Travis Street
San Antonio, TX 78205-1611

Dear Mr. Bailey:

I have reviewed the May 16, 2001 response to the show cause letter that you have submitted on behalf of your client Sedona Contracting, Inc. (Sedona). Sedona asserts that the show cause is inappropriate due to alleged Corps of Engineer (COE) delays and the failure of the COE to make timely payments. I have investigated these allegations and do not find that they have merit.

Sedona complains that initially they planned on an early completion date but due to impacts caused by contract modifications issued by the COE, the completion of the project has been delayed. The initial CPM schedule submitted by Sedona did indicate that the project would be complete prior to the contract completion date. However, Sedona has failed to prosecute and schedule the work in accordance with their initial CPM. I have determined that delays to the project have not resulted from modifications issued by the COE, rather they are from delays caused by Sedona in not starting and completing activities on the maintenance building as required under their schedule.

Sedona asserts that the COE insists on analyzing the schedule for the project as if it reflects the current reality when the project has not been adjusted for pending modifications. The COE analysis of the modifications for the slab at the operations building, the conflicting elevations for the sewer line with the

communications line, and the monitoring wells indicate that delays associated with these modifications, if any, did not impact the contractor's critical path. Therefore, the contractor is not due a time extension.

The contractor contends that Government representatives would not allow the deletion of activities from the schedule that were changed by modification. Specifically it is alleged that the contractor could not delete the activities for the drilled piers and the activities associated with forming and placing concrete in the grade beams for the operations building from the schedule. COE representatives have not prohibited the contractor from changing their schedule to delete activities associated with the drilling of piers and the forming and placing of concrete for grade beams. When the notice to proceed for the modification that deleted the grade beams and drilled piers, changing the foundation to a rib mat foundation, was issued on July 21, 2000, the contractor's schedule should have been revised to reflect this change. Activities for the drilled piers and grade beams should have been deleted, and a new activity for the rib mat foundation added. I note that the contractor continued to include the activities for the drilled piers and grade beams in their schedule through the fall of 2000. Inclusion of these activities in the schedule with their respective durations distorted the schedule, giving an unrealistic view of the status of the project.

Sedona also asserts that there has been a problem in scheduling the required monthly progress meetings. This statement is not factual. Monthly progress meetings have regularly been scheduled between the COE quality assurance representative and the contractor's superintendent in order to review the progress each month the contractor has made on the project.

It is alleged that when Mr. Stangeland was the project engineer, he held regular meeting in order to review and approve out of sequence work. Mr. Stangeland does not verify this allegation. Mr. Stangeland denies that any meetings were held where out of sequence work was identified by the contractor, reviewed, and approved by him. The only meetings he recalls were those in which the amount of work performed in the previous pay period was reviewed and the start and finish dates for activities started and finished in that pay period were verified.

Sedona asserts that in a meeting on May 3, 2001, Mr. Cardenas agreed that the contractor had been delayed 144 days by modification P00003 that changed the foundation in the operations building. This allegation is not correct. Mr. Whitehead provided Mr. Cardenas a frag net in the May 3, 2001 meeting. Mr. Cardenas agreed that the data provided by the contractor indicated certain activities were delayed 144 days. However, he did not agree the contractor was entitled to a time extension. Subsequently, Mr. Cardenas discussed this matter with Mr. Fano, the Resident Engineer. Based on the disparity in the positions taken by the party with the contractor asserting it was delayed 144 days, and the COE acknowledging no delay, Mr. Fano determined further negotiations would not be worthwhile. Therefore, the negotiations planned for May 5, 2001 were cancelled.

Sedona further alleges that the Government acknowledged 51 days of compensable delay during the May 3, 2001 meeting. This allegation is not factual. During the meeting Mr. Jake Trinidad referenced 51 days of compensable delay. Mr. Cardenas did not concur that the contractor was entitled to the time or the additional compensation.

The COE analysis of the schedule does not indicate that Modification P00003 delayed the contractor. The modification deleted the pier and beam foundation and substituted a rib mat foundation for the operations

building. Notice to proceed on the modification was issued on July 21, 2000. A review of the daily quality control logs establishes that it took the contractor only 28 calendar days to form, install slab reinforcement and place the slab. The activities for the pier and beam foundation and slab had been scheduled for 104 calendar days. Any delay involved in the construction of the rib mat slab resulted from the contractor's failure to schedule and pursue to the work in a timely manner. Although the notice to proceed was issued on July 21, 2000 Sedona delayed start of the work on the slab until September 7, 2000. Sedona only worked sporadically on the slab until it was complete on January 24, 2001.

A review of the daily logs and the schedule indicate that in the fall and the summer of 2000, the project was not delayed by work on the operations building, but rather was delayed by a failure to complete the grade beams and the structural steel on the maintenance building. Sedona's schedule, data date June 29, 2000, indicates that the placement of the concrete in the grade beams for the maintenance building had an early completion date of July 28, 2000, and a late completion date of May 11, 2000, indicating that the activity was behind schedule. Placement of concrete in the grade beams was not finished until August 11, 2000. The structural steel activities were scheduled in the June 29, 2000, update of the CPM schedule to have a duration of 45 days and be completed by October 19, 2000. The erection of the structural steel on the maintenance building did not start until November 8, 2000. Based on Sedona's failure to complete the maintenance building as scheduled and its failure to timely pursue work on the operations building, I must conclude that the contractor is not entitled to additional time under Modification P00003.

The Corps of Engineers incorrectly agreed to pay for some stored materials as a percentage of certain activities. Depending on the percentage paid on the

activity, the stored material payment used up a proportionate amount of the duration of that activity, even though Sedona had not started work. For example, activity number 060005.C for "Custom Casework," 78 percent was paid due to stored materials and that used up 7 of the 9 days allowed for duration. It shows an actual start date of January 20, 2001, but this is not correct. The actual work has not started. Sedona was advised by Mr. Fano in a letter dated April 18, 2001, that stored materials are to be paid as a separate item on their invoice, not as a percentage of work in place shown on the schedule. Sedona was furnished a sample form to track the stored materials and submit them for payment. Activities that have been paid to-date (through October 31, 2000), which include stored materials that have not been installed are: 050005.A, 050005.C, and 060005.C.

Sedona also alleges that the COE has failed to timely process progress payments. Sedona correctly asserts that money was withheld from Pay Estimate No. 8. The basis for this withholding was Sedona's certification that it paid its steel subcontractor, when in fact Sedona failed to pay the subcontractor. The surety paid the subcontractor.

Sedona asserts that pay request No. 9 was submitted on December 6,2000 for work performed through November 2000. Sedona was advised by the COE in a letter dated December 22, 2000 that pay request No. 9 could not be processed due to Sedona's failure to comply with the payments clause of the contract. Sedona was advised that they were required to provide a listing of the amounts of work performed by each subcontractor, a listing of the total amount of each subcontract and a listing of the amount the previous payments to the subcontractors. Sedona claims that all of the requested information was provided on January 5, 2001. Subsequent to the receipt of this information a teleconference meeting was held between representatives of the COE, the surety and Sedona. Based on agreements reached in the teleconference, on

January 11, 2001, Sedona directed that future progress payments be made to the joint account. The COE started processing a modification to change the payee address. Sedona was advised in a letter dated January 18, 2001 that the change of payee address would delay payments until early February 2001. Sedona in a letter dated January 22, 2001, reversed the direction to send payments to the joint account and requested that payments be made to their account, although they were under an order issued by the United States District Court for the Western District of Texas, San Antonio Division to direct the owner to make payments to the joint account. Subsequently Sedona in a letter dated February 23, 2001, advised the COE that there had been a mistake in their pay requests and that they would be resubmitted with a corrected invoice.

Sedona asserts that pay Estimate No. 10 was submitted on January 2, 2001, for work performed in December 2000. Sedona incorrectly asserts that no response had been made to that pay request. Mr. Armstrong advised Sedona in a letter dated January 18, 2001, that pay request No. 10 was not a valid pay request because the contractor had failed to comply with the requirements of the contract for submission of pay requests. Sedona had failed to submit the progress narrative, the monthly exposure report for the month of December 2000. Pay request No. 10 was withdrawn in Sedona's letter dated February 23, 2001, due to mistakes in their pay request.

Pay Request No. 11 was submitted on February 15, 2001, for work performed in January 2001. Sedona alleges that no response had been made to this pay request. No response was made because it was withdrawn in Sedona's letter dated February 23, 2001, due to mistakes in their pay request.

On April 2, 2001, Sedona submitted a November through February 28, 2001 pay request. Sedona alleges that no response has been made to this

pay request. This is incorrect. In a letter dated April 9, 2001, Mr. Armstrong advised Sedona that the pay request was not a valid invoice due to their failure to provide a Narrative Report as required under paragraph 3.3.3 of Section 01320 of the contract, their failure to list the amount included for work performed for each subcontractor, the total amount of each subcontract and the amounts previously paid to each subcontractor. Additionally progress on certain activities was disallowed due to the work being out of sequence. Subsequently in a letter dated April 18, 2001, Mr. Fano advised Sedona that an analysis of their CPM update indicated that they were behind schedule. Sedona was advised that the Government would retain 10% retention from further progress payments.

The COE has processed both pay request Nos. 9 and 10 for payment to the joint control account. Sedona has failed to resubmit corrected invoices for pay request No. 11.

Sedona alleges that there is only one instance of non-payment of subcontractors during the administration of the contract. This allegation is not factual. The steel supplier, the steel erector, the site utilities subcontractor, the mechanical subcontractor, the roofer, the precast supplier, the millwork subcontractor, the EFIS subcontractor, and the mason have advised COE representatives of non-payment by Sedona.

Sedona also asserts that subcontractors are working on the project. I do not find any support for this allegation. My representatives visited the site on May 24, 2001, and found only the electrical subcontractor working. The only work being performed on the site was electrical and the drilling of holes for the bollards. A new steel erector did not start work on May 15, 2001, and has not performed any work at the site subsequent to that date. The mason has worked only one day since April 30, 2001. The

mechanical subcontractor has advised COE representatives that they have terminated their contract due to non-payment. The roofer has advised COE representatives that they refuse to work on the project due to nonpayment. The site utility subcontractor has advised COE representatives that they refuse to work on the site due to non-payment. Sedona attempts to place responsibility for non-payment of subcontractors on the COE's refusal to process pay estimates. This allegation has no basis in fact. The reason the pay estimates have not been processed is Sedona's failure to submit estimates that comply with contract requirements.

Sedona asserts that they continue to make progress towards the completion of the project. A review of the daily control reports indicates that this progress is very minimal and will not insure the completion of the contract by the contract completion date. During the first ten days of May 2001 the only work that was performed at the site was electrical, very incidental site work, concrete forming work, concrete curb and gutter, and the mason working on the project one day. My representatives observed less than 10 men working at the site on May 24, 2001. The daily quality control reports indicate that the only work performed at the site during April 2001, was the EFIS, street repair, electrical work, installation of studs and sheathing and the forming and placement of concrete slabs. No mechanical work has been performed at the site since March 7, 2001.

I am advised by the Area Engineer for the San Antonio Area Office, Tom Armstrong and the Resident Engineer for the Lackland Resident Office, Manuel Fano, that the critical activities remaining to be completed for the project are the completion of the structural steel on both facilities, the installation of mechanical equipment on the maintenance facility, the installation of the roofs on both facilities, the installation of overhead doors, exterior doors and the exterior brick veneer on the maintenance facility. No

work is being accomplished to complete these critical items.

Sedona contends that they are entitled to a time extension of 144 days for redesign of the operations facility slab, 60 days for the relocation of the communication line, and 235 to 321 days for modifying monitoring wells in Area A. Sedona also asserts that in issuing time extensions for unusually severe weather; the COE has failed to take into effect the impact of the weather. As discussed previously, Sedona is not entitled to a time extension for the changes to the slab for the operations building. The work on the communications line was site work that was not on the critical path. Further it did not delay any work on the critical path. Therefore, Sedona is not entitled to a time extension. The problem with the monitoring wells affects the site work at the operations building. It has not delayed any activities on the critical path. Therefore, Sedona's claim of a time extension is without merit. The COE in granting the contract time extensions for unusually severe weather has granted a time extension for both the weather and its impact.

Subsequent to the May 16, 2001 submission, Sedona raised a number of issues in a May 17, 2001 submission. These are:

- The grade adjacent to the sidewalk at the new POV area.
- Fabrication of a new column at column line D-6.
- Installation of horizontal metal studs between vertical studs.
- Installation of anodes at fire hydrants.
- Manifesting of haul dirt.

Sedona has failed to provide any analysis indicating that these issues delayed the critical path for construction of the facility. The COE's analysis

of these issues does not indicate that the issues contain any impact.

A thorough review of Sedona's submission of reasons why the contract should not be terminated for default indicates that Sedona's positions are not supported by facts. Mr. Fano in a letter dated April 18, 2001, directed Sedona to submit a plan of action to regain their schedule. Sedona has failed to comply with this request. Sedona has failed to employ and pay subcontractors at the site to insure that the work will be completed by the contract completion date. Sedona has failed to employ sufficient workers at the site to insure that the work is completed in a timely manner. Sedona has failed to procure and install equipment at the site in a time manner. An analysis of the progress on the project, the manning of the project and the schedule does not indicate that Sedona will complete the project by the contract completion date.

Sincerely,

John H. Rodgers
Contracting Officer

CESWF-OC/CROSSWHITE

CESWF-CT/RODGERS

RETURN

CESWF-OC

**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P. O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF:

June 7, 2001

Office of Counsel

SUBJECT: Termination for Default; Contract No. DACA63-99-C-0039, Vehicle Operations-Maintenance Complex, Lackland Air Force Base

Mr. Hector Trinidad
President
Sedona Contracting, Inc.
6800 Park Ten Blvd., Suite 135 East
San Antonio, TX 78213

Dear Mr. Trinidad:

In a letter dated May 12, 2001, Sedona Contracting, Inc., was directed to show cause as to why their contract should not be terminated for default for failure to make sufficient progress to complete the project by the contract completion date. Sedona replied in a letter from their attorney dated May 16, 2001, alleging that the Corps of Engineers had delayed Sedona's progress through the issuance of certain contract modifications, constructive changes and the failure to make progress payments. I examined each issue raised by Sedona and, after a thorough investigation determined that none of the issues had merit. Sedona was advised in a letter dated May 30, 2001, that none of the proffered reasons for their non-performance had validity.

Manuel Fano advised Sedona in a letter dated April 18, 2001, that they were behind schedule and they were directed to provide a schedule indicating how the schedule would be regained. Sedona failed to comply with this directive. Sedona's progress on the project during the last 60 days has been unacceptable. Sedona has failed to employ subcontractors in order to perform critical activities including finishing the erection of the structural steel, installing the roof, and performing mechanical work. A mechanical subcontractor has not worked at the site since March 7, 2001. Neither the roofer nor steel erector will perform work at the site due to non-payment.

Sedona promised to have a steel erector on the site on May 15, 2001. The steel erector did not report to work on that date and no steel erection has taken place subsequent to that date. Except for the removal of soil and minor incidental site work, no site work is being performed. Due to the fact that the roof has not been installed, interior finish work cannot proceed. None of the exterior brick veneer has been installed. Yet, the mason has worked at the site only one day in May 2001. Further, Sedona has advised me that they have no resources with which to complete the project other than the remaining contract balance. At Sedona's present rate of progress the project will not be completed until December 27, 2001. The contract completion date is September 29, 2001. Based on Sedona's rate of progress as demonstrated during the last 60 days on the project, their failure to employ subcontractor's who are critical to the completion of key activities, their failure to obtain critical equipment including mechanical equipment which has a long lead time, and their failure to man the project with a work force which is capable of completing the project in a timely manner, I find that there is no reasonable likelihood that the contractor can make reasonable progress in order to complete the project by the contract completion date.

The Default clause of the contract indicates in subparagraph (a) that if the contractor "refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in the contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work..." In accordance with this clause, Sedona's right to proceed with the remaining work under the contract is terminated for default due to a failure to make sufficient progress on the project in order to complete the work required under the contract by the contract completion date.

In accordance with the Termination for Default Clause, the construction services you contracted to provide, but have failed to complete, may be obtained through award of a completion contract. Sedona will be held liable to the Government for any costs incurred by the Government in the completion of the uncompleted work under the contract, to the extent that such costs exceed the remaining contract balance. Further be advised that the Government reserves any and all other rights and remedies provided for by law or under this contract in addition to the charging of the excess completion costs, including the assessment of liquidated damages.

This letter constitutes the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof should be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision and identify the contract by number. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date your receive this decision.

Sincerely,

John H. Rodgers
Contracting Officer

Copies Furnished:

Theodore M. Bailey, Esq.
Milam Building, Suite 711
115 E. Travis Street
San Antonio, Texas 78205-1611

Darrel Leonard, Esq.
Claims Counsel
Fidelity and Deposit Company of Maryland
3910 Keswick Road, 5th Flood
Baltimore, Maryland 212211

Elizann Carroll, Esq.
Strausberger & Price, LLP
Suite 4300
901 Main Street
Dallas, Texas 76202-3784

Robert G. Watt, Esq.
Watt, Tieder, Hoffar and Fitzgerald, LLP
7929 West Park Drive
Suite 400
McLean, Virginia 232102-4224

DETERMINATIONS AND FINDINGS
OF THE CONTRACTING OFFICER

1. Pursuant to the requirements found under FAR 49.402-3, I herein make the following determinations and findings regarding the performance of Sedona Contracting, Inc. (Sedona), under Contract No. DACA63-99-C-0039, Operations/Maint. Complex, Lackland Air Force Base, Texas.

2. FAR 49.402-3(f)(1), The Terms of the Contract and Applicable Law: The contract, a Standard Form 1442-construction contract, required the construction of an operations building, a maintenance building, and associated site work. The contract duration was 669 calendar days. The original contract completion date was September 14, 2001. The contract completion date has been extended 15 days by modifications to September 29, 2001. The contract contained the mandatory general provisions required by the FAR for a domestic construction contract. Under applicable case law if a contractor fails to complete the contract by the contract completion date, or fails to maintain such progress that there is a reasonable likelihood at the time of termination that the contractor would not have been able to complete the work timely, the Government may terminate the contractor's right to proceed with the contract for default. The Government must show more than a comparison between the percentage of work completed and the amount of time remaining. Among other things that the Contracting Officer should consider prior to a default termination is the period of time required to obtain completion for the work from other sources as compared with the time needed by the allegedly delinquent contractor to complete. Under this contract, the surety has indicated that they are prepared to take over and complete the contract. If the surety can mobilize a contractor within four weeks who will fully man the project, the completion contractor would complete the project quicker than Sedona, based on their rate of progress for the last 50 days.

3. FAR 49.402-3(f)(2), Specific Failures of the Contractor and their Excuses for the Failures:

**SPECIFIC FAILURES OF THE CONTRACTOR**

Sedona has failed to prosecute work under the contract to the point that there is a reasonable likelihood that it will be completed by the contract completion date. The project has virtually been abandoned. My representatives visited the site on May 24, 2001, and found only the electrical subcontractor

working. The only work being performed on the site was electrical and the drilling of holes for the bollards. A new steel erector did not start work on May 15, 2001, as promised and has not performed any work at the site subsequent to that date. The mason has worked only one day since April 30, 2001. The mechanical subcontractor has advised COE representatives that they have terminated their subcontract due to non-payment. The roofer has advised COE representatives that they refuse to work on the project due to non-payment. The site utility subcontractor has advised COE representatives that they refuse to work on the site due to non-payment. Sedona attempts to place responsibility for non-payment of subcontractors on the COE's refusal to process pay estimates. This allegation has no basis in fact. The reason the pay estimates have not been processed is Sedona's failure to submit estimates that comply with contract requirements.

Sedona asserts that they continue to make progress towards the completion of the project. A review of the daily Quality Control Reports indicates that this progress is very minimal and will not insure the completion of the contract by the contract completion date. During the first ten days of May 2001, the only work that was performed at the site was electrical, very incidental site work, concrete forming work, concrete curb and gutter, and the mason working on the project one day. My representatives observed less than 10 men working at the site on May 24, 2001. The daily Quality Assurance Reports indicate that the only work performed at the site during April 2001, was the EFIS, street repair, electrical work, installation of studs and sheathing and the forming and placement of concrete slabs. None of this work was on the project's critical path. No mechanical work has been performed at the site since March 7, 2001.

I am advised by the Area Engineer for the San Antonio Area Office, Tom Armstrong, and the Resident Engineer for the Lackland Resident Office, Manuel Fano, that the critical activities remaining to be completed for the project are the completion of the structural steel on both facilities, the installation of mechanical equipment on the maintenance facility, the installation of the roofs on both facilities, the installation of overhead doors, exterior doors and the exterior brick veneer on the maintenance facility. No work is being accomplished to complete these critical items.

**CONTRACTROR EXCUSES:**

Sedona contends that they are entitled to a time extension of 144 days for the redesign of the operations facility slab, Modification P00003. The COE analysis of the schedule does not indicate that Modification P00003 delayed the contractor. The modification deleted the pier and beam foundation and substituted a ribbed mat foundation for the operations building. Notice to proceed on the modification was issued on July 21, 2000. A review of the daily Quality Control Reports establishes that it took the contractor only 28 days to form, install slab reinforcement and place the slab. The activities for the pier and beam foundation had been scheduled for 104 days. Any delay involved in the construction of the rib mat slab resulted from the contractor's failure to schedule and pursue to the work in a timely manner. Although the notice to proceed was issued on July 21, 2000, Sedona delayed start of the work on the slab until September 7, 2000. Sedona only worked sporadically on the slab until it was complete on January 24, 2001.

A review of the daily logs and the schedule indicates that in the fall and the summer of 2000, the project was not delayed by work on the operations building, but rather was delayed by a failure to complete the grade beams and the structural steel on the maintenance building. Sedona's schedule, data date June 29, 2000, indicates that the placement of the concrete in the grade beams for the maintenance building had an early completion date of July 28, 2000, and a late completion date of May 11, 2000, indicating that the activity was behind schedule. Placement of concrete in the grade beams was not finished until August 11, 2000. The structural steel activities were scheduled in the June 29, 2000 update of the CPM schedule to have a duration of 45 days and be completed by October 19, 2000. The erection of the structural steel on the maintenance building did not start until November 8, 2000. Based on Sedona's failure to complete the maintenance building as scheduled and its failure to timely pursue work on the operations building, I must conclude that the contractor is not entitled to additional time under Modification P00003.

Sedona contends that they are entitled to a time extension of 60 days for the relocation of the communication line, and 235 to 321 days for modifying monitoring wells in Area A. Sedona also asserts that in issuing time extensions for unusually sever weather; the COE has failed to take into effect the impact of the weather. The work on the communications line was site work that was not on the critical path. Further, it did not delay

any work on the critical path. Therefore, Sedona is not entitled to a time extension. The problem with the monitoring wells affects the site work at the operations building. It has not delayed any activities on the critical path. Therefore, Sedona's claim of a time extension is without merit. The COE in granting the contract time extensions for unusually severe weather has granted a time extension for both the weather and its impact.

Sedona raised a number of issues in a May 17, 2001 submission alleging delays. These are:

- The grade adjacent to the sidewalk at the new POV area.
- Fabrication of a new column at column line D-6.
- Installation of horizontal metal suds between vertical studs.
- Installation of anodes at fire hydrants.
- Manifesting of haul dirt.

Sedona has failed to provide any analysis indicating that these issues delayed the critical path for construction of the facility. The COE analysis of these issues does not indicate that the issues contain any impact.

4. FAR 49.402-3(f)(3), Availability of Services From Other Contractors: There are a number of other available prime contractors in the San Antonio, Texas, area who are available and have extensive experience in military construction projects of this nature.

5. FAR 49.402-3(f)(4), Urgency of the Services: There exists an urgent need for the completion of these facilities. The current facilities are located on that part of Kelly Air Force Base that was closed and turned over to the City of San Antonio. There exists a possibility that these facilities could be leased out by the City to a private contractor, thereby causing the evacuation of Air Force personnel. Therefore, it is urgent that the facilities be completed as quickly as possible.

6. FAR 49.402-3(f)(5), Degree of Essentiality of the Contractor: The contractor is not an essential contractor in the Government acquisition program. The contractor, based on information and belief, has only one other Government contract that has not been completed and one Government contract that has been completed, but the contractor has not completed work on the

deficiency list. The termination of this contract would not significantly impact the contractor's ability to complete work under those contracts.

7. FAR 49.402-3(f)(6), Effect of the Termination: All progress payments are being made to an account jointly controlled by the contractor and its surety. Termination for default would not affect those payments other than to stop the contractor's right to request and receive progress payments. There have been no advance payments under this contract. It is unknown if the contractor has guaranteed loans.

8. FAR 49.402-3(f)(7), Other Pertinent Facts: The contractor has made minimal progress on the project during calendar year 2001. All of the subcontractors, except for the electrical subcontractor have walked off the project for non-payment. The prime contractor owns the electrical subcontractor. Work on the project has diminished to the point of being at a standstill. The contractor has advised me he has no financial resources with which to complete the project other than the remaining contract balance. The surety has advised me that on the Laredo Border Patrol station, they are facing payment bond claims in excess of $500,000.00.

John H. Rodgers
Contracting Officer