## I. The Government's Mishandling of the Payment Process Fundamentally Altered F&D's Bonded Risk

### A. The Government Has a Duty to Consider the Surety's Interests When Administering the Contract

The Government has an obligation to administer its bonded contracts in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997). Unpaid contract balances serve to protect both the Government and the surety in the event that the surety is called upon to perform. See e.g. National Surety, 118 F.3d at 1545. Thus, "[c]ontract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests." Id. at 1547; see also United Pacific, 16 Cl. Ct. at 558 (noting that the Government's authority to make progress payments is limited by its duty to act responsibly and to consider the surety's interests).

Similarly, where the Government is entitled to exercise discretion on a contract, it must act responsibly and must keep the surety's interest in mind. Id. The surety's equitable interest in the contract funds is one of a surety's primary interests that must be considered by the Government when administering the contract. Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-38, 83 S. Ct. 232, 235 (1962) (surety has an equitable interest in withheld contract funds); National Surety, 118 F.3d at 1545-46 (the Government has an obligation to consider the surety's interest in withheld contract funds when administering the contract); United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555, 558 (1989). Consequently, the Government was obligated to consider F&D's interests when administering this project's payment process.

### B. The Government Materially Altered F&D's Bonded Risk by Mal-administering the Payment Process Allowing Sedona to Divert Project Funds and then Again by Completely Cutting-off Project Funding to Sedona

The Government's handling of the payment process severely prejudiced F&D's rights as surety on this project. In the beginning of the project, the Government made numerous payments in disregard for specific provisions of the contract requiring subcontractor cost control information. These provisions are intended to insure project funds are being properly used to pay for work performed on the project. Not surprisingly, the Government's lax project administration led to the diversion of funds earmarked for subcontractors. It is only after this diversion of funds became a matter of project record that the Government again altered the contract's payment procedures – then belatedly requiring Sedona to demonstrate proper handling of subcontractor accounts. But the Government attempted to rectify its faulty administration at the

project's expense. The Government's second alteration to the contract's payment provision was done with the knowledge of the following facts: Sedona had diverted funds from project subcontractors; Sedona did not have financial resources to refund this project deficit; and Sedona's only means of project funding was the contract balance. Consequently, project funding was choked-off as the project died a slow death. These actions were taken contrary to F&D's interests and resulted in a fundamental increase in F&D's bonded risk.

1. <u>The Government Ignored Important Contract Requirements Intended to Ensure Project Funds Were Used to Advance the Project</u>

FAR 52.232-5, Payments Under Fixed-Price Construction Contracts, requires a contractor to submit detailed information concerning subcontractor performance and payment with the contractor's payment applications. This information is to ensure that the contractor is paying its subcontractors for their work on the project. In the present case, the Government failed to enforce this provision until Sedona's eighth payment application was submitted in November of 2000. Months before the Government began enforcing the clause, it received and ignored a number of letters from Sedona's subcontractors complaining about non-payment and Sedona's practice of withholding an unauthorized 5% retainage.

A total of $2,407,492 was paid out to Sedona by the Government without the enforcement of contractually required cost controls. A significant amount of these progress earnings were diverted from the project by Sedona severely impairing F&D's equitable rights.

2. <u>The Government's Second Alteration of the Payment Process After November 2000 Impeded Further Progress Payments Causing the Project to Collapse</u>

In November of 2000, the Government received additional subcontractor complaints about non-payment. These included a letter from H&M Steel indicating that it was due a significant amount of money that Sedona had already received from the Government and that F&D had already been required to pay H&M Steel $200,000 on Sedona's behalf under the payment bond. At this time, rather than terminating Sedona,[1] the Government again altered the payment process and began insisting that Sedona demonstrate proper subcontractor payments prior to releasing additional funds.

At this time the Government was aware that Sedona was facing severe financial difficulties, not just on this project, but company-wide. Consequently, the conclusion that Sedona could not fund the project deficit it had created was inescapable. Likewise,

[1] See Section II, below, detailing the grounds for default terminating Sedona's contract.

the determination that due to the Government's second alteration of the payment process further payment was not forthcoming was equally inescapable. F&D provided the Government further evidence of Sedona's bleak financial situation in December of 2000. All interested parties understood that Sedona was in perilous financial straits and was forced to rely on the remaining contract balance to complete the project. As no further progress payments were forthcoming, the job ground to a virtual halt. For seven months, Sedona attempted to get pay applications approved yet was unable to provide the belatedly required compliant subcontractor information as was to be expected.

The Government twice altered the payment process, first by allowing the omission of subcontractor cost control information and facilitating the diversion of funds and then by insisting on a proper accounting of funds after it was clear there was no way Sedona could submit a compliant pay application. By these alterations to the Contract's payment provisions the Government effectively ensured Sedona's failure and fundamentally altered F&D's bonded risk.

C. <u>F&D is Entitled to a Complete Discharge</u>

In <u>National Surety</u>, the Federal Circuit recognized the applicability of § 37 of the Restatement (Third) of Suretyship & Guarantee (the "Restatement") to Government contracts. <u>National Surety</u>, 118 F.3d at 1544. Under § 37 of the Restatement, where the obligee has impaired a surety's rights, a surety is entitled to either a *pro tanto* release or a complete discharge depending on the circumstances of the impairment. Restatement § 37; <u>National Surety</u>, 118 F.3d at 1544. A *pro tanto* discharge is generally appropriate when the obligee impairs the surety's subrogation rights. [2] Restatement § 37(3)(f); Restatement 44; <u>National Surety</u>, 118 F.3d at 1548. The surety is entitled to a complete discharge when the obligee fundamentally alters the risk the surety bonded. Restatement § 37(2).

As applied to the present situation, the Government's failure to properly manage the payment system through Pay Application 8 directly resulted in the impairment of F&D's subrogation rights and caused damages to F&D by permitting the overpayment/diversion of project funds. Accordingly, F&D is entitled to a *pro tanto* discharge of these losses. <u>National Surety</u>, 118 F.3d at 1548.

Beyond these discrete claims, however, the Government's alterations to the payment process allowed Sedona to dissipate the contract balance but also, when it was impossible for Sedona to otherwise finance the work, cut off all funding on the project until Sedona funded the deficit. These acts ensured Sedona's failure and fundamentally

[2] <u>National Surety</u> recognizes that a *pro tanto* discharge for an impairment of the surety's subrogation rights may not provide an adequate remedy where the release of funds reduces a contractor's incentive to complete. <u>National Surety</u>, 118 F.3d at 1548. In such an instance, <u>National Surety</u> suggests that a full discharge to the surety would be the more appropriate remedy. <u>Id.</u>

altered the risk F&D was bonding. Accordingly, F&D is entitled to a complete discharge of its obligation and is entitled to recover all the losses it suffered on this project. Restatement § 37(2) and (4).

## II. The Government Should Have Terminated Sedona in November of 2000

### A. Sedona's Fraudulent Pay Requests Were Grounds For Termination

In November of 2000, the Government was receiving numerous complaints about non-payment and unauthorized retainages being withheld by Sedona. Included in this correspondence were letters from H&M Steel stating that F&D had already been forced to pay it $200,000 because Sedona failed to make payment. The Government also had copies of the checks confirming H&M Steel's allegations. Further enhancing the gravity of these already important notices, the Government had payment certifications submitted by Sedona stating that Sedona had paid its subcontractors and that it was not requesting money that it intended to withhold from its subcontractors as retainage. Based on the evidence before the Government at this time, it was clear that these certifications were fraudulent. Moreover, had the Government actually conducted an investigation of the subcontractor complaints, the fraud would have been even more apparent. Such an investigation would have revealed that Sedona improperly diverted a substantial portion of progress payments made through Pay Application 8. In addition, it would have confirmed Sedona was, in fact, billing the Government for subcontractor work and then withholding portions of the money received as retainage. The Government had the right to terminate Sedona based on Sedona's fraudulent payment certifications. Daff v. United States, 31 Fed. Cl. 682 (1994). "A contractor which engages in fraud in its dealings with the Government on a contract has committed a material breach justifying a termination of the entire contract for default." Joseph Morton Co., Inc. v. United States, 757 F.2d 1273, 1278 (Fed. Cir. 1985); see also Daff, 31 Fed. Cl. at 688.

The Daff case provides an illustration of the Government's right to default terminate a contract for fraud. This case involved a contract for the construction of TOW missile parts. Daff, 31 Fed. Cl. at 686. Pursuant to the terms of the contract and the FAR, the contractor was required to establish an inspection system and prepare records evidencing all inspections. Id. at 686-87. When the Government learned that the contractor was forging some of these inspection records, it default terminated the contract without notice. Id. at 687. The Court of Federal Claims found that the contractor made "requests for payment with an intent to deceive the Government into a belief that the contractor had fully complied with the terms of the contract, when in fact it had not." Id. at 689. Thus, because there was clear and convincing evidence of fraud, the Government's decision to default terminate the contract was justified. Id. at 689, 697.

In our case, it is beyond dispute that Sedona was submitting false certifications with its payment applications in order to receive money from the Government. As was

clear from the many letters received from subcontractors, including the copies of checks received from H&M Steel as well as F&D's claims, Sedona was not paying its subcontractors all the money Sedona received on their behalf from the Government. In addition, there was evidence that Sedona was applying for 100% of its subcontractors' progress payments and then withholding retainages from them in direct contradiction to Sedona's certifications. Accordingly, the Government had grounds to terminate Sedona in the November – December 2000 time period before the project was ground to a halt.

B. The Government's Decision Not to Terminate Sedona Was Against the Best Interests of Both F&D and Itself

In declining to default terminate Sedona in 2000, the Government inappropriately balanced F&D's interests with Sedona's right to continue work. The proper analysis compares the Government's interests in proceeding with the contract with the harm that may befall the surety. See e.g. United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555, 558 (1989); United States Fidelity & Guaranty Co. v. United States, 201 Ct. Cl. 1, 14 (1973). The surety's potential harm in this case was well defined by the end of 2000. Numerous bond claims had already been made. Moreover, Sedona, which was then in default of numerous contract obligations, was taking an extraordinary amount of time to complete a relatively simple project – and without progress payment had no means of financing the remainder of the work. With respect to the Government's interest in efficient completion, F&D had already volunteered to take action under the performance bond as compared to Sedona that was slowly perishing. When F&D sought project control, there was still ample time to get a completion contractor on board to finish the work with minimal impact to the Government. Thus, the Government would have benefited by a timely default. Accordingly, the Government did not properly exercise its discretion in waiting seven months from the notice of Sedona's myriad defaults until it accomplished the inevitable – the default termination of Sedona. Moreover, the Government's decision not to terminate Sedona was clouded by the fact that it was balancing Sedona's rights when all that should have been considered was the Government's and F&D's rights.

We would be happy to further discuss any of these issues with you at your convenience. You may reach me at (703) 749-1076.

Sincerely,

**WATT, TIEDER, HOFFAR & FITZGERALD, LLP**

Christopher J. Brasco

CJB:lwj

Enclosure

cc: Darrell Leonard, Esq.

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
ATTORNEYS AT LAW

7929 Westpark Drive
Suite 400
McLean, Virginia 22102-4224

Telephone: 703-749-1076
Facsimile: 703-893-8029
www.wthf.com

Christopher J. Brasco
cbrasco@wthf.com

**FOR SETTLEMENT PURPOSES ONLY**

August 22, 2003

**Via Fedex**

Rex Crosswhite, Esquire
Deputy District Counsel
Department of Army
Fort Worth District Corps of Engineers
819 Taylor Street, Room 2A08
Fort Worth, TX 76102-0300

| | | |
|---|---|---|
| Re: | Principal: | Sedona Contracting, Inc. |
| | Surety: | Fidelity and Deposit Company of Maryland |
| | Obligee: | United States of America, Department of Army, Fort Worth District Corps of Engineers |
| | Project: | Contract No. DACA63-99-C-0039 Vehicle Operations-Maintenance Complex |

Dear Rex:

This is written in furtherance of our continuing negotiations. By separate letter we have already provided you with our entitlement presentation along with additional legal support. During our August 12th meeting it was agreed that the Corps will pay contract balances due and owing while it separately considers F&D's impairment of suretyship claims. Consistent with this approach, we are now forwarding our accounting of the contract balance, support for unresolved unilateral scope modifications for which F&D is due additional monies and scheduling support for the release of funds withheld as liquidated damages.

Consistent with our settlement framework, we present our request for outstanding contract balances under a full reservation of rights to pursue remaining claims including, without limitation, F&D's impairment of suretyship claims. As also agreed, any payment

of contract monies will leave a contract balance of $100 so that the contract will remain "open" while our negotiations proceed.

As seen by the accounting included behind Tab A, the contract balance due F&D, unadjusted for unresolved unilateral modifications discussed below, is $781,667.68.

Tab B sets forth our scheduling analysis demonstrating that (even apart from F&D impairment of suretyship arguments which are the subject of a separate scheduling analysis) any withholding of liquidated damages for this project is unwarranted. As discussed therein, the schedule impact of the September 11th terrorist attack and their aftermath as well as late arriving Corps' modifications more than justifies the release of liquidated damages.

Finally, Tab C sets forth F&D's entitlement to an additional equitable adjustment to its contract price for certain unilateral modifications issued by the Corps. This adjustment totals $156,723:64.

As set forth above, F&D is due and owing $938,391.32 in contract monies. Consistent with our discussions, we request that payment in the amount of $938,291.32 ($100 is debited acknowledging our continuing negotiations and reservation of rights) be paid as soon as practicable.

We appreciate your continued cooperation and stand ready to provide you any further support you need.

Sincerely,

**WATT, TIEDER, HOFFAR & FITZGERALD, LLP**

Christopher J. Brasco

Christopher J. Brasco

CJB:lwj

Enclosures

cc: Darrell Leonard, Esq.

**Principal: Sedona Contracting, Inc.**
**Project: Lackland Vehicle Operations/Maintenance Complex**
**Bond No.: PRF8131176**
**Subject: Exhibit A**

A. Contract Balance Due.....................................................................$781,667.68

The Total Amended Contract Amount was computed starting with the $6,232,883.51 amended contract balance from the last paid payment application, Yates' Payment Application No. 16. (See Pay Estimates, Tab 16) Two contract MODs (P00032 and P00033) are not incorporated in Payment Application 16. (See Tab P00032 and P00033). MOD P00032 "definitizes" MOD P00030, which is tabulated as well.

Amounts for P00032 (Deduct $8,905.00) and P00033 (Add $11,901.70) are added to the $6,232,883.51 to arrive at the Total Amended Contract Amount of $6,235,880.21.

A total of $5,454,212.53 was paid by the COE to either Sedona or F & D. These amounts are shown in Payment Estimates 1-16, tabulated 1-16 respectively. The Contract Balance Due is therefore $781,667.68

**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF

September 16, 2003

Office of Counsel

SUBJECT: Sedona Contracting, Inc., Fidelity and Deposit Company of Maryland, Contract No. DACA63-99-C-0039, Vehicle operations/Maintenance Complex, Lackland Air Force Based, TX

Christopher J. Brasco
Watt, Tieder, Hoffar &
Fitzgerald, L.L.P.
7929 Westpark Drive
Suite 400
McLean, Virginia 22102-4224

Dear Chris:

We have received and reviewed your letters dated August 21 and 22, 2003.

Initially, addressing the issues raised in your August 22, 2003 letter, a pay estimate is being processed in the amount of $781,667.68. Darrell Leonard will be contacted by John Curtis in our San Antonio Area office in order to negotiate any time extensions or additional compensation Fidelity and Deposit Company of Maryland (F&D) is entitled to under Modifications P00002, P00003, P00006, P00009, or P00026.

Your August 21, 2003 letter presented F&D's position that they had been damaged through the U.S Army Corps of Engineers (USACOE) administration of Contract No. DACA63-C-0039 (contract, or the contract) prior to Sedona's termination for default. F&D initially asserts that the Government has a duty to consider the surety's interest when administering the contract. This duty is well established by case law. The USACOE submits that while its administration of the contract may not have been perfect, it was in compliance with this duty.

Failure to Require Subcontractor Data

F&D has taken the position that the failure to require Sedona to submit subcontractor payment data in the first seven pay applications severely prejudiced F&D's rights as surety on the subject project. Payments under the contract are governed under FAR 52.232-5. It is undisputed that the USACOE failed to note that the contractor did not submit under FAR 52.232-5 (b)(1)(ii) a listing of the amount included for work performed by each subcontractor, (iii) a listing of the total amount of each subcontract, and (iv) a listing of the amount previously paid to each subcontractor under the contract for pay estimate Nos. 1-7. Although F&D has pointed out that an omission was made by the USACOE in the administration of the contract, they have not established that this omission was material resulting in prejudice to the surety. The FAR clause does not require proof of subcontractor payment. It merely requires a listing of the amount included for work performed by each subcontractor, a listing of the total amount of the subcontract and a listing of the amount paid to each subcontractor. Cancelled checks or releases of liens or other proofs of payment to subcontractors are not required to be submitted under the clause.

Customarily, the USACE does not discover the non-payment of suppliers or subcontractors through the information provided by prime contractors in their application for payment. Contractors who are willing to falsify the certification required under FAR 52.232-5 have shown an equal willingness to manipulate the data required under FAR 52.232-5 (b)(1)(ii), (iii) and (iv). The USACOE customarily learns of non-payment by prime contractors through complaints made by subcontractors or suppliers. Therefore, we do not believe that if the requirements of FAR 52.232-5 (b)(1)(ii), (iii) and (iv) had been enforced; it would have been of material benefit to F&D.

The Government acknowledges its duty to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. United States Fidelity and Guar. Co. v United States, 475 F.2d 1377, 1384 (1973). A surety may be discharged where the contract is materially altered or changed without the surety's knowledge or consent. United States v Reliance Ins. Co., 799 F.2d 1382,1385 (9th Cir. 1986). The key in determining whether the surety is discharged from its obligations under the performance bond is the materiality of the alteration or change without the surety's knowledge or consent. It is the USACOE's position that the failure to require Sedona to submit subcontractor data on pay applications Nos. 1 through 7 is not a material alteration of the contract. Payments to the contractor were based on the schedule of values in the contractor's schedule and the percentage of those activities that had been completed during that pay period. Since the subcontractor data required under FAR 52.232-5 was merely an unverified listing, it was not of material benefit to either the Government or consequentially the surety in the administration of the contract. Therefore, the failure to require the submission of this data was not a material alteration to the contract.

Enforcement of FAR 52.232-5

F&D next argues that when the Government started enforcing the requirements of FAR 52.232-5 (b)(1)(ii), (iii) and (iv) it ensured Sedona's failure and fundamentally altered F&D's risk. The contract places responsibility for complying with contract provisions on the contractor. The Government retains only a quality assurance function. The fact that the Government did not note on pay applications Nos. 1-7 that the pay applications were not in full compliance with contract requirements, did not waive the requirements of the contract. Once it was noted that the pay applications were not in compliance with

contract requirements, the Government required the contractor to comply with the requirements of FAR 52.232-5. This was merely a matter of contract enforcement. The enforcement of FAR 52.232-5 did not cause Sedona's financial incapacity or alter F&D's bond risk. The fact that Sedona initially refused to comply with this contract requirement was not the Government's fault or responsibility. While not initially submitting the requested information, Sedona subsequently furnished Pay Request Nos. 9 and 10 submitting the contractually mandated subcontractor information. These pay estimates were subsequently processed and payment was made to the joint trust account.

There exist no valid reasons why the contractor could not have furnished the contractually required information in a timely manner other than their paranoid belief that if money were paid into the joint account, F&D would not allow it to be disbursed to the subcontractors. In late January/early February 2001, Sedona submitted pay estimates Nos. 9, 10 and 11. The USACOE issued a unilateral modification on February 12, 2001, directing all future payments to the account jointly controlled by Sedona and F&D. The modification was faxed to Sedona on February 21, 2000. On February 22, 2001, Sedona faxed the modification back to the USACOE with the word void written on the modification. Subsequently, on February 23, 2001, Sedona furnished the USACOE a memorandum voiding pay request Nos. 9, 10, and 11. Based on these facts, we reiterate the position we took in our August meeting that Sedona refused to submit a pay request in order to prevent contract funds from being paid into the joint account.

Mal-Administration of Contract's Quality Control Procedures

F&D references paragraph 3.4.2 of Section 01451 of the contract, which the surety asserts provides that "[t]he CQC System Manger shall be a graduate engineer,

graduate architect, or a graduate of construction management with a minimum of two years construction experience on construction similar to this contract." Based on this language, F&D asserts that the USACOE approved a quality control systems manager who did not meet these requirements leading to a degradation of the quality control program to the detriment of the surety. F&D fails to reference the complete qualification criteria for a quality control systems manager found under paragraph 3.4.2. In addition to requiring a systems manager who has a degree, paragraph 3.4.2 allows the appointment of a quality control systems manager who is a "construction person with a minimum of five years in related work." Mr. Perez, Sedona's quality control systems manager, while admittedly not a graduate engineer, architect or a graduate of construction management, had the requisite five years experience in related work and, thus, met the contract requirements for a quality control systems manager. Therefore, the USACOE did not approve a quality control systems manager who did not meet the contract qualifications to the detriment of the surety's interest.

F&D asserts that the USACOE permitted and paid for faulty work. Both the Inspection of Construction clause of the contract and section 01451 of the Contract Technical Provisions place the responsibly for compliance with the contract requirements on the contractor. Under the terms of the contract the USACOE may inspect, but does not have a contractual obligation to inspect the work in progress. M.A. Mortenson v United States, 40 Fed.Cl. 389 (1998). Under Sedona's contract the USACOE performed a quality assurance function, making periodic inspections of the project. When either the work or the management of the quality control system was found not to be in compliance with contract requirements, these deficiencies were brought to Sedona's attention and were required to be corrected.

Payment Without An Approved Schedule

F&D complains that three payments were made without the schedule being approved. The submission of a schedule was not applicable to Pay Estimate No. 1 which reimbursed the contractor for their bond premiums. While the proposed schedule did not meet all the technical requirements of the contract, it contained sufficient detail in order to process pay estimates Nos. 2 and 3. These payments were made based on a review of the construction placement by USACOE representatives, and a review of the Sedona's schedule updates breaking down the project by activity assigning a percentage of completion and earned value to each activity. Therefore, the payments were made with safeguards to insure that the work on which payment was being claimed was actually performed.

Mal-Administration of Project's Termination Procedures

F&D argues that Sedona should have been terminated for default in November of 2000. In November of 2000, Sedona was continuing to make progress on the project and was ahead of schedule. Although the amount of progress made on the project began to slow, Sedona maintained its schedule through the early spring of 2001. With the contractor remaining on schedule, the Government did not have a contractually valid basis for termination for default under the default clause of the contract.

Your letter cites Daff v United States, 31 Fed.Cl. 682 (1994) and Joseph Morton Co., Inc. v United States, 757 F.2d 1273, 1278 (Fed.Cir.1985) asserting that a contractor which engages in fraud in its dealings with the Government has committed a material breach justifying a termination of the contract for default. The situation with Sedona differs from the two cited case. In Morton the contractor had actually been convicted of fraud. In Daff the contractor's fraud involved the method of performance. Sedona's false certification of payments to subcontractors does

DS



not rise to the level of fraudulent activity in the cited cases. A termination for default is a discretionary act by the Contracting Officer that the reviewing tribunals place a heavy burden on the Government to justify. We know of no authority that would justify a termination based on the facts of Sedona's contract. Once it appeared that there was not a reasonable possibility that the contractor could complete the project by the contract completion date they were terminated for default.

Although Sedona was not terminated for default, once the USACOE became aware of allegations that the subcontractors were not being paid, we began withholding an amount equal to the amount of non-payment from Sedona's pay request, in part to protect the surety's interest.

Sincerely,

Lloyd R. Crosswhite
Engineer Trial Attorney

CROSSWHITE

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW

7929 Westpark Drive
Suite 400
McLean, Virginia 22102-4224

Telephone: 703-749-1076
Facsimile: 703-893-8029
www.wthf.com

Christopher J. Brasco
cbrasco@wthf.com

March 4, 2004

**Via Federal Express**

Lloyd R. Crosswhite, Esquire
Deputy District Counsel
Department of Army
Fort Worth District Office of Counsel
819 Taylor Street
Fort Worth, TX 76102

| | | |
|---|---|---|
| Re: | Principal: | Sedona Contracting, Inc. |
| | Surety: | Fidelity and Deposit Company of Maryland |
| | Obligee: | United States of America, Department of Army, Fort Worth District Corps of Engineers |
| | Project: | Contract No. DACA63-99-C-0039 Vehicle Operations-Maintenance Complex |

Dear Rex:

Consistent with our prior settlement discussions please find Fidelity & Deposit Company of Maryland's ("F&D") statement of damages along with supporting documentation. This letter supplements our prior correspondence and PowerPoint presentation establishing F&D's entitlement to the relief sought pursuant to the impairment of suretyship doctrine. As we also discussed, we look forward to the opportunity to meet with you and further discuss our quantum analysis and impairment of suretyship claim (See Exhibit 1, F&D's August 21, 2003 letter).

In its response to F&D's initial claim assertions, the Corps readily acknowledges it had a duty to consider F&D's interest when administering the contract. The Corps also acknowledges that it neglected to enforce preconditions to payment by which a contractor is required to account for its use of project funds. Sedona Contracting, Inc.'s ("Sedona") diversion of project funds for other uses and ultimate termination due to its inability to finance the construction demonstrates the significance of the Corps' administrative failure. Yet, the Corps attempts to excuse it errors by postulating that the payment safeguards mandated by the FAR and the Contract were meaningless. Based on this faulty assumption, the Corps goes on to question F&D's entitlement arguing that its administrative failures did not materially alter F&D's interests. The Corps' argument mistakes both its duty to F&D and the impact of its maladministration under the Contract.

## I. <u>INCONTROVERTIBLE FACTS ESTABLISHING F&D'S ENTITLEMENT TO RELIEF UNDER ITS IMPAIRMENT OF SURETYSHIP CLAIM</u>

F&D's entitlement statements raise numerous concerns regarding the Corps' administration of its Contract with Sedona that affect F&D's bonded interests – from the Corps' unauthorized release of Project funds through the Corps' failure to promptly terminate Sedona when its default was manifest and F&D stood ready to takeover. Indeed, F&D's entitlement to relief on its impairment claim can be demonstrated by referring solely to the following incontrovertible facts:

### A. <u>The Corps' Maladministration of the Payment Process</u>

1. In violation of the FAR and the Contract payment provision (FAR 52.232-5, Payment Under Fixed Price Construction Contracts), the Corps approved Pay Application Nos. 1-7 without requiring any subcontractor cost control information – a mandatory precondition to payment. (F&D losses caused by maladministration of the payment process and the resultant diversion of subcontractor funds are presented by F&D's Damages and Supporting Documentation for Request for Equitable Adjustment to Contract ("Damages Claim" § D).

2. In violation of the Contract (Specification § 1320, paragraph 3.5), the Corps approved Pay Application Nos. 1-3 without requiring an approved construction schedule – a mandatory precondition to payment. (F&D losses caused by maladministration of the payment process and the resultant overpayment and diversion of Project money are presented by Damages Claim § D).

3. After improperly modifying the payment provisions to omit subcontractor cost control information in Payment Application Nos. 1-7, the Corps then again modified the payment provisions to require subcontractor cost accounting, <u>which was cited as the reason for its refusal to process any further Sedona payment applications</u> for seven (7) months. This throttling of project funding impeded jobsite progress and ensured Sedona's termination. (F&D losses caused by the Corps' maladministration of the payment process, choking-off jobsite funds, and maladministration of termination process are presented by Damages Claim §§ E, G, H, I and J).

### B. <u>The Corps' Maladministration of the Inspection Process</u>

1. In violation of the Contract (Specification § 01451, ¶ 3.2.1), the Corps permitted construction to proceed in January 2000 with only "conditional" acceptance of the Contractor Quality Control Plan. This lesser standard was improperly substituted for the formal acceptance required. The Corps insisted that past marginal performance by Sedona's selected Quality Control Manager necessitated this conditional acceptance and that close monitoring would be required. By letter dated December 22, 2000, almost a year after its conditional

acceptance, the Corps belatedly made Sedona's longstanding and systemic quality control failures a matter of record but provided no explanation why its conditional acceptance was not rescinded when its terms were first breached. (F&D losses caused by the Corps' maladministration of the inspection process are set forth in the Damages Claim § F).

2. Sedona's CQC Systems Manager did not meet the Contract's qualification requirements (Specification § 01451, ¶ 3.4.2). While acknowledging that Sedona's Quality Control Manager did not meet the Contract's express educational requirement, the Corps interprets the Contract's separate experience requirement to negate this educational requirement. Contrary to the Corps' reading, the five (5) years experience requirement in "related work" modifies only the two (2) year experience requirement in more proximate, "similar work". The fact that the Contract's education and experience requirements are separate is made manifest by Specification § 01451, paragraph 3.4.4 which states that in addition to the above <u>experience</u> and <u>educational requirements</u>, the CQC System Manager shall have completed the course entitled "Construction Quality Management for Contractors." (F&D losses caused by the Corps' maladministration of the inspection process are set forth in Damages Claim § F). In any event, the Corps' failure to abide by the conditions of its own conditional acceptance of Sedona's quality control representative impaired F&D's interests as the surety bonding Sedona's performance and entitles F&D to relief.

## C. <u>F&D's Injuries Caused by the Corps' Maladministration</u>

1. Through Payment Application No. 7, Two Million Three Hundred Sixty-One Thousand Six Hundred Forty-One Dollars ($2,361,641) in unauthorized funds were released – a substantial portion of which was diverted from the Project. (See Damages Claim § D).

2. As a result of a deficient quality assurance/quality control process, funds were improperly released for deficient work and extensive rework was required. (See Damages Claim §§ D, F).

3. The Corps' twice improper modification of the payment process first resulted in overpayment and the diversion of Project funds and then a halting of all Project funding. The Corps mishandling of Project funds wrongly depleted the contract balance and unnecessarily halted construction progress for numerous months. (See Damages Claim §§ E, G, H, I, J).

## II. THE CORPS MISTAKES ITS DUTY TO F&D BY INSISTING ON A SHOWING OF MATERIAL ALTERATION OF CONTRACT AS A PREDICATE FOR RELIEF

### A. Failure to Adhere to a Contractual Precondition for Payment Entitles a Surety to Relief

The Corps misconstrues the impairment of suretyship doctrine to insist on a showing of material breach before a surety is entitled to any relief. The "impairment of suretyship" doctrine discharges a surety from its obligation to perform whenever the obligee increases the surety's risk of loss without the surety's consent. This doctrine is set forth in the RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY §§ 37-44 (1996), which explains that when an obligee acts to increase the surety's risks by increasing its potential cost of performance or decreasing its ability to have its principal meet their obligations, the surety is entitled to relief. RESTATEMENT § 37 a.

Shortly after the RESTATEMENT'S revision in 1996, the Federal Circuit affirmed the impairment doctrine's application to federal government contracts in Nat'l Sur. Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997). In National Surety, the court reviewed whether the government breached the Contract's payment requirements when it issued progress payments without withholdings after having only received a "progress curve" when the contract specifically required an "arrow diagram." Although both were required under the contract and both provided similar information, the court found the government liable for making the payment before receiving the "arrow diagram." In reaching its conclusion, the court did not find that the government's actions constituted a material breach of the contract. Indeed, there is no material difference between a progress curve or arrow diagram as they relate to project retainage. In ruling, the court stated that the government "simply departed from the contractually required retainage" and impaired the surety's collateral. See National Surety, 118 F.3d at 1545.

Consistent with the National Surety holding, the RESTATEMENT takes what it terms as a bifurcated, or two-pronged approach when addressing a surety's remedial options. The RESTATEMENT explains that when the obligee fundamentally or materially alters the risks imposed on the surety, the resulting situation is no longer that for which the surety bargained. Accordingly, the surety is discharged from any unperformed duties upon such action by the obligee. See RESTATEMENT § 37 cmt. a,b. Thus, the surety may receive a complete discharge if it can show that the obligee's actions fundamentally altered the risk bargained for by the surety. Alternatively, the second half of the RESTATEMENT'S bifurcated approach holds that, in the absence of a fundamental alteration, a surety is discharged to the extent it is actually injured by the obligee's actions. Accordingly, contrary to the Corps' analysis, breach of any precondition to a payment entitles a surety to recover, at the very least, all resultant losses and no showing of material breach is required. In fact, a showing of material breach goes well beyond just substantiating a surety's damages claim, but also entitles a surety to complete discharge. While

in no way diminishing the importance of considering the proper legal standard, our claim supports fully the argument that the Corps' maladministration of the Sedona contract fundamentally altered F&D's rights as surety and entitles F&D to relief even under the Corps' unduly restrictive standard.

### B. Premature Payment Predicated on Improper Government Inspection Entitles a Surety to Relief

The Corps also mistakes its inspection obligation owed to F&D by wrongly maintaining that it is absolved of any inspection failures as a consequence of the contractor's duties. In United Pacific Insurance Co. v. United States, 16 Cl. Ct. 555 (1989), the government's improper inspection entitled a surety to recover funds improperly released for defective work. More specifically, in United Pacific, a surety brought suit against the government on an emergency power system contract for making a progress payment to a defaulting contractor before properly inspecting materials delivered to the site. Id. at 556. When the contractor failed to pay its subcontractors, the surety stepped in and paid them, then pursued the government for the erroneous payment. The Court held that by not going beyond a simple initial inspection, the government "utterly failed" to protect the surety's interests. See id. at 558. While not using the term "impairment," the court held that by failing to fulfill a condition precedent to payment, i.e. the inspection, the government improperly increased the surety's risk. Consequently, the surety was entitled to recover its losses as measured by the overpayment due to the government's faulty inspection. By this same precedent, F&D is entitled to relief for the Corps' failure to properly administer the QA/QC inspection process.

## III. THE CORPS MISTAKES THE IMPACT OF ITS MALADMINISTRATION

Each instance of Corps' maladministration resulted in the unauthorized release of project funds. Consistent with the foregoing authority, these improper payments increased F&D's risk of loss by diminishing its security in withheld contract balances and entitles F&D to relief as set forth in its Damages Claim. The impact of several established instances of Corps' maladministration is addressed separately below.

### A. The Corps Mistakes the Impact of Its Admitted Maladministration of the Payment Process

Unpaid contract balances exist for protection of both the government and the surety in the event that the contractor is unable to complete its work and the surety is called upon to perform. Thus, the government's unauthorized release of contract funds constitutes an impairment of the surety's rights and discharges the surety, at the very least, to the extent that funds improperly released are not used for the project. National Surety and United Pacific both make clear that proper administration of the payment process is so essential to a surety's risk assessment that any unauthorized release of funds establishes entitlement to relief and any inquiry regarding the extent of the injury goes only to the measure of damages.