While the controlling legal standard does not require a showing of material alteration, the Corps' maladministration of the contract's payment provision did facilitate a substantial diversion of funds and materially altered F&D's bonded risk. The Corps acknowledges its failure to collect or consider any subcontractor cost control data in Sedona's Payment Application Nos. 1 through 7 – resulting in the unauthorized disbursement of Two Million Three Hundred Sixty-One Thousand Six Hundred Forty-One Dollars ($2,361,641). A substantial portion of this sum was diverted from the subcontractors for whom they were released and used for ends that did not further the project. Without question, the rationale of contractually requiring subcontract cost control information was to assist in preventing this very circumstance from occurring.

The contract's payment clause requires a monthly report detailing committed subcontractor costs, amounts invoiced on behalf of project subcontractors and amounts paid to project subcontractors. By reviewing this subcontractor cost control information, the Corps has data from which to determine if a contractor's schedule of values accurately reflects work being performed and if project funds are properly being paid to the subcontractors who earned them. Both means of safeguarding project funds are intended to make certain the unearned project balance is being used to further the project and not diverted for other uses.

The Corps seeks to ignore the obvious and essential safeguards offered by collecting subcontractor cost control information by speculating that this provision may not achieve its intended purpose because a contractor can always lie. What this convenient supposition ignores is that by enforcing the subcontractor cost control requirements, the government retains a record of committed subcontract costs and subcontract payment administration that would provide a means of evaluating the schedule of values for any overpayment and would allow liars intent on diverting funds to be caught upon the first government request for verification or subcontractor complaint. Alternatively, by not retaining any subcontractor cost control information, the government forfeits an important baseline by which to measure the integrity of the payment process and assess the righteousness of subcontractor complaints.

The Corps' "a contractor can always lie defense" also ignores the simple fact that by properly administering the contract, the Corps provides a great disincentive to those who might falsify information. The Contract's payment provision requires the contractor to submit written records that, if falsified, would establish an intent to mislead the government when submitting its certified payment application. The material significance of this requirement is made manifest by the significant civil and criminal penalties attached to the False Claims Act.

Any effort to demonstrate what should have been gained from the proper retention of subcontractor cost control data is in large measure a theoretical effort since the Corps did not collect this information as required. Nevertheless, assuming the collection of record evidence would not have averted the problem in the first instance by faithful compliance, one obvious benefit would have been that the earliest subcontractor complaints would have demonstrated

misstatements in Sedona's payment data. This should have resulted in increased payment scrutiny as early as August 2000 and before Sedona's diversion of substantial additional funds received after August 2000. Moreover, even based on the belated submission of Sedona's subcontract cost control information with Payment Application Nos. 9 and 10, important red flags were raised. First, it was apparent Sedona was reporting payments to Genz Electric, a sister entity, of money far in excess of project earnings. (By May 2002, Sedona earned approximately $113,200 on electrical work yet paid Genz by its own records $370,000 for a project deficit of $256,800). Further, project payments so significantly outweighed subcontractor payments that it was apparent that the contractor was significantly overpaid due to an unbalanced schedule of values. (By May 2002, Sedona was paid $2,886,371, yet by its own records, only $1,499,566.96 was paid to subcontractors leaving a project deficit of $1,386,848.04, which far exceeds any amount properly allocated to Sedona for overhead and profit.)

Finally, the Corps tacitly recognized the significance of reviewing Sedona's subcontractor cost control information by its refusal to process later Sedona Payment Applications without this information. This, unfortunately, occurred after it was known that substantial contract monies were diverted. If the subcontractor cost control information was of no benefit to the Corps, as it now argues, then the Corps abused its discretion by long delaying the release of needed project funds due to its insistence on receiving "meaningless information" that had been ignored in practice for almost one (1) year. (See Damages Claim §§ D, E, G, H, I, J).

**B. The Corps Mistakes the Impact of Its Maladministration of the Inspection Process**

The surety's recovery based on the government's improper inspection in <u>United Pacific</u> contradicts the Corps' sweeping conclusion that Sedona's quality control obligation blunts F&D's claim based on the Corps' maladministration of the inspection process. Acceptance of a proper quality control plan implemented by a qualified quality control supervisor was a precondition to <u>any</u> payment on the project. The Corps failed to implement these payment safeguards to F&D's detriment. F&D was injured in this regard in, at least, two ways: (1) the contract balance was wrongly depleted with unauthorized payments being made for deficient work; and (2) F&D completion work was delayed and made more expensive as a result of inefficient rework. (See Damages Claim §§ F, J).

**C. The Corps Improperly Discounts the Significance of Sedona's False Certification of Payments to Subcontractors when Considering its Default Termination**

In its letter addressing F&D's claims, the Corps acknowledges that a contractor's fraud on the government justifies the government's default termination of a contract. The Corps, however, seeks to distinguish the broad rule of law announced in <u>Daff</u>, by arguing that in that

case the fraud went to the method of performance. This conclusion ignores the factually indistinguishable finding in Daff that the contractor made requests for payment with intent to deceive the Government into the belief that the contractor had fully complied with the terms of the Contract, when in fact it had not. Daff, 31 Fed. Cl. at 689. In any event, to the extent any distinctions exist, it is a distinction without a difference. Fraud committed against the Government justifies default termination during the discharge of any contractor obligation regardless of whether that obligation is part of the physical construction or administration of the Contract, especially when that fraud involves the divergence of funds necessary to complete the work.

When first considering Sedona's default action, the Corps knew then that Sedona's only means of project financing was the unpaid contract balance. Thus, any diversion of funds from this project was of material significance and fraud facilitating this diversion of equal significance. This is particularly so in this case where the Corps did not faithfully administer the contract's subcontractor cost control requirements, and the contractor's "word" became the only measure for defending the integrity of the payment process. Thus, the Corps' failure to terminate when it knew or should have known that the funds required to complete the work were fraudulently diverted amounts to an abuse of discretion for which F&D is entitled to relief.

As discussed above, when the impact of the Corps' maladministration is rightly considered, the conclusion that F&D's bonded risk was compensably altered is inescapable.

Consistent with our prior negotiations, please contract us as to when you anticipate completing your review of this information so we can schedule our planned negotiation session.

Sincerely,

**WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.**

CJB

Christopher J. Brasco

cc: Darrell S. Leonard

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW
7929 Westpark Drive, Suite 400
McLean, Virginia 22102-4224
Telephone: 703-749-1000
Facsimile: 703-893-8029
www.wthf.com

John B. Tieder, Jr.
Robert G. Watt
Julian F. Hoffar
Robert M. Fitzgerald
Robert K. Cox
Lewis J. Baker
Wayne G. Tatusko
Richard G. Mann, Jr.
Henry D. Danforth
Carter B. Reid
Mark A. Sgarlata
Michael G. Long*
Edward J. Parrott
Paul A. Varela
Vivian Katsantonis
Kathleen O. Barnes
Shelly L. Ewald
Christopher J. Brasco
John G. Lavoie
Robert C. Niesley*
Colin J. Smith
Jean V. Miller
Gregory J. Dukellis*
Fred A. Mendicino
William J. Burch*
Michael D. Germain*
Robert G. Barbour
Keith C. Phillips
Marybeth Z. Gaul
Timothy E. Heffernan*
W. Drew Mallender
James M. Donahue
Bennett J. Lee
Todd R. Metz
Michael R. Gandee*
Michael P. Hutchins*
Jeffrey J. Renzulli
Joseph S. Guarino
Lewis I. Askew, Jr.
Erica S. Beardsley
Erica B. Robinett*
David F. McPherson*
Harish Mirchandani
David R. Johnson*
Scott W. Kowalski
C. Kelly Skrabak
J. Brian Cashmere
Joseph C. McGowan*
Daniel J. Alexander*
Geoffrey A. Graves*
C. William Groscup
Kevin J. McKeon
John R. Marking*
Frank S. Murray
David E. Nemeth, Jr.*
Michael M. Suga*
Michelle G. Hicks
Jason D. Blatt
Christopher M. Rogers*
Alexander N. Lamme
Timothy E. Elliott*
James M. Phelps
Justin S. Hawkins
Arnie B. Mason
Viktor V. Pregel
Jowita L. Wysocka*
Matthew E. Vinciguerra
Kirk J. McCormick
Howard J. Manheimer
Julie L. Gentry*
Kimberly A. Mulligan
Christopher M. Harris
Erik B. von Zeipel*
Christopher M. Burke
Samuel B. Franck
Franci E. Gardner
Donna H. Tobar*
Michael M. Fernandez*
Michael D. Kiffney
John P. Bean
Brian S. Kelly
Benjamin T. Benumof*
Henry C. Ma*
Gregory T. Gledhill
Laura R. Schempf
*Not Admitted in Virginia

June 1, 2004

**VIA FIRST-CLASS MAIL**

Lloyd R. Crosswhite, Esquire
Deputy District Counsel
Department of Army
Fort Worth District Office of Counsel
819 Taylor Street
Fort Worth, TX 76102

JUN - 3 2004

Re: Principal: Sedona Contracting, Inc.
Surety: Fidelity and Deposit Company of Maryland
Obligee: United States of America, Department of Army, Fort Worth District Corps of Engineers
Project: Contract No. DACA63-99-C-0039
Vehicle Operations-Maintenance Complex

Dear Rex:

We trust that you are in receipt of the several submissions we have forwarded to your office in furtherance of our claim on the above referenced project ("Project"). In the interest of reaching a swift and fair resolution of the matters related to our claim, we respectfully suggest that the Fidelity and Deposit Company of Maryland ("F & D") and the Fort Worth District Corps of Engineers ("Corps") (collectively the "Parties") submit these matters to the mediation process in accordance with and as encouraged by FAR 33.204 (agencies encouraged to use ADR procedures to the maximum extent practicable prior to claim submission) and FAR 33.214 (encouraging ADR methods and requiring contracting officer to state rationale for rejecting ADR offer). We believe that mediation would provide an opportunity for the Parties to resolve the issues between them in an inexpensive, fair and efficient manner.

Please consider this letter as Fidelity and Deposit Company of Maryland's formal request for a mediation conference with the Corps for the purpose of resolving the issues between the parties related to the Project.

Please contact us as soon as possible upon your review of this letter.

Sincerely,

**WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.**

Christopher J. Brasco

**DEPARTMENT OF THE ARMY**
FORT WORTH DISTRICT, CORPS OF ENGINEERS
P. O. BOX 17300
FORT WORTH, TEXAS 76102-0300

REPLY TO
ATTENTION OF:

June 17, 2004

Office of Counsel

SUBJECT: Contract No. DACA63-99-C-0039, Vehicle Operations-Maintenance Complex, Lackland Air Force Base

Christopher J. Brasco, Esq.
Watt, Tieder, Hoffar, and
Fitzgerald, LLP
7929 West Park Drive
Suite 400
McLean, Virginia 22102-4224

Dear Mr. Brasco:

I have received and reviewed your letters dated March 4, 2004 and June 1, 2004, with the Contracting Officer, John Rodgers, Tom Armstrong, Chief of Contract Management Branch, and Mike Zalesak, Chief Contract Support Section, regarding the request for an equitable adjustment and mediation by Fidelity and Deposit Company of Maryland (F&D) for alleged improper administration of Contract No. DACA63-99-C-0039, Vehicle Operations-Maintenance Complex, Lackland Air Force Base by the United States Army Corps of Engineers (USACE). Based on the divergence of the positions which F&D and the USACE have in this matter and based on the need to avoid setting a precedent expanding the liability of the USACE, we feel that this matter falls under the purview of 5 U.S.C. 572(b)(1) which provides an agency shall not consider using a dispute resolution proceeding if a definitive or authoritative resolution of the matter is required for precedential value, and such a proceeding is not likely to be accepted generally as an authoritative precedent.

After reviewing and researching the issues presented on behalf of your client, we have determined that they have no merit except as acknowledged below. If your client wishes to pursue these matters further, a final decision of the Contracting Officer should be requested under the Disputes Act of 1978.

In response to your March 3, 2004 submission, the following reply is submitted:

Under issue I.A. F&D argues that the USACE mal-administered the payment process resulting in overpayment and diversion of contract funds by Sedona. This issue was previously addressed in a letter dated September 16, 2003, in which we took the position that although the payment process was not initially administered in strict compliance with the contract's Payment Clause (FAR 52.232-5) there was not a material omission causing injury to the surety. F&D relies in part on National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997) in support of their position. In National Surety, the contract required the Government to retain 10% retainage on each progress voucher until a complete arrow diagram was approved. The contractor failed to provide the required arrow diagram and the Government did not withhold the required retainage. After finding that the retainage provision "in a bonded construction contract serves to protect the surety as well as the government, and is an interest of the surety that cannot be disregarded or diminished by a party to the contract," the Court found that the Government's failure to withhold the retainage was a change in the terms of the contract.

The facts relative to the payments to Sedona under the first seven pay estimates are distinguishable from National Surety. In the first seven progress payments to Sedona, the Government failed to obtain data regarding Sedona's payment to subcontractors. The contract did not require the withholding of retainage until this data was furnished. Therefore, the terms

of the payment clause that were not enforced did not create a security interest for the surety that was disregarded or diminished by a party to the contract. Therefore, we continue to maintain that the failure to enforce the requirement for subcontractor payment data for the first seven pay estimates was not a material breach of the contract entitling the surety to damages or a pro tanto discharge from their obligations under the Miller Act Performance Bond.

F&D also argues that the enforcement of the requirement for submission of subcontractor data starting with pay request No. 8 was a "throttling of project funded impeded jobsite progress and ensured Sedona's termination." F&D argues that the failure to require subcontractor payment data on the first seven pay requests, placed Sedona in a position where that data could not be provided on subsequent pay requests. There is no validity to F&D's argument. Sedona could have submitted the required subcontractor data on subsequent pay requests. They simply chose not to do so.

Under issue II.B. F&D argues it was prejudiced through improper Government inspections. F&D relies on United Pacific Insurance Co. v. United States, 16 Cl.Ct. 555 (1989) wherein the Government paid for materials that had not been delivered to the site, failing to comply with the conditions for payment of off-site materials. Government liability was founded on the disregard of the payments for off-site materials provision of the contract. Liability was premised on the failure of the Government to verify that the equipment was ninety percent complete and the "disregard of the observed status of the generator..." There are no parallels to United Pacific on the Lackland project. The USACE performed both initial and follow up inspections to insure that the work in place was in conformance with contract requirements. The contract placed responsibility for quality control on the contractor. The USACE verified that work was in place prior to making payments.

In respect to F&D's submissions of damages contained in the various exhibits, we make the following responses:

Exhibit B

Exhibit B requests $18,470.18 for 27 days of extended overhead allegedly incurred by Sedona due to the change in the design of the slab for the Vehicle Operations Facility. This claim is based on the critical path for the project running through the Vehicle Operations Facility. We dispute the premises on which this claim is based. Our analysis indicates that the critical path for the project ran through the Vehicle Maintenance Facility and that any delays encountered with the change in design of the foundation for the Vehicle Operations facility did not delay the project. Therefore, there is no USACE liability for extended overhead.

Exhibit C

Exhibit C pertains to the pricing of modifications relative to the change of the foundation at the Vehicle Operations Facility (Modifications P00003 and 00017) and the removal of material excavated from that site (Modification P00026).

Modifications P00003 and P00017

Modifications P00003 and P00017 were issued to address the costs of converting the pier and beam foundation for the Vehicle Operations Building to a rib mat foundation. Also, the modifications added a ventilation system under the slab of the facility. We disagree with F&D's assertion that the ribbed mat foundation is a more expensive foundation system than the pier and beam. F&D's cost proposal fails to provide a credit for the deletion of the piers, the deletion of forming and placing the grade beams and the efficiency gained in the monolithic placement of the ribbed mat foundation rather than the utilization

of the pier and beam foundation which requires additional labor and forming and stripping of forms for the grade beams, and for a separate forming operation for the placement of the floor slab. Our review of the costs submitted for the redesign of the floor slab reveals that F&D has failed to provide credit for the more expensive labor-intensive pier and beam foundation.

We further question F&D's proposed cost for the ventilation system of $15,782.62. Sedona's original costs for the ventilation system was only $4,250.00. We also question F&D's use of estimated cost rather than actual costs. However, since the modifications remain open, we are prepared to revisit the cost issues relative to both Modifications P00003 and P000017 in order to reach a resolution of the quantum issues.

Modification P00026

Modification P00026 was issued for the removal of materials to be excavated for the foundation of the Vehicle Operations Building from the site. In order to support the costs submitted by F&D Government representatives requested supporting documentation such as manifest and load counts in order to support the surety's purported quantities and their assertion that the material was hauled to a regulated landfill. When such documentation is submitted, we are prepared to continue the negotiation of the modification.

Exhibit D

In addition to disputing that the USACE made faulty payments to Sedona, we question whether a valid correlation exists between the pay estimates identified in this exhibit and F&D's payments to subcontractors. Exhibit D totals Pay Estimates 1 through 10 as payments to Sedona. However, Pay Estimates Nos. 9 and 10 were not released to Sedona

and should be deleted from F&D's computation reducing the total payments to Sedona from $2,886,370.50 to $2,407,492.00. Further, your client wants to base unpaid subcontractor costs on a July 11, 2001 status report, when Pay Estimates Nos. 1 through 8 extended only through October 31, 2000. Additionally, Pay Estimate No. 1 should not be considered in this calculation since it paid the contractor solely for the costs of the bond. Therefore, if the premises utilized by your client were valid, the amount subject to your clients claim should be reduced by the value of Pay Estimate No. 1 ($54,791.00) to $2,352,701.00.

Exhibit D also contains a tabulation of unpaid subcontractors allegedly attributable to the faulty payment administration. This tabulation includes subcontractors who worked at the site subsequent to the period covered by Pay Estimates Nos. 1 through 8 including $189,892.00 for Corrugated Erectors who did not man the site until December 11, 2000; $17,500.00 for Gates Concrete whose first invoice is dated November 17, 2000; $126,315.00 for Leeder Masonry whose first payroll is dated July 10, 2001; $25,474.50 for Gordon C. Scott who did not man the project until late February of 2001; $6,687.50 for Bonded Lighting Protection who performed a minimum amount of work during the period covered under Pay Estimate No. 6, returning to the site performing the majority of their work after December 15, 2000 and $29,997.90 for Quality Fire Protection who performed only minimum work during the period covered under Pay Estimate No. 8.

Additionally, it is not clear how much of the payments by your client were to subcontractors who performed a substantial amount of work both during and subsequent to periods covered by Pay Estimates Nos. 1-8, such as Concord Services, M&M Services, L.C. Mosel and Pro Erectors and Maintenance was for the period covered by Pay Estimates Nos. 1-8 and how of the payment was for labor or materials supplied during subsequent pay periods.

The amount shown transferred to F&D should be increased by $478,878.00 to account for Pay Estimates Nos. 9 and 10 that were paid to the joint account controlled by F&D.

Exhibit E

Exhibit E requests $670,195.21 due to the alleged failure of the USACE to timely terminate Sedona for default. F&D furnished the USACE a voluntary letter of default from Sedona in November 2000. Sedona had provided F&D the voluntary letter of default in order to secure performance and payment bonds. Sedona contacted the USACE in November 2000 and disputed the validity of the voluntary letter of default. F&D argues that the USACE should have terminated Sedona in November of 2000, and that the subsequent termination of Sedona in June 2001, increased the surety's damages through an increase in the costs of completion and the necessity to obtain replacement subcontractors for those subcontractors who would not complete remaining work under their subcontracts.

In November 2000, the project was scheduled to be 30% complete and Sedona had completed 30% of the contract work. Under the termination for default clause of the contract between Sedona and the USACE, the Government's right to terminate a contractor's right to proceed with a contract for default is limited to those circumstances wherein the contractor is not making sufficient progress to insure that the contract will be completed by the contract completion date. Since Sedona was on schedule in the fall of 2000, they were manning the project, and subcontractors, although complaining of the failure of Sedona to make timely payment, continued to work on the project, Sedona was not in default of their contractual obligations and could not be terminated for failure to make sufficient progress in order to insure completion of the project by the contract completion date. It was not until May of 2001, that Sedona had fallen behind schedule to such an extent

that the USACE could meet the requisite burden of proof that it was not possible for Sedona to complete the project by the contract completion date. Therefore, the USACE termination of Sedona's right to proceed with work under the contract was timely exercised. Further, we view the damages requested by the surety as speculative since there is nothing to establish that similar costs would have been incurred, had Sedona been terminated in November 2000, rather than June 2001.

Exhibit F

Exhibit F requests $70,805.50 for rework allegedly caused by the USACE's faulty quality control administration. It appears that the first eleven, if not the first thirteen, items under Exhibit F relate to the fabrication of the structural steel. These items should have been back charged against H&M, the steel manufacturer. The remaining items appear to be construction deficiencies that are routinely corrected as a project progresses. There is nothing to attribute any of these costs to any actions or failure to act on the part of the USACE.

EXHIBIT G

Exhibit G requests $77,923.88 for alleged deterioration to work at the site due to the failure of the USACE to terminate in November 2000. As stated above, the USACE did not have a right to terminate Sedona's right to proceed with the contract until May/June 2001. Therefore, the termination was timely exercised. Further, most of those invoices relate to the painting of structural steel, which had arrived unpainted at the project.

Exhibit H

Exhibit H requests an additional $145,668.15 additional overhead for Sedona due to the USACE's failure to terminate in November 2000. Since there

was no basis to terminate in November 2000, we dispute F&D's entitlement to these costs.

Exhibit I

F&D requests $48,480.00 for alleged acceleration of their completion contractor, Yates. The damages represent the costs of an additional project manager. The USACE disputes that F&D was either directly or constructively accelerated. We likewise dispute F&D's entitlement to such costs.

Exhibit J

F&D requests $38,334.60 for Yates allegedly being extended on the project. This matter relates to delay incurred by Yates during the performance of the completion contract and is subject to negotiation.

Exhibit K

F&D requests $100,000.00 for claim preparation costs. Claim preparation costs are not recoverable under FAR 31.205-47.

Based on the above analysis, the USACE declines to enter into negotiations of your client's request for equitable adjustment, except for issues identified under Exhibits C and J. If your client desires to pursue this matter further, the remaining issues should be submitted as a claim with the required certification under the Disputes Act of 1978.

Sincerely,

Rex Crosswhite
Deputy District Counsel

CESWF-OC/CROSSWHITE
CESWF-EC-AS/ZALESAK
CESWF-EC-A/ARMSTRONG
CESWF-CT-C/RODGERS
RETURN
CESWF-OC

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
ATTORNEYS AT LAW

7929 Westpark Drive
Suite 400
McLean, Virginia 22102-4224

Telephone: 703-749-1076
Facsimile: 703-893-8029
www.wthf.com

Christopher J. Brasco
cbrasco@wthf.com

20 2004

AUG 2

August 19, 2004

**Via Federal Express**

Lloyd R. Crosswhite, Esquire
Deputy District Counsel
Department of Army
Fort Worth District Office of Counsel
819 Taylor Street
Fort Worth, TX 76102

| | | |
|---|---|---|
| Re: Principal: | Sedona Contracting, Inc. | |
| Surety: | Fidelity and Deposit Company of Maryland | |
| Obligee: | United States of America, Department of Army, Fort Worth District Corps of Engineers | |
| Project: | Contract No. DACA63-99-C-0039 Vehicle Operations-Maintenance Complex | |

Dear Rex:

This letter follows up on your June 17, 2004 correspondence concerning F&D's request for an equitable adjustment. We appreciate your apparent willingness to equitably resolve on a negotiated basis Modifications P00003, P00017, and P00026 (Exhibit C to F&D's REA) and the delay damages related to extended performance by Sedona and Yates (Exhibit Nos. B and J to F&D's REA). Under a complete reservation of rights, we have forwarded with this letter, our engineering and scheduling analysis addressing issues raised by you on these discrete claims. With regard to the remaining outstanding issues, we respectfully request that the USACE reconsider its position to decline ADR measures due to a divergence of opinions as, we believe, the case law strongly supports F&D's claim.

In particular, we ask that you consider the points addressed in the following sections of this letter. The first section considers the USACE's attempt to limit a surety's security interest in contract funds to retainage alone. The second part of this letter briefly addresses the USACE's position that Sedona was free to submit subcontractor data to the Government after the USACE requested it for the first time in November of 2000. The third section considers the USACE's defenses related to the USACE's handling of the quality control problems on the project. The fourth section addresses the USACE's position that Sedona could not be default

terminated in November of 2000. Finally, the fifth section sets forth legal support for the recovery of F&D's claim preparation costs.

I. **As the Project Surety, F&D Has a Subrogation Interest in the Entire Contract Balance**

It is unquestioned that the USACE failed to administer the subject Contract pursuant to the Payment Clause (FAR 52.232-5) when it made payments without the mandated subcontractor payment information. It is also unquestioned that the USACE had the right to withhold all payment until this information was provided. However, the USACE has taken the position that the USACE's failure to enforce this provision did not breach any duty to F&D because "the terms of the payment clause that were not enforced did not create a security interest for the surety that was disregarded or diminished by a party to the contract." In arriving at this conclusion, the USACE attempts to distinguish National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997) by essentially stating that F&D only had an interest in the retainage and not the progress payments. This position contradicts the unambiguous case law.

The Court in National Surety made it clear that "[c]ontract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests." Id. at 1547. The surety's security interest, which is based on the doctrine of subrogation, extends beyond just the project retainage to all the "securities and remedies which the creditor (the United States) was capable of asserting against it debtor." Id. at 1545. The surety does not just have a subrogation interest in the retainage, it has a subrogation interest in the entire contract balance. Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161 (Fed. Cir. 1985) (*citing* Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962)).

Clearly, the Contract provisions that required the Government to obtain subcontractor payment reports prior to paying Sedona were intended to ensure funds were being properly dispersed on the project. The importance of this requirement is highlighted by the fact that, after Pay Application 7, the Government cut off all funding to Sedona because Sedona would not provide this contractually mandated information. By enforcing this provision from the start, USACE would have provided a disincentive for Sedona to siphon funds off the project and would have allowed the Government to identify any payment improprieties from the date the subcontractors first began complaining of non-payment in August of 2000. In addition, had the Government properly enforced this provision, it would have discovered that Genz Electric, an affiliate of Sedona, was being paid far in excess of its project earnings. These are just the types of incidents this FAR/Contract Provision was designed to address and the reason it was included in the Contract. When F&D bonded this project, it had a right to assume that the Government would prudently exercise the contractual controls that serve to protect the contract balance and F&D's subrogation rights. When the USACE ignored or waived these protections, it did so with no consideration to F&D's interests as the project surety.

## II. The USACE Knew Sedona Could Not Submit a Satisfactory Pay Application That Included the Subcontractor Payment Data After Pay Application 7

The record is clear that, once Sedona was allowed to divert the project funds unchecked by the USACE, its financial condition would not allow it to make up these financial shortfalls. Thus, the re-modification of the payment process after Pay Application No. 7, to belatedly require the submission of compliant subcontractor payment data, could only result in a payment impasse that would further impair the surety's rights. By the time Pay Application 8 was submitted, the USACE not only knew that Sedona was behind in subcontractor payments, it also knew that Sedona was in serious financial straits. USACE's argument that Sedona simply chose not to submit the subcontractor data ignores these facts and how the Corps' belated insistence on subcontractor data after funds were diverted made it impossible for Sedona to submit accurate data to the USACE that did not run afoul of the False Claims Act. Sedona's difficulties in determining how to present its subcontractor accounts in light of this legal conundrum is what delayed Sedona's payment application.

## III. The USACE Failed to Take Appropriate Contractual Measures to Prevent Quality Control Problems

In considering F&D's claims related to the USACE's mismanagement of the quality control aspects of the project, the USACE ignores the fact that, specification § 01451, ¶ 3.2.1 of the Contract makes the acceptance of an appropriate quality control plan and qualified quality control personnel preconditions to work/payment on the project. Implementation of these quality control measures were important to both F&D, as the performance bond surety, and the USACE as a means of preventing unauthorized payments and excess performance costs related to deficient work.

Just as in the case of United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555 (1989), the USACE had an obligation to properly enforce this precondition to payment to protect F&D's and the USACE's interests. As noted in your letter, the dispute in United Pacific arose as a consequence of the Government paying for work without properly performing inspections that were a condition precedent to payment. Id. at 557-58. The Court found that the Government abused its discretion by failing to enforce these preconditions to the surety's detriment. Id. at 558-60.

In the present case, the USACE granted conditional acceptance of Sedona's quality control manager despite the fact that the USACE knew this individual had performed poorly in the past and the fact that he did not meet the contractual qualifications. Even after the USACE documented continuous and on-going quality control errors - an apparent breach of the terms of the "conditional" acceptance, the USACE never revoked Sedona's right to proceed and continued to allow the quality control problems to persist. As a result of the USACE not enforcing its right to stop Sedona's work pursuant to Specification § 01451, ¶ 3.2.1, the contract

balance was depleted on deficient work and F&D's completion efforts were complicated and delayed due to necessary rework.

## IV. The Government Had the Right to Default Terminate the Contract in November of 2000

In its response to F&D's request for an equitable adjustment, the USACE asserts that "the Government's right to terminate a contractor's right to proceed with a contract for default is limited to those circumstances wherein the contractor is not making sufficient progress to insure that the contract will be completed by the contract completion date." Based on this analysis, the USACE rejects the claims set forth in Exhibits E, G, and H of F&D's request for an equitable adjustment.

As set forth in our prior correspondence, USACE's position is simply incorrect. The Federal Circuit has found that the commission of fraud during performance is also grounds for default termination. Joseph Morton Co. v. United States, 757 F.2d 1273, 1278 (Fed. Cir. 1985) ("A contractor which engages in fraud in its dealings with the Government on a contract has committed a material breach justifying a termination of the entire contract for default."); see also Daff v. United States, 31 Fed. Cl. 682 (1994). The USACE first had the right to default terminate Sedona's Contract in November of 2000 when it discovered that Sedona was falsifying its pay applications in order to obtain payment from the USACE.

## V. Claim Preparation Costs Are Allowable

Costs of preparing a claim before and even after its submission, with the genuine objective of furthering negotiations with the Contracting Officer are allocable under the FAR. Propellex Corp., ASBCA 50203, 02-1 BCA ¶ 31.721; see also FAR 31.205-33(b). As our detailed claim preparation, scheduling analysis and engineering re-pricing was all aimed at furthering a negotiated settlement, we ask that you again consider these costs as part of any on-going negotiations.

## VI. Conclusion

We appreciate your consideration of these issues. Consistent with your request, we are forwarding by this letter additional support related to Modifications P00003, P00017, P00026

and the delay damages related to extended performance by Sedona and Yates. We will contact you after you have had an opportunity to review this additional material.

Sincerely,

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.

CJB

Christopher J. Brasco