**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIDELITY AND DEPOSIT COMPANY OF MARYLAND** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 1:06-cv-00186-LB (Judge Block)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

/s/ Christopher J. Brasco
CHRISTOPHER J. BRASCO
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
Counsel for the Plaintiff

**TABLE OF CONTENTS**


**STATEMENT OF THE ISSUES ..... 1**
**STATEMENT OF THE CASE ..... 1**
A. Nature of the Case ..... 1
B. Statement of Facts ..... 3
The Government's Improper Administration of the Contract's Payment Process ..... 3
The Government's Improper Administration of Sedona's Contractor Quality Control Plan ..... 5
The Government's Notice of Irregularities in Sedona's Progress Payment Requests 8
The Government's Decision Not to Terminate Sedona's Contract for Default in November 2000 Despite its Knowledge of Sedona's Financial Instability ..... 8
Forestalling the Inevitable: The Government Allows Sedona to Continue Work from November 2000 until June 2001 ..... 10
The Government's Show Cause Notice and Default Termination of Sedona's Contract ..... 12
F&D's Takeover of the Project ..... 13
**ARGUMENT ..... 14**
I. Standard of Review ..... 14
II. Defendant's Argument that F&D Cannot Prevail on its Equitable Subrogation Claims because it did not Specifically Allege that it Satisfied all Payment Bond Claims in its Complaint is Without Merit ..... 15
III. The Government Impaired F&D's Rights as Surety and Materially Altered F&D's Bonded Risk when it Made Progress Payments to the Contractor in Derogation of the Contract's Mandatory Payment Provisions ..... 18
IV. The Government Impaired F&D's Rights as Surety and Materially Altered F & D's Bonded Risk by Materially Departing from the Contract's Quality Control Provisions ..... 23
V. The Government's Abuse of Discretion in Delaying Sedona's Termination until June 2001 Impaired F&D's Rights as Surety and Materially Altered F&D's Bonded Risk ..... 28
**CONCLUSION ..... 37**

# TABLE OF AUTHORITIES

**Federal Cases**

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)........................................................ 14
Alabama Farm Bureau Mutual Cas. Co., Inc. v. American Fid. Life Ins. Co., 606 F.2d 602 (5th Cir. 1979)........................................................................................ 15
American Insurance Co. v. United States, 62 Fed. Cl. 151 (2004).................................. 18
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).................................................. 14
Argonaut Ins. Co. v. United States, 193 Ct. Cl. 483 (1970) ........................................... 29
Baker v. United States, 50 Fed. Cl. 483 (2001) .............................................................. 14
Balboa Ins. Co. v. United States, 775 F.2d 1158 (Fed. Cir. 1985) ........................ 29,30,33
Becho Inc. v. United States, 47 Fed. Cl. 595 (2000) ...................................................... 14
C.W. Over & Sons v. United States, 48 Fed. Cl. 342 (2000) ......................................... 14
Capital Indemnity Corp. v. Price Mun. Corp., 2002 WL 818064 (D.Utah) ........... 21,23,26
Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................... 14
Daff v. United States, 31 Fed. Cl. 682 (1994) ................................................................ 36
Insur. Co. of the West v. United States, 55 Fed. Cl. 529 (2003) .................................... 16
Int'l Fid. Ins. Co. v. United States, 25 Cl. Ct. 469 (1992)................................................ 17
Joseph Morton Co., Inc. v. United States, 757 F.2d 1273 (Fed. Cir. 1985) .................... 36
Kanag'iq Constr. Co. v. United States, 51 Fed. Cl. 38 (2001)......................................... 14
Lamb Eng'g & Constr. Co. v. United States, 2002 WL 32933387 (Fed. Cl.) ................. 36
Liberty Mutual Ins. Co. v. United States, 70 Fed. Cl. 37 (2006)..................................... 17
Lumberman's Mut. Cas. Co. v. United States, 67 Fed. Cl. 253 (2005) ........................... 29
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).............. 15
Nat'l Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997) ......................................................................... 16,19,20,21,22,23,26,28,29,35
Nova Cas. Co. v. United States, 69 Fed. Cl. 284 (2006) ............................................ 15,29
Ohio Cas. Ins. Co. v. United States, 12 Cl. Ct. 590 (1987) ........................................ 30,33
Overhead Electric, ASBCA 25656, 85-2 BCA ¶18,026.................................................. 36
Premier Ins. Co. v. United States 32 Fed. Cl. 308 (1994)……………………………. 17
Transamerica Premier Ins. Co. v. United States, 32 Fed. Cl. 308 (1994)........................ 17
Trinity Universal Ins. Co. v. Gould, 258 F.2d 883 (10th Cir. 1958) ................................ 19
United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) ...................................... 29
United States Fidelity & Guar. Co. v. United States, 201 Ct. Cl. 1 (1973) ............ 27,28,29
United States v. Reliance Ins. Co., 799 F.2d 1382 (9th Cir. 1986) .................................. 18
Westech Corp. v. United States, 20 Cl. Ct. 745 (1990) ................................................... 17
Xerox Corp. v. Genmoora Corp., 888 F.2d 345 (5th Cit. 1989)....................................... 15

Plaintiff, Fidelity and Deposit Company of Maryland ("F & D"), by counsel, hereby submits its Brief in Opposition to Defendant's Motion for Summary Judgment in accordance with the Rule 56 of the Rules of the United States Court of Federal Claims.

## STATEMENT OF THE ISSUES

(1) Whether the Government's payments to the Contractor in violation of the payment provisions in the contract between the Government and the Contractor impaired F&D's rights as surety.

(2) Whether the Government violated and improperly administered the Contract's quality control provisions, and if so, whether the Government's violation and improper administration of the Contract's quality control provisions impaired F&D's rights as surety.

(3) Whether the Government abused its discretion in failing to terminate the Contractor until June 7, 2001, seven months after F&D expressed the desire to take over the work and the Government acknowledged the contractor's default, and thereby impaired F&D's rights as surety.

## STATEMENT OF THE CASE

A. Nature of the Case

F&D, as performance bond surety, has brought this action against the Government to recover damages it has suffered as a result of the Government's impairment of F&D's rights as surety through its improper administration of the contract ("Contract") between the Army Corps. of Engineers and Sedona Contracting, Inc. ("Sedona"). The Government materially modified the contract by failing to adhere to the contract's payment provisions requiring the contractor to satisfy conditions precedent to payment. This Government failure allowed Sedona to divert contract funds to other projects and to a sister entity instead of paying its subcontractors on the

Project, which significantly increased F&D's costs to complete the Project. The Government also materially modified the contract by allowing Sedona to proceed with work without having an acceptable quality control plan in place in derogation of the contract. As a result, the Government paid Sedona for defective work that F&D was ultimately required to repair and/or replace in its completion of the Project. The Government's material modifications to the contract impaired F&D's rights as surety and caused F&D to suffer significant damages.

The Government further impaired F&D's rights by unduly delaying the termination of Sedona for default by nearly seven months. F&D and Project subcontractors had provided the Government with significant evidence of Sedona's non-payment of subcontractors and diversion of contract funds by November 2000. F & D simultaneously expressed its desire to mitigate damages and take over the work at its expense. The Government abused its discretion by ignoring the difficult circumstances born of its own misadministration and refused to terminate Sedona until June 7, 2001. Instead of taking action, the Government chose to wait while it insisted that Sedona do what it knew it couldn't - account for the funds Sedona had wrongly diverted. During this period, the Project grinded to a predictable halt, which resulted in F&D's suffering of substantial losses in restarting the work.

The Government's admissions concerning its maladministration of the Project raise genuine issues of material fact that preclude the entry of summary judgment. The Government acknowledges (1) its maladministration of the payment process (Defendant's Proposed Findings of Uncontroverted Fact ("D. SOF.") #18 Defendant's Brief ("D. Brief") p. 9); (2) its awareness of Sedona's diversion of Contract funds (D. SOF #25, #38; Defendant's Appendix ("D. App.") 196-245); and (3) its knowledge of Sedona's lack of capacity to complete the Project (Plaintiff's

Proposed Additional Findings of Controverted Fact ("P. SOF. #39). As such, summary judgment should be denied and discovery should be allowed to begin in this matter.

B. Statement of Facts

The Government's Improper Administration of the
Contract's Payment Process

The Contract sets forth specific procedures related to the payment process. The Contract incorporated several provisions of the Federal Acquisition Regulations ("FAR"), including FAR 52.232-5, entitled, "Payments Under Fixed-Price Construction Contracts (May 1997)." D. App. 129-130. In accordance with FAR 52.232-5(b)(1), Sedona was required to provide the following accounting of subcontractor payments in its progress payment requests:

> (i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested;(ii) A listing of the amount included for work performed by each subcontractor under the contract.; (iii) A listing of the total amount of each subcontract under the contract; (iv) A listing of the amounts previously paid to each such subcontractor under the contract.

In addition, FAR 52.232-5(c) required Sedona to attest to the propriety of its payment and withholding practices with a certification that it paid the appropriate amounts to subcontractors and suppliers from prior payments received.

Sedona submitted seven applications for payment prior to October 20, 2000. None of these payment requests complied with FAR 52.232-5(b)(1). P. SOF. #6, 7. Specifically, Sedona's payment applications did not include any data to verify subcontractor payments. Id. On each of its payment applications, Sedona failed to provide a listing of the amount included for work performed by each subcontractor under the Contract, a listing of the total amount of each subcontract under the Contract, or a listing of the amounts previously paid to each such subcontractor under the Contract. P. SOF. #6.

In response to Sedona's Payment Application No. 3, the Government informed Sedona that its payment application was being returned unprocessed for several reasons. P. SOF. #7. One reason provided by the Government was Sedona's failure to provide the required information related to subcontractor payments as set forth in FAR 52.232-5. Id. In addition, the Government noted Sedona's failure to obtain an approved schedule. Plaintiff's Appendix ("P. App.") 3-4. The Government ultimately approved Payment Application No. 3 and paid Sedona, even though Sedona never provided all of the information required by the Contract and requested by the Government. P. SOF # 7. Thus, the Government contemporaneously acknowledged that Sedona's payment applications did not satisfy the Contract's payment requirements, but it nevertheless approved payments to Sedona without receiving any subcontractor payment information.

The Contract also required that Sedona submit an approved schedule in order to receive progress payments. Paragraph 3.5 of Specification -1320, entitled "Basis for Payment," provides in part:

> The schedule shall be the basis for measuring Contractor progress. Lack of an approved schedule, scheduling personnel, or approved periodic schedule updates shall result in an inability of the Contracting Officer to evaluate Contractor progress for the purposes of payment. In this event, progress payments will not be made until corrective action or additional information is provided which is determined sufficient in the judgment of the contracting officer to analyze progress.

P. SOF #8. The Government expressly notified Sedona during the pre-construction meeting that no payments would be made during the first 60 days of work without an approved preliminary project schedule, nor after the first 60 days without an approved and tested complete project schedule. P. SOF. #9. Further departing from the Contract terms and contradicting its express representations, the Government approved Sedona's first three payment applications without

having an approved schedule in place to measure Sedona's progress. P. SOF. #11. By October 20, 2000, the Government had released $2,361,641 in Contract funds to Sedona in derogation of the Contract's payment provisions. P. SOF. #12. A significant amount of the improperly released Contract funds were intended for the benefit of Sedona's subcontractors and suppliers. Due to the Government's modification of the contractual payment requirements, Sedona was able to divert a substantial amount of the funds paid by the Government to Sedona away from the Project without the contractually prescribed safeguards. P. SOF. #13. The Government's failure to adhere to the Contract's payment and scheduling provisions impaired F&D's rights as surety and caused F&D to suffer significant losses in its completion of the Project.

The Government's Improper Administration of
Sedona's Contractor Quality Control Plan

The Contract required Sedona to submit a Contractor Quality Control Plan ("CQC Plan") to the Government within five (5) days of its receiving the Notice to Proceed. P. SOF. #14. The requirements for this CQC Plan are set forth in the Contract at Specification Section 01451. Id. According to Paragraph 3.2.3 of Specification Section 01451, the Government's acceptance of Sedona's CQC Plan or, alternatively, an interim plan covering the specified portion of the work to be immediately performed, was a prerequisite to the start of construction. Specifically, Paragraph 3.2.3 provides:

> The Contractor shall furnish for review by the Government, not later than 5 days after receipt of notice to proceed, the Contractor Quality Control (CQC) Plan proposed to implement the requirements of the Contract Clause titled "Inspection of Construction." The plan shall identify personnel, procedures, control, instructions, test, records, and forms to be used. The Government will consider an interim plan for the first 60 days of operation. Construction will be permitted to begin only after acceptance of the CQC Plan or acceptance of an interim plan applicable to the particular feature of the work to be started. Work outside of the features of work included in an acceptable interim plan will not be permitted to

> begin until acceptance of a CQC Plan or another interim plan containing the additional features of the work to be started.

Id. Specification Section 01451 sets forth numerous requirements for an acceptable CQC Plan. Id.

The Government failed to properly administer the quality control procedures in the Contract and wrongly allowed Sedona to perform construction without having the proper quality controls in place. In a letter dated December 8, 1999, the Government notified Sedona that it was granting Sedona's CQC plan "interim acceptance" due to deficiencies in the plan. P. SOF. #18. Over a month and a half after its December 8, 1999 letter, the Government notified Sedona that it continued to have concerns regarding Sedona’s CQC Plan, concerns that precluded the Government from accepting the CQC Plan. P. SOF. #20. In a letter dated January 26, 2000, the Government notified Sedona that it could only give conditional acceptance to Sedona’s proposed CQC System Manager, Arthur Perez', due to his “marginal performance” on a previous project. Id. As a condition of acceptance of Mr. Perez as CQC System Manager, the Government promised that Mr. Perez' "performance and this project will be monitored closely and action taken as deemed necessary." Id. The Government’s January 26, 2000 letter also noted “that in the area of Contractor Quality Control several items remain outstanding as of the date of this letter,” such as Sedona’s revised CQC Plan addressing the Government’s review comments on quality control, scheduling, and the submittal register. Id. Despite Sedona’s failure to comply with the Contract’s CQC requirements and the Government's promise to monitor the quality control aspects of the project carefully, the Government allowed Sedona to proceed with the work and made progress payments to Sedona. P. SOF. #21.

In addition to Mr. Perez’s poor performance on prior projects, he was ineligible to serve as CQC Systems Manager because he lacked the educational requirements set forth in the

Contract. P. SOF. #15,19. As part of the CQC Plan, the Contractor was required to designate a qualified CQC Systems Manager to oversee all matters pertaining to quality control on the Project. P. SOF. #15. Paragraph 3.2.3 of Section 01451 stipulates that "[t]he CQC Systems Manager shall be a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work." P. SOF. #15. The Government acknowledges that Sedona's CQC Manager failed to meet the education requirements and instead attempts to justify its actions based upon Mr. Perez's work experience. D. Brief p.8, D. SOF. #7,10. This justification is particularly weak in light of the Government's characterization of Mr. Perez's previous work as "marginal." P. SOF. #20.

Despite Sedona's failure to meet its CQC prerequisites, the Government continued to allow Sedona to perform the work without the proper adherence to the Contract's quality control requirements. On several instances, the Government complained of Sedona's quality control problems, but the Government continued to pay for work that was defective, work that F&D later paid to correct. In a letter dated December 22, 2000, the Government noted several instances of Sedona's failure to follow the Contract requirements and quality control procedures. P. SOF. #22. Although this letter specifically noted examples of Mr. Perez's failures as CQC System Manager and threatened to order his removal from the Project, the Government never took any such action to rescind its prior "conditional acceptance" of Mr. Perez as CQC System Manager or to otherwise support its promise of close monitoring. Id. Despite having never received Sedona's compliant quality control submission, the Government continued to make progress payments to Sedona for portions of the work that F&D ultimately had to correct.

The Government's Notice of Irregularities in Sedona's Progress Payment Requests

In May of 2000, suppliers and subcontractors began to inform the Government of Sedona's failure to pay the amounts owing to the suppliers and subcontractors that had been released by the Government in progress payments to Sedona. P. SOF. #23. For example, on October 15, 2000, Sedona's structural steel subcontractor notified the Government that it was owed substantial sums by Sedona for prior billings. Id. In addition, Sedona's precast concrete subcontractor notified the Government of nonpayment on November 1, 2000. Id. The unpaid invoices for these two subcontractors totaled over $500,000. The Government continued to receive numerous notices from unpaid subcontractors and suppliers through June 7, 2001, the date on which it terminated Sedona's Contract. P. SOF. #24. At least eleven subcontractors and material suppliers contacted the Government regarding Sedona's nonpayment for materials and/or services provided on the Project. Id.

F&D also notified the Government that Sedona had not been paying its subcontractors the amounts received in progress payments from the Government. P. SOF. #25. On November 8, 2000 F&D notified the Government that it had already received payment bond claims. Id. F&D continued to notify the Government as it received additional payment bond claims. P. SOF. #26.

The Government's Decision Not to Terminate Sedona's Contract for Default in November 2000 Despite its Knowledge of Sedona's Financial Instability

By November 2000, it was clear that Sedona's financial condition had deteriorated to the point that the Project's completion was jeopardized. The Government had actual notice that Sedona had not been paying its subcontractors the amounts approved in prior payment applications and that certain subcontractors had asserted payment bond claims against F&D. P. SOF. #23,24,25. The Government also had expressed concerns at this time regarding Sedona's

excessive payments to Genz Electric, Inc. a subcontractor that was a related corporate entity to Sedona.

On November 8, 2000, F&D provided the Government with a voluntary letter of default from Sedona. P. SOF. 27. F&D's letter forwarding Sedona's voluntary letter of default warned the Government that "F&D has become aware of circumstances that indicate that Sedona Contracting, Inc. is financially unable to pay for the completion of the Project." P. SOF. #28. F&D subsequently provided additional information that demonstrated that Sedona was financially imperiled. F&D also requested that the Government terminate Sedona's Contract for default and allow F&D to takeover and complete the work. Id. F&D took this action in order to mitigate damages and to complete the work as quickly and cost effectively as possible.

On November 16, 2000, the Government informed F&D that it would not terminate Sedona's Contract for default. P. SOF #30. The Government chose to ignore plain evidence of the diversion of funds it tacitly permitted and Sedona's lack of capacity to complete the Project. Instead, the Government myopically focused on a misplaced schedule analysis to justify its refusal to terminate Sedona. P. SOF. #34. No effort was made by the Government to mitigate the damages caused by its maladministration of the Project. Indeed, the Government maintained the position that Sedona's progress was not behind schedule and reiterated this position in a letter to F&D, dated November 20, 2000. However, in a November 29, 2000 letter to Sedona, the Government threatened to withhold progress payments from Sedona due to its schedule showing unsatisfactory progress. P. SOF. #32. The Government's November 29, 2000 letter further notified Sedona that it must correct the deficiencies in the scheduling of its work. Id. The Government concluded that "[i]f these deficiencies are not corrected, we will retain 10% of your November 2000 pay request, in accordance with Contract Clause 79 of Contract Section 00700,

due to your schedule showing unsatisfactory progress." Id. As the Government well knew by that juncture, Sedona lacked the capacity to make substantial progress on the Project.

Forestalling the Inevitable: The Government Allows Sedona to
Continue Work from November 2000 until June 2001

Despite the Government's knowledge of Sedona's failure to make progress and its failure to pay its subcontractors, the Government allowed Sedona to remain on the Project for seven more months. The Government, however, modified its administration of the payment process beginning with Sedona's Application for Payment No. 8, originally submitted on November 21, 2000. P. SOF. #31. On November 27, 2000, the Government notified Sedona that its payment request was being returned unprocessed due to Sedona's failure to provide the subcontractor cost control information required under FAR 52.232-5. Id. The Government rejected Sedona's Payment Application Nos. 8, 9, and 10 because Sedona failed to submit payment applications that were in compliance with the Contract's payment requirements. The Government effectively ceased making payments to Sedona on the Project following the Government's approval and payment of Payment Application No. 7 on October 20, 2000.[1] The Government should have known that Sedona would be unable to provide the subcontractor payment information it was now belatedly insisting on. The Government understood that Sedona did not have the financial capacity to replace funds it had diverted from the Project. Consequently, Sedona's submission of its subcontractor accounting would only serve the purpose of documenting its prior transgressions. Without further progress payments and already in a precarious financial situation, Sedona was predictably unable to make any significant progress on the Project after November 2000.

[1] Between October 2000 and May 2001, the Government approved a portion of one additional payment request, approving a partial payment of $45,851 in Contract Funds for Payment Application No. 8 on December 19, 2000.

The Government had no legitimate reason to allow Sedona to remain under Contract because it knew that Sedona lacked capacity to make progress without further payments. In December 2000, the Government demonstrated awareness of Sedona's financial inability to complete the work. In a letter dated December 22, 2000, the Government notified Sedona that "[w]e have been advised by your structural steel supplier that Sedona has billed the Government $233,000.00 for structural steel and has failed to make payment to the supplier after receiving payment from the Government. P. SOF. #37. We have further been advised by F&D that they have paid the structural steel supplier $200,000.00 under their Miller Act Payment Bond." Id. The Government requested that Sedona provide "documentation that your company has sufficient financial resources to complete the project and that your company intends to complete the project." Id. On February 5, 2001, the Contracting Officer's Representative notified Sedona that he was "very concerned with the news that two of your [Sedona] main subcontractors have walked off the project . . ." In a February 8, 2001 letter to F&D's counsel, the Government asserted that Sedona was in breach of its contractual obligations for its failure to pay subcontractors. P. SOF. #38. Nevertheless, the Government attempted to support its lack of decisive action by noting, "other than the failure to pay subcontractors, they are not in breach of their contractual obligations." Id. On February 12, 2001, Sedona acknowledged that its subcontractors remained unpaid, notifying the Government that several of its subcontractors were refusing to work until they received payment. P. App. 10,11.

In February 2001, a Government legal advisor acknowledged in an internal memorandum that based upon his experience, "Sedona will not complete the project." P. SOF. #39. This memorandum notes that "Sedona has no assets other than the unpaid contract balance to finance the Lackland job." Id. Despite the Government's accurate assessment of the Project's status, the

Government continued to ignore F&D's takeover request, instead remaining content to stand by while the Project continued to deteriorate. In a March 22, 2001 letter to Sedona's counsel, the Government stated, "[w]e have been advised that several subcontractors are either refusing to return to work until they are paid or have threatened to walk off the job unless they are paid by a specific date." P. SOF. #40. The Government further noted that F&D was willing to take over the Project if Sedona agreed to the Government's offer of a no-cost termination. Id. The Government noted the "deterioration of the situation at the job-site." D. App. 314-315. Id.

The Government's Show Cause Notice and Default
Termination of Sedona's Contract

The Government again notified Sedona that it was in default of its obligations under the Contract in a May 7, 2001 letter. P. SOF. #41. The Government stated, "[t]he failure of Sedona to make timely payment to its subcontractors and suppliers is a breach of Sedona's contractual obligations." Id. The letter also noted that little work was being performed at the site, which it attributed to subcontractors that left the project due to Sedona's failure to make payment. Id. The Government further stated its belief that Sedona's ability to complete the remaining work within the remaining Contract duration was doubtful. Id. Finally, the Government directed Sedona to show cause as to why its Contract should not be terminated for default. Id. The Government was made known of Sedona's diversion of Project funds and lack of financial capacity in November of 2000. Seven months later, these reasons formed the bases for the Government's default termination of Sedona.

On June 7, 2001, the Government terminated Sedona's Contract for default. P. SOF. #42. The Government cited the same reasons F&D had made clear in November 2000, namely, Sedona's "failure to employ subcontractor's [sic] who are critical to the completion of key activities, their failure to obtain critical equipment which has a long lead time, and their failure to

man the project with a work force which is capable of completing the project in a timely manner." Id. The Government further noted that "[n]umerous subcontractors have abandoned the site and refused to perform further work due to Sedona's failure to make subcontractor payments." Id. Of course, this subcontractor abandonment was an inevitable consequence of the Government's course of action. Following Sedona's termination, the Government demanded that F&D takeover and prosecute the work to its completion in accordance with its Bond obligations.

The Government had been on notice of Sedona's failure to make payments to its subcontractors for many months, dating back to the first notices that it had received in or around August 2000. Nevertheless, the Government allowed Sedona to remain under Contract, but without any income stream to perform the work. Thus, the Project languished from November 2000 until Sedona's default termination in June 2001.

F&D's Takeover of the Project

In response to the Government's default notice and demand on the Bond and under a full reservation of rights, F&D immediately commenced performance of Sedona's obligations. P. SOF. #43. F&D entered into a Takeover Agreement with the Government on June 26, 2001, in order to complete the work remaining on the Contract. Id. F&D contracted with W.G. Yates & Sons Construction Co. to complete the work on the Project. P. SOF. #44. F&D incurred substantial additional costs in completing the work as a result of the Government's failure to adhere to the Contract's payment provisions, the Government's departure from the Contract's quality control procedures and improper administration of those procedures, and the Government's delay in terminating the Contract until June 7, 2001. F&D's losses consist of costs it expended during completion accounting for funding shortfalls due to Sedona's diversion of

funds as well as premiums F&D expended to reprocure Project subcontracts and accelerate the work.

## ARGUMENT

I. Standard of Review

According to RCFC 56(c), summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A factual dispute is considered genuine "when the evidence presented would permit a reasonable jury to find in favor of the non-movant." Kanag'iq Constr. Co. v. United States, 51 Fed. Cl. 38, 42 (2001) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2502, 2510 (1986). The moving party bears the burden of showing the absence of genuine disputes over material facts. Kanag'iq Constr. Co., 51 Fed Cl. at 42 citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-325, 106 S.Ct. 2548 (1986). Trial courts should act with caution and should deny summary judgment "if there is reason to believe that the better course would be to proceed to a full trial." C.W. Over & Sons v. United States, 48 Fed. Cl. 342, 346-7 (2000) quoting Anderson 477 U.S. at 255.

In ruling on a summary judgment motion, determinations of credibility, weighing of evidence, and drawing inferences from the facts and evidence are not the proper functions of the Court. See Anderson 477 U.S. at 255; Baker v. United States, 50 Fed. Cl. 483, 488 (2001). As such, the Court must view the evidence presented by the moving party in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970). In addition, the evidence presented by the non-moving party must be believed and all justifiable inferences must be drawn in the non-movant's favor. Becho Inc. v. United States, 47

Fed. Cl. 595, 599 (2000) citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

This action is not ripe for disposition via summary judgment, especially at this early stage of the litigation. See Xerox Corp. v. Genmoora Corp., 888 F.2d 345, 354 (5th Cir. 1989) quoting Alabama Farm Bureau Mutual Cas. Co., Inc. v. American Fid. Life Ins. Co., 606 F.2d 602, 609 (5th Cir. 1979), cert. denied 449 U.S. 820 (1980) ("Summary Judgment should not . . . ordinarily be granted before discovery has been completed."). Pursuant to the Rule 26(d) of the Rules of the Court of Federal Claims, the Parties have yet to begin discovery. Even at this early juncture, several admissions contained in Defendant's Motion, Statement of Facts, and Appendix actually support, rather than contradict, the allegations of impairment of suretyship contained in F&D's Complaint. The discovery process will only reveal further documentation and information that support F & D's claims. Further, the resolution of F&D's claim that the Government abused its discretion in delaying Sedona's termination until June 2001 will likely involve substantial weighing of evidence and credibility determinations of multiple witnesses. See Nova Cas. Co. v. United States, 69 Fed. Cl. 284, 298 (2006). As such, Defendant's Motion for Summary Judgment should be denied, and this case should be permitted to advance to the discovery phase and ultimately to a trial on the merits.

## II. Defendant's Argument that F&D Cannot Prevail on its Equitable Subrogation Claims because it did not Specifically Allege that it Satisfied all Payment Bond Claims in its Complaint is Without Merit

Defendant's misguided, hyper-technical argument that F&D's omission of a specific allegation in its Complaint that it satisfied all payment bond claims precludes F&D from asserting its claims demonstrates Defendant's misunderstanding of the nature of F&D's claims and, in any event, does not entitle Defendant to prevail on summary judgment. In making its

argument, Defendant relies on Insur. Co. of the West v. United States, 55 Fed. Cl. 529 (2003), which stands for, in part, the proposition that once a surety discharges the outstanding bills of subcontractors, it can step into the shoes of the contractor and claim retained funds held by the Government as a stakeholder or funds that were wrongfully distributed to the Contractor.

Insur. Co. of the West is distinguishable from F&D's action in several important respects. In Insurance Co. of the West, the Government, acting as stakeholder, incorrectly made several payments to the Contractor after the Contract had been formally modified to reflect that payment should be made to the surety. Id. at 532. The Court rejected the Government's argument that the surety's payment of subcontractors under its payment bond only subrogated the surety to the rights of subcontractors, which had no right to sue the Government under principles of sovereign immunity. Id. at 534-538. In contrast, F&D's action is an impairment of suretyship action arising from its performance bond obligation and brought under the Restatement (third) of Suretyship & Guaranty § 37 and Federal Government contracts case law. F&D has alleged that the Government's departure from Contract terms that provide security for the surety and the Government's abuse of discretion in administering the Contract impaired F&D's bonded risk and its rights as surety and caused F&D to suffer damages. See generally Nat'l Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997). F&D seeks its damages resulting from the Government's impairment of its rights as a performance bond surety. See Id. Therefore, there is no issue as to what party has a priority over contract funds and the Government's argument that F&D failed to allege that it satisfied all claims of subcontractors is invalid.

A recent United States Court of Federal Claims decision, Nova Casualty Co., v. United States, 69 Fed. Cl. 284 (2006), clarified that a performance bond surety obtains jurisdiction under the Tucker Act through equitable subrogation when it performs under the performance bond, a

distinct ground for obtaining equitable subrogation jurisdiction from that obtained through payment of material suppliers and subcontractors under a payment bond. See also Transamerica Premier Ins. Co. v. United States, 32 Fed. Cl. 308 (1994) (Surety can establish right of subrogation in either of two ways, by completing the contract pursuant to its obligation under the performance bond *or* by satisfying materialmen's claims under the payment bond) (emphasis added); Westech Corp. v. United States, 20 Cl. Ct. 745, 749 (1990) (by financing the Government's project to completion, the surety is equitably allowed to maintain a claim against the Government). In the instant action, F&D is claiming for its damages suffered related to its completion of the Contract under the performance bond. As such, F&D has standing to assert its impairment claims against the Government.

Even if the satisfaction of all subcontractor claims was a condition precedent to F&D's impairment claims, the Government's argument still fails. F&D specifically alleged in its complaint that all conditions precedent to bringing its claims had been satisfied. More significantly, there are no outstanding payment bond claims. See Affidavit of Darrell Leonard, P. App. 1-2. In any event, the lack of a specific allegation in F&D's Complaint that it has paid all outstanding claims does not provide grounds for Defendant to prevail on summary judgment where Defendant has not provided any evidence of outstanding claims. See Liberty Mutual Ins. Co. v. United States, 70 Fed. Cl. 37, 54-55 (2006); see also Int'l Fid. Ins. Co. v. United States, 25 Cl. Ct. 469, 474 (1992) (affidavit from surety's bond claims attorney stating that all payment bond claims had been paid, settled, or were barred by the statute of limitations constitutes sufficient proof that the surety paid all payment bond claims). In addition, Defendant's argument, at the most, would warrant F&D's amendment of its Complaint to allege satisfaction of all payment bond claims rather than a disposition of the case on summary judgment.

## III. The Government Impaired F&D's Rights as Surety and Materially Altered F&D's Bonded Risk when it Made Progress Payments to the Contractor in Derogation of the Contract's Mandatory Payment Provisions

The Government's significant departure from the requirements of the mandatory Contract payment provisions, set forth in FAR 52.232-5, impaired F&D's rights as surety and materially altered the bonded risk that F&D agreed to undertake. As a result of the Government's significant departure from the Contract payment provisions, F&D suffered substantial losses in its completion of the Project.

It is well settled that a surety may recover against the Government where the Government impairs its suretyship status. American Insurance Co. v. United States, 62 Fed. Cl. 151, 156 (2004). A surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent. United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986). The Restatement (third) of Suretyship & Guaranty sets out the elements of a claim for impairment of suretyship. Restatement (third) of Suretyship & Guaranty § 37(1) provides in part, "[a]n act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an 'impairment of suretyship' status." Restatement (third) of Suretyship & Guaranty § 37(3) lists certain acts of the obligee that entitle the surety to a *pro tanto* discharge, including modifying the duties of the principal and impairing the value of collateral securing the underlying obligation. Under the Restatement (third) of Suretyship & Guaranty § 37(4), a surety is also entitled to assert an affirmative claim where it has already performed any portion of the secondary obligation without knowledge of the impairment or under business compulsion.

The principles advanced in Restatement (third) of Suretyship & Guaranty § 37 have been expressly adopted by the Federal Circuit and held to be applicable in the context of Federal Government contracts. See Nat'l Surety Corp. United States, 118 F.3d 1542, 1544 (Fed. Cir. 1997); see also American Ins. Co., 62 Fed. Cl. at 156-157 (surety is entitled to affirmative recovery against the Government where the Government impairs its suretyship by departing from the terms of its contract with the principal obligor). Nat'l Surety Corp. involved a surety's affirmative claim for amounts that had been improperly paid prior to the surety's involvement. In Nat'l Surety Corp., the bonded contract contained a provision requiring the Government to retain 10% of the Contract funds from payments to the Contractor until the Contractor submitted an approved project arrow diagram. Despite the contractor's failure to submit an approved arrow diagram, the Government did not withhold the retainage as required by the Contract. The contractor ultimately defaulted and the surety completed the project. The Federal Circuit held that the Government's departure from the Contract's retainage provision constituted a material modification to the bonded contract and an impairment of National Surety Corp.'s rights as surety. Id. at 1546-1547. In its decision, the Federal Circuit noted that "[i]t is of course almost axiomatic that any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation." Id. at 1547 citing Trinity Universal Ins. Co. v. Gould, 258 F.2d 883, 885 (10th Cir. 1958). The Court further stated, "[c]ontract terms that provide security for the bonded performance cannot be ignored, waived, or modified without consideration of the surety's interest." Nat'l Surety Co., 118 F.3d at 1547. The Court held that the surety was entitled to a recovery equivalent to the actual damages it suffered as a result of the Government's departure from the Contract's retainage provision. Id. at 1548. In remanding the case for a hearing on damages, the Federal Circuit observed that the Court should

determine "whether the unauthorized release reduced the contractor's incentive to complete the contract, thereby increasing the risk to the surety." Id.

The Government's material departure from the mandatory subcontractor payment substantiation requirements in the case at bar is analogous to the Government's failure in Nat'l Surety Corp. to withhold retainage despite the lack of a proper project arrow diagram. The Contract incorporated FAR 52.232-5, which requires, as a precondition to payment, the contractor to submit subcontractor payment information. Specifically, FAR 52.232-5(b)(1) provides that the contractor *shall* provide this required substantiation. (Emphasis added). The provision's plain language, specifically the use of the word "shall," indicates that the contractor's inclusion of the listed subcontractor payment information as a part of a valid payment application is mandatory and not discretionary. As Defendant notes in its Brief in Support of its Motion for Summary Judgment, it is undisputed that the Government made payments to Sedona for payment estimate numbers one through seven in the total amount of $2,361,641 despite Sedona's failure to submit any contractually required subcontractor payment information. Def.'s Brief p. 9, P. SOF. #7. The Government's failure to require subcontractor payment substantiation facilitated Sedona's diversion of a significant amount of Project funds away from the Project instead of making contractually required payments to subcontractors and suppliers.

It is inarguable that FAR 52.232-5 was incorporated into the Contract for the purpose of ensuring that Contract funds were being properly disbursed on the Project. The provision was intended to make certain that the unearned Contract balance was being used to further Project progress and not diverted for other uses. This provision safeguarding Project funds clearly provides security for the surety, which is secondarily liable for the completion of the Project and payment of Project subcontractors and suppliers. Had the Government enforced the provision, it

would have obtained a record of committed subcontract costs and subcontract payment administration that would have provided a means of evaluating the Contractor's schedule of values for overpayments. In addition, enforcement of the payment provisions would have provided the Government with an important baseline by which to measure the integrity of the payment process and assess the veracity of subcontractor complaints. In this regard, the Government could have discovered that Sedona was improperly diverting Contract funds upon receipt of the first verifiable subcontractor complaint of non-payment.

The Government's adherence to the payment provisions would have also provided a great disincentive to Sedona to divert Contract funds. While it appears that Sedona did indeed submit false certifications, it likely would have been more hesitant to create and submit to the Government written documents containing affirmative misrepresentations of prior subcontractor payments if the Government had enforced the payment provisions. In accordance with the Court's holding in Nat'l Surety Corp., the Government's failure to adhere to the FAR 52.232-5 subcontractor payment substantiation requirements, which, when enforced, provide security for the surety, materially altered F&D's bonded risk and impaired F&D's rights as surety. Id. at 1547; see also Capital Indemnity Corp. v. Price Mun. Corp., 2002 WL 818064 (D. Utah) (city's payment to contractor in violation of the contract terms impaired the rights of the surety and entitled the surety to recover damages caused by the city's impairment).

Further demonstrating the Government's misadministration of the payment aspects of the Project, the Government disregarded Project Specification 1320, paragraph 3.5, which requires the contractor to submit an approved schedule and approved schedule updates in order that contracting personnel can measure progress for the purposes of payment. P. SOF. #11.The Government acknowledges that it processed and paid Sedona for three payment applications

without having approved Sedona's Initial Project Schedule. Id. These Government payments also were made in derogation of its express representation during the pre-construction meeting that no payments would be made during the first 60 days of work without an approved preliminary project schedule, nor after the first 60 days without an approved and tested complete project schedule. P. SOF. #9. The Government did not approve Sedona's Initial Project Schedule until July 27, 2000, nearly eight months after notice to proceed was issued. P. SOF. #10.

F&D suffered significant damages related to the Government's failure to enforce the contractual payment provisions. The Government's lack of enforcement of the subcontractor payment control provisions of FAR 52.232-5 facilitated Sedona's non-payment of subcontractors and its diversion of Contract funds from the Project. When the Government began to enforce FAR 52.232-5 in November 2000, Sedona could not readily submit a compliant pay application that showed it was up to date with payments to subcontractors. As a result, the Government withheld payment from Sedona and Sedona made no further substantial progress. Without a stream of progress payments, most of the subcontractors walked off the job due to non-payment between November 2000 and June 2001. The Government acknowledged this problem in its May 7, 2001 show cause letter and its May 30th response to Sedona's show cause notice. When F&D took over completion of the Project, the surety was forced to make subcontractors whole and pay premium fees to come back to the jobsite to have the remaining scope of work accomplished. Due to the Government's delayed termination, F&D was also forced to accelerate performance in order to mitigate liquidated damages. F&D is entitled to recover these losses caused by the Government's impairment of F&D's rights as surety. See Nat'l Surety Corp., 118 F.3d at 1546-1547 (the correct measure of surety's recovery is the surety's actual damages

attributable to the Government's impairment); Capital Indem. Corp. v. Price Mun. Corp., 2002 WL 818064 (D. Utah) (city is liable to surety for the actual damages that resulted from city's impairment of the surety's rights); Restatement (third) of Suretyship & Guaranty § 37.

The Government relies on the argument that the Corps exercised reasonable discretion in its decision not to withhold retainage under the Contract's payment provision as a defense to F&D's impairment of suretyship claims. This argument, however, does not take into account the fact that the Contract did not permit the Government to make progress payments, *in any amount*, without demanding the subcontractor payment information required by FAR 52.232-5. P. SOF. #5. While FAR 52.232-5(e) authorizes the Government to retain a maximum of 10% of the amount of the payment upon a finding that satisfactory progress has not been made, the Government's reliance on this subsection misses the point. F&D's impairment arises from the Government's making progress payments to Sedona made without the contractually required subcontractor payment information. As these provisions were mandatory, the Government had no discretion to exercise in administering the subcontractor payment control provisions contained in FAR 52.232-5(b)(1). See Nat'l Surety Corp., 118 F.3d at 1546-1547. Therefore, the Government's refusal to require such information constitutes a material departure from a mandatory provision of the Contract, and as such, an analysis of whether the Government acted with reasonable discretion is irrelevant to F&D's impairment claims.

## IV. The Government Impaired F&D's Rights as Surety and Materially Altered F&D's Bonded Risk by Materially Departing from the Contract's Quality Control Provisions

The Government's material deviations from Contract provisions governing the Quality Control aspects of the Project impaired F&D's rights as surety and altered the risk it agreed to undertake in providing bonds for the Project. Under the holding in Nat'l Surety Corp. and

pursuant to Restatement (third) of Suretyship & Guaranty § 37 (discussed in detail above), F&D is entitled to recover the damages it suffered in completing the Project caused by the Government's material departure from the protective Contract quality control provisions.

The Government materially departed from the Contract's quality control provisions when it granted "interim acceptance" to Sedona's deficient Contractor Quality Control ("CQC") Plan and allowed Sedona to begin construction prior to its submission of a contractually compliant CQC Plan. P. SOF. #18. Section 01451, paragraph 3.2.1 of the Contract specifications requires the contractor to submit a CQC Plan within five days after receipt of notice to proceed. P. SOF. #14. Alternatively, Paragraph 3.2.1 allows for Government consideration of a contractor's interim CQC Plan applicable to a discreet portion of the work, but limits its utilization to the first 60 days of operations and only allows work to progress in the discreet area of work addressed by the interim plan. Id. The Government, in its December 8, 1999 letter to Sedona, purported to give Sedona's plan an "interim acceptance" despite its inability to determine whether Sedona's proposed Plan Manager met the Contract experience requirements and the existence of at least twenty-six deficiencies with Sedona's proposed plan. P. SOF. 18. Def.'s App. 55-57. Without limiting Sedona to any particular scope of work, the Government allowed Sedona to begin general construction operations under its "interim acceptance" of the deficient CQC Plan. While Paragraph 3.2.1 contemplates Government consideration of an acceptable "*interim plan*" that meets the requirements of an acceptable CQC Plan for a discreet portion of the work, the provision certainly does not provide the Government with discretion to grant "*interim acceptance*" to a patently deficient overall CQC Plan. P. SOF. 14. This unauthorized Government modification of important contractual CQC requirements materially impaired F&D's bonded risk.

The Government's "conditional acceptance" of Sedona's unqualified CQC Plan Manager, Mr. Perez, in derogation of the CQC specifications constituted an additional instance of the Government's maladministration of the CQC process. P. SOF. #20. Paragraph 3.2.2 provides a detailed listing of the required contents of the CQC Plan, including the requirement that the contractor select a qualified CQC Plan Manager to oversee the CQC Plan and overall quality control aspect of the Project. D. App. 99-119. The specifications make no allowance for conditional acceptance of the CQC Manager. Id. Without any contractual authority, the Government granted "conditional acceptance" of Mr. Perez as CQC Manager despite noting his marginal performance on a previous project. P. SOF. #20.

In further departure from the specifications, the conditionally accepted Mr. Perez did not have the requisite educational qualifications to serve in the position. P. SOF. #19. Paragraph 3.4.2 of section 01451 requires that the CQC Plan Manager meet certain minimum education and experience requirements. Specifically, Paragraph 3.4.2 provides in relevant part, "[t]he CQC Systems Manager shall be a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work." P. SOF. #15. This provision requires that the System Manager be a graduate engineer, graduate architect, or a graduate of construction management, and in addition, requires that the System Manager have either two years of construction experience on construction similar to the Contract or be a construction person with five years in related work. This interpretation is mandated by the existence of a comma after the word "management," which makes it clear that "or a construction person . . ." modifies only the experience criteria, specifically, "with a minimum of two years . . ." and does not modify the separate educational requirement. Any ambiguity in Paragraph 3.4.2

is clarified in paragraph 3.4.4 which makes the existence of separate educational and experience requirements manifest by providing in part, "[i]n addition to the above experience *and* education requirements the CQC System Manager shall have completed the course entitled . . ." (emphasis added). D. App. 102. Thus, it is beyond dispute that Mr. Perez was unqualified for the position of CQC Manager due to his failure to meet the contractual education requirements.

The Government's actions in granting an improper "conditional acceptance" to Sedona's proposed CQC System Manager and its allowance of a contractually unqualified individual to serve as the System Manager materially departed from the mandatory CQC provisions of the Contract to F&D's detriment. The fact that F&D's risk was materially altered by these unauthorized modifications to the CQC Contract provisions was made manifest when F&D suffered significant Project completion losses related to the correction of Sedona's defective work. F&D is entitled to recover these losses caused by the Government's impairment of F&D's rights as Surety. See Nat'l Surety Corp. v. United States, 118 F.3d 1542, 1548 (1997); Capital Indem. Corp. v. Price Mun. Corp., 2002 WL 818064 (D. Utah); Restatement (third) of Suretyship & Guaranty § 37.

The Government's non-compliance with even its own substituted CQC requirements is further evidence that the Government impaired F&D's risk. In the Government's January 26, 2000 letter in which it granted Sedona's proposed CQC System Manager conditional acceptance in derogation of the Contract, the Government stated that it would monitor the Project and the CQC Manager's performance closely. P. SOF. #20. The letter also noted that Sedona had yet to submit a revised CQC Plan addressing the many deficiencies in its proposed plan that the Government cited in its December 8, 1999 letter. Id.

The Government's December 22, 2000 letter to Sedona demonstrates that the Government did not live up to its self-imposed obligation to monitor the Project and the CQC Manager's performance closely. P. SOF. #22. The letter described numerous quality control failures related generally to Sedona's failure to have designated personnel on site observing the work and specifically to the protection of concrete from extreme temperatures, numerous problems with contractor inspections and submittals, and the inadequate performance of Sedona's CQC Manager. Id. The Government also threatened in the letter to remove Mr. Perez from the Project if the quality control situation did not improve. Despite the poor performance of Mr. Perez, the Government never took any steps to rescind its "conditional acceptance" of Mr. Perez as CQC Manager. Id.

Defendant's argument that it had no contractual duty to inspect work in progress misses the point and is untenable in light of the Government's actions in materially departing from the Contract's protective CQC provisions. As an initial matter, the Conract prohibited any work from proceeding until a compliant CQC Plan was submitted, therefore no payments should have been made. Moreover, due to the contractually inadequate nature of Sedona's CQC plan and its CQC Manager, the Government invented an extra-contractual scheme whereby it placed conditions on its acceptance of Sedona's CQC Manager and promised careful scrutiny of the quality of Sedona's performance and the performance of the CQC Manager. After its alteration of the Contract, the Government, at the very least, owed a duty to itself and F & D, as surety, to ensure that Sedona was adequately performing its quality control responsibilities prior to making progress payments for work performed. See United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) (Court held that Government's failure to properly inspect materials entitled surety to recover funds paid to contractor for the materials where a proper inspection would have revealed

that the contractor did not have title to materials); see also United States Fidelity & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1384 (1973) (Government has a duty to consider the surety's interest in administering the contract during performance). Instead, the Government relied on Sedona's insufficient CQC Plan and marginal CQC Manager to ensure that the work was performed in accordance with the Project's specifications, which it predictably was not. The Government's failure to adhere to the CQC requirements and its subsequent failure to enforce the terms of its unauthorized "conditional acceptance" resulted in the improper release of funds to Sedona for defective work and caused F&D to incur additional costs in completing the work following its takeover of the Project.

The Government's claim that it exercised reasonable discretion in its administration of quality control procedures ignores the fact that the Government departed from mandatory, non-discretionary Contract requirements related to quality control to the detriment of F&D. This Contract departure materially altered the underlying Contract that F&D agreed to bond as well as its risk under the bond and constituted an impairment of F&D's rights as surety. See Nat'l Surety Corp., 118 F.3d at 1546-1547; Restatement (third) of Suretyship & Guaranty § 37. Thus, F&D is entitled to recover its losses caused by the Government's failure to comply with the terms of the Contract's quality control provisions. See Id.

## V. The Government's Abuse of Discretion in Delaying Sedona's Termination until June 2001 Impaired F&D's Rights as Surety and Materially Altered F&D's Bonded Risk

The Government's failure to terminate Sedona for default in November 2000 and its subsequent delay in terminating Sedona until June 2001 constituted a Government abuse of discretion in light of the Government's knowledge of Sedona's diversion of Contract funds, its non-payment of Project subcontractors and suppliers, its failure to make sufficient progress, and

its financial inability to complete the Project. The Government's inaction during this period is particularly troubling given both the Government's maladministration of the payment process prior to November 2000 and the Government's decision after November 2000 to allow Sedona to remain under Contract without access to the Contract balances the Government knew were necessary for the financially strapped contractor to complete the work. As a consequence of the Government's actions, any significant progress on the Project was effectively halted for approximately seven months. This abusive Contract administration impaired F&D's rights as surety and materially altered the risk that it agreed to bond at the beginning of the Contract. F&D suffered extensive damages as a result of the Government's abuse of discretion and impairment of suretyship.

It is well settled that where the Government is entitled to exercise discretion under a contract, it has a duty to act reasonably and to consider the surety's interest in its administration of the Contract. Nat'l Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997) quoting U.S. Fidelity & Guaranty Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1384 (1973); United Pacific Insurance Co. v. United States, 16 Cl. Ct. 555, 558 (1989); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1164 (Fed. Cir. 1985); Argonaut Ins. Co. v. United States, 193 Ct. Cl. 483, 434 F.2d 1362 (1970). The Government also owes the surety a duty to administer the contract in a way that does not materially increase the surety's risk. Lumberman's Mut. Cas. Co. v. United States, 67 Fed. Cl. 253, 255 (2005) citing Nat'l Surety Corp. 118 F.3d at 1546; see also Nova Cas. Co., Inc. v. United States, 69 Fed. Cl. 284, 298 (2006) (Government abuse of discretion can constitute an impairment of suretyship and give rise to damages).

In Balboa Ins. Co. v. United States, 775 F.2d 1158 (Fed. Cir. 1985), a surety brought an action against the Government to recover a progress payment that the Government made to the

contractor after the surety had notified the Government that the contractor was in default. The Court noted that upon a surety's notification to the Government that a contractor is in default, the Government must conduct a reasonable investigation to determine whether the contractor had the capacity and intent to complete the job. Id. at 1164. The Court listed eight factors to be considered in determining whether the Government has exercised reasonable discretion in distributing funds to the contractor after the surety has notified the Government of the contractor's default. Id. at 1164-1165. In Ohio Cas. Ins. Co. v. United States, 12 Cl. Ct. 590 (1987), the Claims Court applied the Balboa factors to determine that the Government abused its discretion in delaying the termination of a defaulting contractor.

In this case, the Government's analysis of the eight Balboa factors is both incorrect and incomplete. The application of the Balboa factors is also fact intensive, which further demonstrates that summary judgment is not appropriate. Each Balboa factor is considered below:

> (1) Attempts by the Government after notification by the surety to determine that the contractor had the capacity and intent to complete the job (citations omitted). Balboa Ins. Co., 775 F.2d at 1164.

Beginning in November 2000, F&D continuously provided extensive notice to the Government of Sedona's non-payment of subcontractors and its financial inability to complete the Project. P. SOF. #25,26,27. In addition, F&D submitted to the Government a voluntary notice of default that it had required Sedona to provide as a condition to bonding the contractor. Def.'s App. 178. The Government's brief mistakenly focuses on the self-serving statements made by Sedona related to its desire to complete the work. The Government's acknowledgement that subcontractors left the Project due to non-payment belies its arguments related to Sedona's capacity to complete the work. P. SOF. #38,39,40,41,42. Aside from determining that Sedona's

progress was allegedly within the parameters of the Project schedule, the Government took no steps to investigate Sedona's financial condition or non-payment of subcontractors. The Government finally questioned Sedona about its financial condition and non-payment of subcontractors in late December 2000. P. SOF. #37. However, the Government refused to terminate Sedona, relying on Sedona's submission of a letter on January 8, 2000 containing a rudimentary cash flow projection and assertions that Sedona had sufficient financial resources and the intent to complete the project. Def.'s SOF #32, Def.'s App. 296. This is particularly troubling in light of the Government's contemporaneous acknowledgement of Sedona's lack of capacity.

> (2) Percentage of contract performance completed at the time of notification by the surety. (citations omitted). Id.

According to the Government's December 8, 2000 letter to F & D, Sedona was 37% complete at that time. P. SOF. #34. In a November 29, 2000 letter, the Government expressed concern with Sedona's progress stating, "we noted several construction activities with negative total float indicating that your progress is less than satisfactory." P. SOF. #32. The Government also had grounds to be skeptical of any analysis that relied solely on the percentage of completion because the Government had previously assessed that the Contractual "construction period of 669 days for [the] relatively unsophisticated facility is excessive." P. SOF. #29. Thus, if anything, Sedona's progress at this point was inadequate.

> (3) Efforts of the Government to determine the progress made on the contract after notice by the surety (citations omitted).

The Government was aware that Sedona had diverted Contract funds from the Project. During the course of Sedona's performance and beginning in May 2000, the Government received notification of Sedona's non-payment from subcontractors and material suppliers. P.

SOF. #23,24. When the Government began requiring Sedona to submit subcontractor payment control information in November 2000, it was aware that Sedona would not be able to submit compliant pay applications due to its diversion of Contract funds and its poor financial condition. The Government's withholding of further progress payments from Sedona ensured that Sedona would not be able to make significant progress on the Project. Government counsel acknowledged Sedona's precarious situation in a February 2001 memorandum stating bluntly, "my experience tells me that Sedona will not complete this project." P. SOF. #39.

> (4) Whether the contract was subsequently completed by the contractor. (citations omitted) Id. at 1164-1165.

The Government's brief attempts to characterize this fourth factor as irrelevant. Rather, the Government's ultimate termination of Sedona's Contract on June 7, 2001 weighs heavily in F&D's favor.

> (5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen . . . (citations omitted). Id. at 1165.

It is undisputed that Sedona diverted Contract funds and engaged in the non-payment of subcontractors and suppliers during the period when the Government made progress payments to Sedona in violation of the Contract's payment provisions. Subcontractors and suppliers ultimately filed $1,113,568.06 in payment bond claims on the Project. P. App. 1-2. After November 2000, the Government effectively ceased making progress payments to Sedona, notifying Sedona that no further payments would be made until Sedona could cure its payment irregularities. P. SOF. #31. While Sedona was unable to explain these irregularities, the Government still allowed Sedona to remain under Contract for seven months. Subcontractors ultimately abandoned the Project as a result of Sedona's non-payment.

> (6) Whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government (citations omitted). Id.

The Government had notice of the fact that Sedona was not paying its suppliers and subcontractors as early as May 15, 2000, when it received a copy of a Project material supplier's claim for $18,190.36 for Sedona's nonpayment of invoices. P. SOF. #23. On August 24, 2000, another subcontractor notified the Government that although Sedona had been paid for the subcontractors work nearly a month before, Sedona had not made payment to the subcontractor in breach of the subcontract. Id. The subcontractor threatened to walk off the job unless it received immediate payment. Id. The subcontractor continued to copy the Government on subsequent correspondence to Sedona seeking the overdue payment. Def.'s App. 200-202. As such, the Government was clearly aware that Sedona was breaching the Contract by failing to make payments to subcontractors even though it had received payment from the Government for their work. Of course, after F&D notified the Government of Sedona's default in October 2000, suppliers and subcontractors continued to provide the Government with notice of Sedona's nonpayment. P. SOF. #24.

> (7) Whether the Government's action violates one of its own statutes or regulations (citations omitted).

It is undisputed that the Government violated FAR 52.232-5 when it made payment to Sedona without requiring Sedona to submit subcontractor payment information for the first seven payment applications it submitted. Def.'s SOF #18. The Government also violated Contract provisions related to mandatory contractor quality control procedures. P. SOF. #11,18,20. See Ohio Cas. Ins. Co., 12 Cl. Ct. at 595 (violations of provisions of the Contract and agency policy demonstrate a disregard for the equitable duty owed to the surety under Balboa's seventh factor.)

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor (citations omitted).

In November 2000, F&D attempted to take responsibility for completing the Project in an effort to mitigate the damages that it knew all parties would suffer if Sedona was permitted to stay on the Project. The intense concern of F&D coupled with the Government's knowledge that Sedona was failing to pay subcontractors should have been sufficient evidence for the Government to determine that F&D would have completed the Project more quickly and cheaply than Sedona, which ultimately failed to complete the Project at all. Had the Government terminated Sedona in November 2000, there would have been ample time for F&D to obtain a completion contractor to complete the Project with minimal impact to the Government.

The Government's actions and omissions in administering the Contract and in failing to terminate Sedona until June of 2001 demonstrate that the Government failed to exercise reasonable discretion under the principles set forth by the Claims Court in Balboa Ins. Co., 775 F.2d 1158. At the very least, factual disputes regarding the Government's conduct preclude disposition of this case on summary judgment. The Government's failure to terminate Sedona in November 2000 and its subsequent delay in terminating Sedona until June 2001 impaired F&D's rights as surety and altered the risk that it agreed to bond.

The Government compounded its abuse of discretion by effectively making it impossible for Sedona to receive progress payments even though the Government made the decision to allow Sedona to stay on the Project. When the Government made the late decision to enforce the subcontractor payment provisions of FAR 52.232-5, it did so with the following knowledge: (1) Sedona had diverted funds away from the project that were properly due and owing Project subcontractors; (2) Sedona did not have the financial resources to refund the deficit in Project funds it had created through its illegal diversions; and (3) Sedona's only means of funding further

progress on the Project was the contract balance held by the Government.[2] See Def.'s Brief, p. 14. Armed with this knowledge, the Government knew or should have known that Sedona would be unable to submit a pay application that complied with FAR 52.232-5.

If the Government was willing to dispense with reasonable discretion and keep Sedona on the Project, it had a duty to release necessary progress payments, perhaps through a joint-check or other safeguarded arrangement, so that there was a possibility of further progress on the project. The Government effectively made a choice to allow the Project to die a slow death by leaving Sedona on the Project without making progress payments. In this regard, the Government jeopardized the Project and ignored the interests of F&D as surety with its cowardly attempt to insulate itself from a contractor wrongful termination claim and a surety improper payment claim. The Government was content to secure its position by letting the Project languish for almost seven months at the ultimate expense of F&D. This Government behavior is particularly egregious considering that the Government's material departures from the Contract played a significant role in allowing the Project circumstances to become so dire. When F&D finally took over the Project, it was forced to accelerate performance to overcome the delays caused by the Government's hands off approach to dealing with Sedona's default. F&D also had to pay premium fees to subcontractors to convince them to return to complete performance after they had walked off the job several months prior to Sedona's termination. F&D is entitled to recover these losses it suffered as a result of the Government's abuse of discretion and impairment of F&D's rights as surety. See Nat'l Surety Corp., 118 F.3d at 1546-1547; Restatement (third) of Suretyship & Guaranty § 37. Finally, the Government's argument that it could not have terminated Sedona in November 2000 because it was allegedly making sufficient

[2] The Government acknowledged in a February 2001 internal memorandum that "Sedona has no assets other than the contract balance to finance the Lackland job." D. App. 194.

progress under the construction schedule lacks merit. Sedona's diversion of Contract funds away from the Project, its nonpayment of subcontractors, and its submission of improper payment certifications gave the Government the right to terminate Sedona in November 2000.

Under Federal Government contract law, failure to make progress is not the only grounds for a default termination. For example, "[l]oss of performance capability because of a contractor's precarious financial condition has been held to be a constructive abandonment of performance or anticipatory breach entitling the Government to terminate for default." Overhead Electric, ASBCA 25656, 85-2 BCA ¶ 18,026. In addition, False Claims Act violations provide grounds for a default termination. See Lamb Eng'g & Constr. Co. v. United States, 2002 WL 32933387 (Fed. Cl.). Further, a contractor that acts fraudulently in its performance of a Government Contract has committed a material breach of the contract justifying termination for default. Joseph Morton Co., Inc. v. United States, 757 F.2d 1273, 1278 (Fed. Cir. 1985). Daff v. United States, 31 Fed. Cl. 682 (1994), provides an analogous illustration of the Government's right to default terminate a contractor for fraud. The Daff case involved a contract for the construction of missile parts. Id. at 682. Pursuant to the terms of the contract and the FAR, the contractor was required to establish an inspection system and prepare records evidencing the inspections. Id. at 686-687. During the course of the contractor's performance, the Government discovered that the contractor had forged some of the inspection records. The Government promptly terminated the contractor for default without notice. Id. at 687. The Court of Federal Claims found that the contractor "made requests for payment with an intent to deceive the Government into a belief that the contractor had fully complied with the terms of the contract, when in fact it had not." Id. at 689. Thus, because there was clear and convincing evidence of fraud, the Government's decision to default terminate the contract was justified. Id. at 689, 697.

In the case at bar, it is beyond dispute that Sedona was submitting inaccurate and incomplete certifications with its payment applications in order to receive funds from the Government. The Government had evidence of Sedona's nonpayment of subcontractors from the many letters it received from subcontractors and suppliers beginning in May 2000 and the notification it received from F&D that Sedona had been fraudulently diverting Project funds. This evidence clearly contradicted the false payment certifications Sedona submitted, which certified that it had paid subcontractors for the work that it had billed the Government and received payment for. When confronted with its payment irregularities in November 2000, Sedona offered no reasonable explanation. Yet the Government nevertheless improperly waited seven months before terminating Sedona's contract. The Government knew that Sedona was acting fraudulently and it is manifest that the Government had sufficient grounds to terminate Sedona for default in November 2003.[3] The Government's failure to do so caused F&D to suffer significant losses in its completion of the Project after Sedona was finally terminated. F&D is entitled to recover the losses it suffered as a result of the Government's abuse of discretion and impairment of F&D's rights as surety in failing to terminate Sedona until June 2001.

## CONCLUSION

Defendant has not met its burden of demonstrating the absence of genuine issues of material fact with respect to any of Defendant's alleged grounds for summary judgment or any of the allegations contained in F&D's Complaint. In addition, the legal arguments contained in Defendant's Motion for Summary Judgment are misplaced. For all of the reasons discussed

[3] The Government's May 7, 2001 Show Cause Letter cited Sedona's failure to make timely payments to subcontractors as a breach of the Contract and listed this issue as a primary reason for the Government's consideration of termination. D. App. 318-319.

herein, Plaintiff respectfully requests the Court to deny Defendant's Motion for Summary Judgment in its entirety.

Dated September 21, 2006.

Respectfully Submitted,

/s/ Christopher J. Brasco
CHRISTOPHER J. BRASCO
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
Counsel for the Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2006, a copy of Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment was filed electronically. I understand that notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Christopher J. Brasco