**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIDELITY AND DEPOSIT COMPANY OF MARYLAND** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 1:06-cv-00186-LB** |
| | ) | **(Judge Block)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**<u>PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, Fidelity and Deposit Company of Maryland (F & D) respectfully submits these responses to Defendant's proposed findings of uncontroverted fact.

A. <u>Sedona Awarded Construction Contract</u>

1. Sedona Contracting Incorporated ("Sedona") was awarded a contract by US Army Corps of Engineers ("the Corps") on September 23, 1999, (DACA63-99-C-0039) to construct vehicle operations and maintenance facilities at Lackland Air Force Base, Texas. Appendix ("App.") 102. The total contract lump-sum price was initially $6,077,257.00. <u>Id.</u>

**<u>Plaintiff's Response</u>**: Admitted.

2. On October 25, 1999, Sedona secured a performance bond in the amount of $6,077,257.00 and a payment bond in the amount of $2,500,000.00 from Fidelity & Deposit Company of Maryland ("Fidelity" or "F&D"), which named F & D as surety, Sedona as principal and the United States as obligee. App. 3-8.

**<u>Plaintiff's Response</u>**: Admitted.

3 Notice to proceed with construction was acknowledged by Sedona on November 15, 1999. App. 9.

**<u>Plaintiff's Response</u>**: Admitted.

4. The contract, section 01451, para 3.2.1, required Sedona to submit a contractor's Quality Control Plan ("CQC Plan") for review within five days of the notice to proceed. App. 53-54. Construction could only begin after acceptance of the CQC Plan or acceptance of an interim plan, available for the first 60 days of operations. <u>Id.</u>

**<u>Plaintiff's Response</u>**: Disputed as stated. Paragraph 3.2.1 of Section 01451 did require Sedona to submit a contractor's CQC plan for review within five days of the notice to proceed. Plaintiff disputes Defendant's characterization of paragraph 3.2.1 of section 01451 because it fails to acknowledge or properly paraphrase the provision's language that defines a proper interim plan. The paragraph contemplates Government consideration of an interim CQC plan that covers a discrete portion of Contract work and meets the requirements of an acceptable CQC plan for that discrete portion of the work. In this way, the contractor could gain approval to begin work on only the discrete portion of work covered by the interim plan for the first 60 days of performance without having gained acceptance of an entire CQC plan. Paragraph 3.2.1 of Section 01451 does not authorize the Government to grant interim acceptance to a deficient CQC plan.

5. Sedona submitted its initial CQC Plan on December 2, 1999. App. 55-76.

**<u>Plaintiff's Response</u>**: Admitted.

6. The Corps, by letter dated December 8, 1999, gave Sedona's plan interim acceptance, noting program deficiencies that required correction. App. 55-76. One deficiency

noted the inability to determine if the proposed CQC Plan systems manager, Mr. Harrell, had the requisite experience. Id.

**Plaintiff's Response**: Disputed as stated. In derogation of the Contract, the Government purported to give Sedona's Plan interim acceptance even though the Government admits it was unable to determine whether Sedona's proposed CQC Plan systems manager had the required experience. Plaintiff disputes Defendant's incomplete characterization of the Plan deficiencies noted by the Government. Aside from its inability to determine whether Sedona's proposed Plan systems manager had the required experience, the Government listed approximately 26 other deficiencies with Sedona's Plan in its December 8, 1999 letter.

7. The contract, section 01451, para 3.4.2, specified education and/or work experience requirements for the CQC Plan system manager, to include being a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work. App. 77-78.

**Plaintiff's Response**: Disputed. Defendant's characterization of the section 01451, paragraph 3.4.2 education and work experience requirements for the Plan system manager as "education and/or work requirements" is incorrect. The relevant part of the provision states, "[t]he CQC System Manager shall be a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work." This provision requires that the System Manager be a graduate engineer, graduate architect, or a graduate of construction management and, in addition, requires that the System Manager have either two years of construction experience on construction similar to the Contract or be a

construction person with five years experience in related work. Any ambiguity in section 01451, paragraph 3.4.2 is clarified in section 01451, paragraph 3.4.4, which provides in part, "[i]n addition to the above experience *and* education requirements the CQC System Manager shall have completed the course entitled 'Construction Quality Management for Contractors.'" (emphasis added). Paragraph 3.4.2 also required the System Manager to "be on the site at all times during construction . . ." and to be "assigned no other duties."

8. The duration of the contract was set at 669 days. App. 10.

**Plaintiff's Response**: Admitted as qualified. Plaintiff admits that the Contract duration was set at 669 days. Plaintiff notes that the Government set a 669-day construction period because the performance times of Government options were included in the base bid time but the options were ultimately not awarded to Sedona. In a November 9, 2000 internal memorandum, an Air Force engineer expresses that "[a] construction period of 669 days for this relatively unsophisticated facility is excessive." P. SOF. #29.

9. The contract with Sedona was modified nineteen times between March 2, 2000 and June 7, 2001. App. 11-52. The final modification was the termination of the contract for default. Id.

**Plaintiff's Response**: Admitted as qualified. The paragraph is limited to modification between the Government and Sedona and does not address modifications made or pending with respect to F&D's takeover work.

B. Sedona's Quality Control Issues

10. By letter dated January 26, 2000, Sedona substituted Mr. Arthur Perez for Mr. Harrell as its CQC Plan manager. Mr. Perez satisfied the requirement of five years of construction experience in related work. App. 82-85.

**Plaintiff's Response**: Disputed. Plaintiff admits that by letter dated January 21, 2000, Sedona advised the Government that Arthur Perez would serve as Sedona's CQC plan manager. Plaintiff maintains that Mr. Perez did not meet the Contract's CQC plan manager education requirements and therefore was ineligible to serve as CQC plan manager.

11. On January 26, 2000, the Corps conditionally accepted Mr. Perez as CQC Plan manager and contemporaneously notified Sedona that the Corps was still awaiting a reply to the CQC Plan deficiencies noted in its December 8, 1999 letter. App. 79-80.

**Plaintiff's Response**: Disputed as stated. Plaintiff admits that the Government purported to conditionally accept Mr. Perez as CQC plan manager in a January 26, 2000 letter to Sedona. However, the Contract does not permit conditional acceptance of the CQC Plan Manager and the Government's conditional acceptance of Mr. Perez constituted an improper modification of the Contract's quality control provisions. Plaintiff disputes Defendant's incomplete characterization of the January 26, 2000 letter and states that in addition to the Government's notification to Sedona that it had not received Sedona's revised quality control plan, the letter pointed out two other outstanding items that Sedona had failed to submit in accordance with Government requests: (1) a revised submittal register and (2) a revised preliminary project schedule. The January 26, 2000 letter also sets forth the terms of the Government's improper conditional acceptance, stating that "[Mr. Perez'] performance and this project will be monitored closely and action taken as deemed necessary."

12. On February 4, 2000, Sedona provided the Corps with its revised CQC Plan program, which the Corps approved in a letter dated February 25, 2000. App. 86.

**<u>Plaintiff's Response</u>**: Admitted as qualified. The Government's February 25, 2000 letter neither resolved Mr. Perez's lack of education qualifications nor the terms of the Government's conditional acceptance of Mr. Perez.

13. Sedona was responsible for inspection of work and quality control under the contract, however, the Corps had the right to reject any nonconforming work. App. 98. The contractor remained liable for replacing or correcting work found not to conform to the contract. App. 99-121.

**<u>Plaintiff's Response</u>**: Admitted as qualified. Plaintiff notes that the Contract language provides the most accurate description of the Parties rights and obligations under the Contract. Plaintiff further notes that the work was not supposed to commence without a proper CQC plan.

14. The Government did not have a contractual obligation to inspect the work in progress. App. 98. The Corps performed a quality assurance function under the contract, making periodic inspections of the project. <u>Id.</u>

**<u>Plaintiff's Response</u>**: Disputed. By the terms of its conditional acceptance of Sedona's CQC Manager, the Government had a continuing duty to monitor the work in progress. Plaintiff also notes that the Contract language provides the most accurate description of the Parties rights and obligations under the Contract.

15. On December 22, 2000, the Corps notified Sedona by letter of several quality control issues found to be unacceptable, including failure to protect the concrete foundation for the vehicle maintenance facility from freezing temperatures; conducting a masonry preparatory inspection without the appropriate foreman and the absence of follow-up inspection; the failure to schedule and conduct initial inspections; scheduling preparatory inspections without

approved submittals; work being performed without a preparatory phase; the CQC Plan manager not spending adequate time in the field; and the CQC Plan manager performing administrative duties inconsistent with his primary duties. The Corps advised that it would consider recommending removal of the superintendent and/or the CQC Plan manager unless performance improved. App. 122-125.

**Plaintiff's Response**: Admitted as qualified. Plaintiff notes that the actual language of the letter provides the most accurate description of Sedona's excessive quality control failures.

C. Payment of Contract Proceeds

16. Payment of contract proceeds is governed by contract section 0700, ¶ 79 and FAR 52-232-5, "Payments Under Fixed-Price Construction Contracts," and contract section 0700, ¶ 82 FAR 52.232-27, "Prompt Payment for Construction Contracts." App. 129-137. Generally, progress payments are made monthly to the contractor as the work proceeds. Id. The contract required Sedona to provide a list of the amount of work performed by each subcontractor, a list of the total amount of each subcontract and a list of the amount of previous payments to the subcontractors. App. 346; FAR 52.232-5(b)(1)(ii)-(iv). In addition, each request for payment required Sedona to certify that the amounts requested were only for performance in accordance with the contract; that payments to subcontractors and suppliers had been made from previous payments received; that timely payments would be made from the proceeds covered by the present certification; and that the request for progress payments did not include any amount Sedona intended to withhold or retain from a subcontractor or supplier. App. 129-137; FAR 52.232-5(c)(1)-(3).

**Plaintiff's Response**: Admitted as qualified. Plaintiff notes that the Contract language provides the most accurate description of the Parties rights and obligations under the Contract.

17. Contract section 0700, ¶ 70, FAR 52.232-5(e), provides the contracting officer with the discretion to withhold up to 10% of the amount of the authorized progress payment if unsatisfactory progress has been made during that period. App. 130-31. "The contracting officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." App. 130 (emphasis added).

**Plaintiff's Response**: Admitted as qualified. This Contract subsection, taken out of context, creates a misimpression of the Government's payment duties and ignores the Government's duty to require that numerous preconditions to payment are met. Plaintiff notes that the Contract language provides the most accurate description of the Parties rights and obligations under the Contract.

18. The Corps received and processed for payment seven progress payment applications from Sedona between December 27, 1999 and October 20, 2000. App. 138-152. With each application package Sedona included a certification pursuant to FAR 52.232-5(c)(1)-(3), which required Sedona to properly use funds distributed to it by the Corps. Id. However, information regarding the amount owed and amount paid subcontractors, required by FAR 52.23205(b)(1)(ii)-(iv), was not provided by Sedona and the Corps did not initially require its submission before making payment. Id.

**Plaintiff's Response**: Disputed. The certification pursuant to FAR 52.232-5(c)(1)-(3) did not "[require] Sedona to properly use funds distributed to it by the Corps." Rather, it required Sedona to certify that it had paid subcontractors and suppliers from previous payments and that it would do so with the current payment. Plaintiff agrees that information regarding the amount owed and amount paid to subcontractors, required by FAR 52.23205(b)(1)(ii)-(iv), was not provided by Sedona and that the Government did not require submission of the required

information for the first seven progress payments to Sedona. The Government failed to require Sedona to submit the supporting subcontractor/supplier payment information required by FAR 52.23205(b)(1)(ii)-(iv). Sedona diverted funds from the first seven payment applications, funds that were earmarked for payment to Project subcontractors. Had the Government enforced the FAR 52.23205(b)(1)(ii)-(iv) subcontractor/supplier payment data submission requirements, the Government would have been able to audit the diversion of funds that Sedona had failed to pay to subcontractors.

19. A total of eleven numbered progress payment applications were received from Sedona while the contract was in effect. App. 138-177. Beginning with progress payment application number eight, the Corps notified Sedona that it would begin enforcing the contractual requirement to provide the subcontractor payment information breakdown. App. 153. For progress payment number eight, Sedona was only paid $45,851.00. Id. The Corps deducted $238,307.00 for non-payment of subcontractors. Id. A joint bank account was set up for payment to Sedona and Fidelity on February 12, 2001. App. 493. Payment estimate numbers 9 and 10 were paid out to the joint bank account. App. 166, 493, 494. Payment estimate number 11 was paid solely to Fidelity. App. 177, 492, 493.

**Plaintiff's Response**: Disputed as stated. Defendant's characterization of the Government's payments beginning with progress payment application number eight is misleading in that it does not accurately reflect the Government's complete failure to effectively address the issues related to Sedona's diversion of funds away from the project and Sedona's financial inability to complete the Project. Despite F & D's willingness to take over the Project in November 2000, the Government refused to terminate Sedona until June of 2001, while at the same time, refusing to make progress payments that it knew were necessary for Sedona to make

progress on the Project. This "hands off" approach taken by the Government after its maladministration of the payment process caused the Project to languish for seven months. Payment estimate number eight was a small payment in the amount of approximately $45,000 while payment estimates 9 and 10 were paid to the joint account after the Government had issued Sedona a show cause letter and less than a month before the Government finally terminated Sedona.

D. Adversarial Relationship Between Sedona and F & D

20. In October 2000, the Corps received a year-old letter, dated October 25, 1999, from Sedona advising it was voluntarily defaulting and terminating the contract. App. 178, 181.

**Plaintiff's Response**: Admitted as qualified. The voluntary default letter was obtained by F & D from Sedona as part of an arms length commercial transaction whereby the Sedona, as principal, agreed that F & D would have the discretion to take over Project work should Sedona become financially imperiled.

21. In October 2000, the Corps received a year-old letter, dated October 25, 1999, from Sedona requesting that any remaining monies due under the contract be deposited in a joint account with F & D. App. 179, 181.

**Plaintiff's Response**: Admitted as qualified. The joint account letter was obtained by F & D from Sedona as part of an arms length commercial transaction whereby the Sedona, as principal, agreed to accept joint check payments payable jointly to F & D and Sedona in the event that Sedona became financially imperiled during Contract performance.

22. The Corps received a letter dated October 30, 2000, from F& D requesting compliance with the Sedona October 25, 1999 letter on payment of contract funds. App. 181.

**Plaintiff's Response**: Admitted.

23. Sedona subsequently notified the Corps that the October 25, 1999 voluntary default letter was obtained from it by F & D under duress and that it intended to continue performance on the contract. App. 181-182; See e.g. 495-497.

**Plaintiff's Response**: Admitted as qualified. The voluntary default letter was obtained by F & D from Sedona as part of an arms length commercial transaction whereby the Sedona, as principal, agreed to let F & D take over Project work should Sedona become financially imperiled. Sedona's self-serving notification to the Corps. was not accurate.

24. The U.S. District Court for the Western District of Texas issued an order, dated December 6, 2000, for Sedona to pay into a joint bank account with F & D all proceeds from various Federal projects Sedona was engaged in with F & D as surety. App. 183-89. Although the Corps was not a party to the litigation, the Corps determined that it would comply with the direction of the district court, even though not specifically addressed to do so, and made payments to the joint account. App. 193-95.

**Plaintiff's Response**: Admitted as qualified. The Government effectively stopped making progress payments until less than a month before Sedona's termination, with the exception of a nominal payment for payment application number 8 of $45,851. The District Court order provided the Government with further evidence of Sedona's precarious financial situation and non-payment of subcontractors and suppliers.

E. Sedona Fails to Pay Subcontractors and Fidelity Demands that the Corps Stop Payment of Contract Proceeds.

25. As early as May 2000, the Corps was notified by a subcontractor that Sedona had not paid for materials acquired for use on the contract. App. 196. The Corps responded that it could not directly provide recovery, as no privity of contract exists between subcontractors and the Corps. App. 197, 203, 233. Further, under the Miller Act, 40 U.S.C. 270, the subcontractor

must seek redress through Sedona's surety on its payment bond if Sedona refuses to pay. App. 5-8, 197, 203, 233. Although the Corps did not make any direct payments to subcontractors, in September and December 2000, the Government did deduct the amount owed subcontractors from payments made to Sedona. App. 153-54, 498. Approximately 11 subcontractors contacted the Corps about non-payment by Sedona for materials and/or services provided for the contract. App. 196-245.

**<u>Plaintiff's Response</u>**: Admitted as qualified. Plaintiff admits that in May 2000 the Corps was notified by a subcontractor that Sedona had failed to pay for materials acquired for use on the Contract. Had proper payment applications been required by the Government, early subcontractor inquiries regarding nonpayment would have enabled the Government to promptly identify Sedona's diversion of funds. Plaintiff admits that the Government did not make direct payments to subcontractors and that it informed subcontractors that that they must seek redress through Sedona's payment bond surety. Plaintiff admits that the Government deducted amounts owed to subcontractors from Sedona's Payment Estimate No. 8 in December 2000. Plaintiff admits that approximately 11 subcontractors contacted the Corps about non-payment by Sedona for materials and/or services provided for the contract.

26. F & D negotiated a compromise payment of $200,000.00 for subcontractor H & M Steel App. 245. Fidelity does not allege that it settled the claims of any other subcontractors. Compl.

**<u>Plaintiff's Response</u>**: Disputed. Plaintiff admits that it paid H & M Steel $200,000 in satisfaction of its payment bond claim. To the extent that settlement of the payment bond claims of other subcontractors is a condition precedent to any count contained in Plaintiff 's Complaint, Plaintiff has alleged that it has "satisfied all conditions precedent required to assert its equitable

subrogation claims against the Government in the present action." Complaint ¶ 92. Plaintiff further states that there are currently no outstanding payment bond claims related to the Project. Plaintiff's Appendix ("P. App.") 1-2.

27. On November 8, 2000, Fidelity demanded that the Corps not release any other funds to Sedona without the advance written consent of Fidelity. App. 495. Fidelity stated that Sedona was financially unable to pay for the completion of the project and that subcontractors on the project had asserted claims under the payment bond totaling $443,550.63. Id. Again, by a letter dated December 1, 2000, F & D demanded that the Corps stop payment of contract funds to Sedona, and honor the letter of default submitted by Sedona on October 25, 1999, in order to permit F & D to avail itself of the doctrine of equitable subrogation as a surety. App. 268-73. Fidelity asserted that the Corps had abused its discretion by "the Corps' failure to honor the voluntary letter of default and its attendant failure to escrow contract funds." App. 268.

**Plaintiff's Response**: Admitted with the qualification that F & D's December 1, 2000 letter to the Government consists of six pages single-spaced, and that Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of the December 1, 2000 letter, which sets forth other reasons supporting F&D's takeover of the Project. Plaintiff states that the letter speaks more accurately for itself. Plaintiff further notes that the Government's Deputy District Counsel, Rex Crosswhite, in a February 21, 2001 memorandum, verified Sedona's precarious financial circumstances and incapacity to complete the Project, stating specifically, "Sedona has no assets other than the contract balance to finance the Lackland job." P. SOF # 39.

28. The Corps informed F & D's counsel by letter dated December 8, 2000, that Sedona was then on contract schedule (37% complete) and that the Government's right to

terminate the contractor's right to proceed with a contract for default is limited to those circumstances wherein the contractor is not making sufficient progress to insure that the contract will be completed by the contract completion date. App. 274-280. By permitting Sedona to continue, the Corps was balancing both contractual obligations to Sedona and F & D's rights as surety. Id.

**Plaintiff's Response**: Disputed as stated. There is an inherent factual dispute precluding summary judgment arising from the Government's bare assertion that the Corps "balanced both contractual obligations to Sedona and F & D's rights as surety. As an initial matter, the Government's assertion ignores its role in payment maladministration and in creating the conditions F&D sought to cure. Plaintiff admits that the Government's December 8, 2000 letter misleadingly states that Sedona was on contract schedule and incorrectly states that the Government's right to terminate the contractor for default is limited to circumstances wherein the contractor is not making sufficient progress to insure completion by the contract completion date. Plaintiff maintains that Sedona's technical compliance with the Contract schedule is misleading in light of the November 9, 2000 memorandum in which an Air Force Chief of Engineering states, "[a] construction period of 669 days for this relatively unsophisticated facility is excessive." In addition, by letter dated November 29, 2000, the Government expressed concern with Sedona's unsatisfactory progress on the Project stating, "[u]pon review of of your progress schedule, we noted several construction activities with negative total float indicating that your progress on this project is less than satisfactory." Sedona's diversion of Contract funds, its non-payment of subcontractors in derogation of the Contract and its submission of false certifications constituted adequate grounds to justify default termination in November 2000. The Government's "do nothing" approach in failing to terminate while at the same time withholding

payments that were necessary for progress on the Project, allowed the Project to languish and allowed Project damages to accrue to the detriment of F & D.

29. Fidelity responded on December 12, 2000, asserting that Sedona had failed to make subcontractor payments in excess of $550,000.00, its financial situation continued to deteriorate, and that it would be unable to complete the contract with remaining funds. App. 281-82. Fidelity asserted that the Corps, after notice, took no steps to investigate the alleged nonpayment of subcontractors. App. 285. F & D notified the Corps of its intent to setoff bond losses on this contract against other projects it had bonded with the Federal Government. App. 286.

**Plaintiff's Response**: Admitted as qualified. Plaintiff notes that F & D's December 12, 2000 letter to the Government consists of seven pages, single-spaced, and that Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of the December 12, 2000 letter. Plaintiff states that the letter speaks more accurately for itself.

F. Sedona’s Capacity To Complete The Contract

30. On December 20, 2000, F & D provided to the Corps an accountant’s summary evaluation of the financial condition of Sedona. App. 288-89. The summary stated that Sedona would not be able to meet its obligations because its short-term liabilities exceeded liquid assets by nearly $400,000.00. App. 289.

**Plaintiff's Response**: Admitted as qualified. F & D's letter and evaluation of Sedona's financial condition speaks more accurately for itself and that Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of the December 20, 2000 accountant's evaluation. The accountant's evaluation also demonstrated additional aspects

of Sedona's precarious financial situation, including its approximate negative net worth of $1,400,000 as of September 30, 2000, not including accrued and projected bond losses.

31. The Corps, by letter dated December 22, 2000, notified Sedona of F & D's assertions concerning capacity to complete the contract and nonpayment of subcontractors. App. 294. The Corps requested a meeting with Sedona in order to address the assertions. App. 294.

**Plaintiff's Response**: Admitted.

32. Sedona, by letter dated January 8, 2001, asserted that it had sufficient financial resources and was committed to completing the contract. App. 295-99. Specifically, Sedona stated it has sufficient financial assets to complete the project because all payments to Sedona would be made through a joint account on which both F&D and Sedona were signatories. App. 295. Sedona provided the Government with a cash flow projection which indicated that "a positive cash flow [existed] for this project." App. 296.

**Plaintiff's Response**: Admitted as qualified. Plaintiff admits that Sedona claimed in its January 8, 2001 letter that it had sufficient financial resources and was committed to completing the Project. Plaintiff admits that Sedona provided the Government with a cash flow projection. Plaintiff notes that Sedona did not deny that it was in a precarious financial condition and Sedona made it clear that it was dependent upon future payments of the contract balance into the joint account in order to make progress on the Project. By January 8, 2001, the Government was aware of Sedona's non-payment of subcontractors and its precarious financial condition. As such, it was completely improper for the Government to rely on Sedona's self-serving January 8, 2001 letter and cash flow projection as evidence of Sedona's ability to complete the Project. The Government had a duty to investigate the circumstances that its material departures from the Contract helped to create. Plaintiff further notes that the Government's Deputy District Counsel,

Rex Crosswhite, in a February 21, 2001 memorandum, verified Sedona's precarious financial circumstances and incapacity to complete the Project, stating specifically, "Sedona has no assets other than the contract balance to finance the Lackland job." P. SOF # 39.

G. Sedona's and Fidelity's Joint Bank Account

33. Attached to a letter dated January 11, 2001, was a copy of a January 3, 2001 letter from Sedona to the Corps that requested future payments under the contract be made to a joint bank account with F & D. App. 300-302. Sedona informed the Corps, on January 22, 2001, about the manner in which F & D was administering their joint bank account, specifically accusing F & D of sabotage by the surety's refusal to sign checks for payments. App. 181. As a result, Sedona requested that the Corps make direct payments to it. App. 182.

**Plaintiff's Response**: Admitted as qualified. Plaintiff admits that in a January 3, 2001 letter, from Sedona requested that the Government make future Contract payments to a joint bank account with F & D. Plaintiff admits that Sedona accused F & D of sabotage and that Sedona requested that the Government pay it directly so that it could contravene a U.S. District Court order. Plaintiff states that Sedona's letter is misleading because the Government did not make any Contract payments to the joint account until May 2001 due to Sedona's inability to submit a compliant pay application due to its previous diversion of subcontractor funds from the Project.

34. The Corps decided to make contract payments to the joint Sedona and F & D bank account in accordance with the district court order setting up the account. App. 193-95. The Corps began making payments to the joint account after it was set up in February 2001. App. 493.

**Plaintiff's Response**: Disputed as stated. Plaintiff admits that the Government ultimately decided to make payments to the joint account in accordance with the district court order. Plaintiff admits that the Government executed a Contract amendment in February 2001 changing the payment information to reflect that future payments should be made to the joint account. Plaintiff states that Defendant's proposed finding of uncontroverted fact is misleading in that the Government did not make any payments to the joint account until the eve of Sedona's termination in May 2001, after the Government had issued Sedona a cure notice.

35. By letter dated March 5, 2001, F & D defended its decision not to countersign checks submitted by Sedona for payment based upon an alleged lack of accompanying adequate information to evaluate the propriety of the payments. App. 308-310. F & D also asserted that Sedona failed to provide a proper project budget. App. 309.

**Plaintiff's Response**: Disputed as stated. In its March 5, 2001 letter, F & D defends its decision not to countersign certain checks submitted by Sedona for multiple reasons including Sedona's failure to submit a complete pay request since November 2000, Sedona's submission of a very limited amount of checks for subcontractors, Sedona's pre-payment of employee salaries and expenses through June 2001, Sedona's failure to explain its submission of additional checks for administrative expenses, Sedona's failure to provide sufficient information to evaluate the checks submitted by Sedona and Sedona's failure to provide a proper budget under the joint trust account agreement, with which the district court ordered the F & D and Sedona to comply.

H. Subcontracting Supervision of the Contract

36. F & D provided notice to the Corps, by a letter dated February 14, 2001, that Sedona had further breached the contract and violated FAR 52.236-6, Superintendence by the

Contractor, by subcontracting responsibility for supervision of the contract to 3TI, Inc. App. 305-306.

**Plaintiff's Response**: Admitted.

37. The Corps responded to F & D on March 20, 2001 by stating that the subcontracting of the supervision of the contract was authorized under the contract clause. App. 312. "The superintendence of construction clause required the project to be superintended by the contractor or a competent superintendent who is satisfactory to the [c]ontracting [o]fficer and who has authority to act for the contractor." Id. "The clause does not require the superintendent to be a direct employee of the contractor." Id.

**Plaintiff's Response**: Admitted as to the content of the letter. Plaintiff disputes the incorrect legal conclusion drawn by the Government.

I. Sedona's Termination & Fidelity's Takeover

38. Sedona demanded that the Corps either force F & D to pay subcontractor invoices or pay the invoices itself. App. 314. On March 22, 2001, the Corps notified Sedona that it would not comply with a request that placed responsibility upon the Corps to assure payment of subcontractors. Id. The Corps also informed Sedona that the Government was aware that several of Sedona's subcontractor's were either refusing to work or threatening to walk off the job due to nonpayment. Id. The Corps expressed concern that Sedona's ability to complete the project in a timely manner was being adversely affected. Id. The Government posed the possibility of a no-cost termination of the contract, noting that the surety would be interested in taking over the project. App. 315.

**Plaintiff's Response**: Admitted.

39. Sedona, by letter dated March 30, 2001, notified the Corps of several checks F & D had refused to sign for job costs, indicating that the Corps had to either force F & D to pay or pay the vendors itself. App. 316. Otherwise, the services would be terminated by April 9, 2001. Id.

**Plaintiff's Response**: Admitted that Sedona took these incorrect positions.

40. The Corps issued a letter on May 7, 2001, directing Sedona to show cause why the contract should not be terminated for default. App. 318-321. The Corps noted the departure of subcontractors from the job site due to Sedona's failure to make timely payments, the small amount of work currently in progress, and the fact that only 63% of the contract work was completed with 79% of the duration elapsed. App. 318.

**Plaintiff's Response**: Admitted as qualified. Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of the Government's May 7, 2001 show cause letter. Plaintiff states that the letter speaks more accurately for itself. Plaintiff notes that the Government states in its show cause letter, "[t]he failure of Sedona to make timely payments to subcontractors and suppliers is a breach of Sedona's contractual obligations."

41. On May 16, 2001, Sedona responded to the Corps show cause letter. App. 322. Sedona asserted that it was entitled to a time extension of at least 144 days, and therefore was not behind schedule. App. 338. Sedona noted the Corps had not made any payments to Sedona since November 2000, impacting the ability to pay subcontractors, and impacting the subcontractors' ability to continue work on the job. App. 322.

**Plaintiff's Response**: Admitted as qualified. Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of Sedona's May 16,

2001 letter. Sedona's letter is 19 pages long and contains numerous assertions, alleged justifications and excuses in addition to the ones discussed in Defendant's proposed finding as to why it should not be terminated. Plaintiff states that the letter speaks more accurately for itself.

42. The Corps responded to counsel for Sedona on May 30, 2001. App. 342-351. The Government determined that Sedona's claims of Corps' delay and failure to make timely payments were meritless. Id. Specifically, delays to the project resulted from "delays caused by Sedona in not starting and completing activities on the maintenance building as required under their schedule." App. 342.

**Plaintiff's Response**: Admitted as qualified. Defendant's proposed finding of uncontroverted fact is an incomplete summary of portions of the contents of the Government's May 30, 2001 letter to Sedona. The letter is ten pages, single spaced and rejects the numerous assertions, alleged justifications and excuses proffered by Sedona. Specifically, the Government's letter notes that "[t]he steel supplier, the steel erector, the site utilities contractor, the mechanical subcontractor, the roofer, the precast supplier, the millwork subcontractor, the EFIS subcontractor, and the mason have advised COE representatives of non-payment by Sedona." The Government's letter further provides, "Sedona has failed to employ and pay subcontractors at the site to insure that the work will be completed by the Contract completion date." Plaintiff states that the letter speaks more accurately for itself.

43. The Takeover Agreement became effective in June 2001. App. 44-50. At that time, a total of $2,886,371 had been paid to Sedona. App. 45. The balance on the contract (including change orders that increased the original contract price) amounted to $2,945,715.51. Id.

**Plaintiff's Response**: Admitted.

44. By the time the contract was completed in September 2003, the total contract price had been increased, through several modifications, to $6,235,880.21. App. 11-51, 492. Fidelity was paid almost all of the remaining balance on the contract, except for $100. App. 491.

**Plaintiff's Response**: Admitted with regard to the modifications that were finalized as of September 2003. Plaintiff notes that there are modifications and F&D's claim still pending.

J. Procedural History

45. The Corps notified Sedona on June 7, 2001, that it terminated the contract for default. App. 352-360.

**Plaintiff's Response**: Admitted.

46. The Corps notified F & D of the contract default termination, on June 7, 2001, and demanded the surety takeover the project. App. 361-62.

**Plaintiff's Response**: Admitted.

47. F & D and the Corps entered into a takeover agreement on June 26, 2001. App. 44. The contract was modified in August 2001 to reflect the agreement. App. 50.

**Plaintiff's Response**: Admitted.

48. Sedona provided the Corps, on July 24, 2001, with a $1,347,793.00 claim for work performed but not paid as a result of the contract termination. App. 364, 372.

**Plaintiff's Response**: Admitted.

49. Sedona submitted to the Corps, on July 25, 2001, a second claim for $303,600.83 for delays experienced under the contract. App. 374-377.

**Plaintiff's Response**: Admitted.

50. On August 14, 2001, counsel for Sedona filed a complaint with the Armed Services Board of Contract Appeals ("ASBCA"), appealing the Corps termination of the contract for default. App. 378-399.

**Plaintiff's Response**: Admitted.

51. The Corps answered the ASBCA complaint. App. 400-419.

**Plaintiff's Response**: Admitted.

52. The Corps notified counsel for Sedona on August 15, 2001 that, due to workload, staffing, and the approaching fiscal year end, it did not anticipate issuing a final decision on the unpaid work and delay claims until December 21, 2001. App. 420.

**Plaintiff's Response**: Admitted.

53. On September 18, 2001, counsel for Sedona notified the Corps that Sedona had filed for bankruptcy on August 31, 2001. App. 421.

**Plaintiff's Response**: Admitted.

54. The ASBCA was advised of the Sedona bankruptcy and ordered the production of related documents. App. 424. Sedona agreed to dismiss the appeal and the ASBCA so ordered on November 20, 2001. Id. Sedona also agreed to suspend processing of its two claims until the bankruptcy trustee made an authorization determination. App. 425.

**Plaintiff's Response**: Admitted.

55. Fidelity moved for relief from the automatic stay in bankruptcy with respect to the contract funds. App. 426-31. On November 13, 2001, the bankruptcy court issued an order allowing Fidelity to take control of remaining contract balances, and permitting the Government to terminate the Sedona contract. App. 489.

**Plaintiff's Response**: Admitted.

56. Fidelity began negotiations with counsel for the Corps, by letter dated August 21, 2003, for its entire bond losses. App. 440. Fidelity alleges that the Corps fundamentally altered the risk assumed as surety, and all losses were caused by the Corps alleged failure to timely terminate Sedona in late 2000. App. 440.

**Plaintiff's Response**: Disputed. Defendant's proposed finding that F & D's letter alleges that all losses were caused by the Corps' alleged failure to timely terminate Sedona in late 2000 mischaracterizes the allegations in the letter and completely ignores nearly three pages of the letter that are devoted to explaining the Government's impairment of Sedona's rights by materially departing from the Contract's payment provisions (FAR 52.232-5). F & D's August 21, 2003 letter states that F & D has a "right to recover its entire bond loss because the Government acted to fundamentally alter the risk it assumed as project surety." The Government impaired F & D's rights and altered the risk F & D agreed to bond when the "Government ignored important contract requirements intended to ensure Project funds were used to Advance the Project," namely FAR 52.232-5, Payments Under Fixed-Price Construction Contracts. Section II of F & D's letter "provided an analysis of why F & D is entitled to all losses caused by the Government's failure to timely terminate Sedona at the end of 2000."

57. By letter dated August 22, 2003, Fidelity requested $938,391.32 as owed for contract performance. App. 448.

**Plaintiff's Response**: Admitted.

58. The Corps, by letter dated September 16, 2003, informed Fidelity that a pay estimate for $781,667.68 was being processed for contract performance, and indicated that the Corps complied with its duty to consider the surety’s interests in the administration of this contract. App. 450-456.

**Plaintiff's Response**: Admitted as qualified.

59. By letter dated March 4, 2004, F & D maintained that the Corps had impaired its suretyship in the contract. App. 457-464.

**Plaintiff's Response**: Admitted as qualified. Plaintiff notes that F & D's March 4, 2004 letter to the Government consists of eight pages, single-spaced, and that Defendant's proposed finding of uncontroverted fact improperly attempts to summarize the contents of the letter with a single statement. Plaintiff states that the letter speaks more accurately for itself.

60. By letter dated June 1, 2004, F & D requested that the dispute be submitted to a mediator. App. 465-466.

**Plaintiff's Response**: Admitted.

61. On June 17, 2004, the Corps declined mediation because of the parties' drastic divergence in positions. App. 467-475.

**Plaintiff's Response**: Admitted

62. By letter dated August 19, 2004, F & D requested the Corps to reconsider its June 17, 2004 decision. App. 476-480.

**Plaintiff's Response**: Admitted as qualified. Plaintiff notes that F & D's August 19, 2004 letter to the Government consists of five pages, single-spaced, and that Defendant's proposed finding of uncontroverted fact improperly attempts to summarize the contents of the letter with a single statement. Plaintiff states that the letter speaks more accurately for itself.

63. On October 20, 2005, F & D agreed to a modification to settle one of the claims (soil disposal). App. 481-84.

**Plaintiff's Response**: Admitted.

64. By letter dated January 13, 2006, counsel for F & D filed a claim with the contracting officer under the Contract Disputes Act against the Corps in the amount of $1,416,179.37. App. 485-88.

**Plaintiff's Response**: Admitted.

65. The Corps informed Fidelity that due to the complexity of the claim, office staffing and workload, it anticipated providing a contracting officer's final decision on the claim in July 2006. Complaint ("Compl.") ¶ 91.

**Plaintiff's Response**: Admitted.

66. On March 7, 2006, F & D filed the instant case in the United States Court of Federal Claims. Compl.

**Plaintiff's Response**: Admitted.

Dated September 21, 2006

Respectfully Submitted,

/s/ Christopher J. Brasco
CHRISTOPHER J. BRASCO
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2006, a copy of Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact was filed electronically. I understand that notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Christopher J. Brasco