**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIDELITY AND DEPOSIT COMPANY OF MARYLAND** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **THE UNITED STATES OF AMERICA,** <br><br> **Defendant.** | ) | **Case No. 1:06-cv-00186-LB** <br> **(Judge Block)** |

# PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF CONTROVERTED FACT

Plaintiff, Fidelity and Deposit Company of Maryland (F&D), hereby respectfully submits the following Additional Proposed Findings of Controverted Fact in support of its Brief in Opposition to Defendant's Motion for Summary Judgment and pursuant to Rule 56 of the Rules of the United States Court of Federal Claims.

Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact has demonstrated the existence of genuine issues of material fact. Further, Defendant's Proposed Findings of Uncontroverted Fact raise genuine issues of material fact as to whether the Government acted improperly in its administration of the Contract and in its failure to terminate Sedona in a timely manner. Nevertheless, because Defendant's Proposed Findings do not address all of the disputed facts that bear upon its Motion for Summary Judgment, Plaintiff was compelled to file the following Proposed Findings of Controverted Fact, which more fully address the factual disputes underlying the Government's actions taken in impairment of F&D's rights as surety. Finally, the Court should consider that discovery has not yet commenced in this case and that the disputed

factual record solely arises from the documents attached to Defendant's Appendix as well as a limited set of documents produced in response to a narrow FOIA request.

A. Contract Award and Provision of Bonds

1. On September 23, 1999, the Government, acting by and through the Department of the Army, Fort Worth District, Corps of Engineers (“Corps” or “Government”), entered into Contract No. DACA63-99-C-0039 (“Contract”) with Sedona Contracting, Inc. (“Sedona”) in the lump-sum amount of $6,077,257.00, for a construction project designated as the Vehicle Operations/Maintenance Complex at Lackland Air Force Base in San Antonio, Texas (“Project”). Defendant's Appendix ("D. App.") 1.

2. Sedona’s scope of work included the construction of a large Maintenance Building for the repair and maintenance of vehicles as well as a smaller Operations Building, where the related clerical work would be performed. Sedona’s Contract also included three options: (1) a small storage building, (2) a compressed natural gas site with equipment, and a privately owned vehicle parking lot.

3. On or about October 25, 1999, F&D issued a Performance Bond in the amount of $6,077,257.00, and a Payment Bond in the amount of $2,500,000.00 for the Project. Both the Performance Bond and Payment Bond named F&D as Surety, Sedona as Principal, and the United States of America as Obligee. The Government received and accepted the Performance and Payment Bonds provided by F&D. D. App. 3-8.

4. Sedona received Notice to Proceed on November 15, 1999, and began work on the Project, which was scheduled for a duration of 669 calendar days. D. App. 9.

B. The Government's Improper Administration of the Payment Process

5. The Contract incorporated several provisions of the Federal Acquisition Regulations ("FAR"), including FAR 52.232-5, entitled, "Payments Under Fixed-Price Construction Contracts (May 1997)." D. App. 129-130. In accordance with FAR 52.232-5(b)(1), the Government had a duty to withhold payment unless Sedona submitted the required accounting of subcontractor payments in its progress payment requests in accordance with the following:

> (i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.
>
> (ii) A listing of the amount included for work performed by each subcontractor under the contract.
>
> (iii) A listing of the total amount of each subcontract under the contract.
>
> (iv) A listing of the amounts previously paid to each such subcontractor under the contract.
>
> (v) Additional supporting data in a form and detail required by the Contracting Officer.

Id.

FAR 52.232-5(c) required Sedona to attest to the propriety of its payment and withholding practices as part of each progress payment request by certifying that:

> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract.
>
> (2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States Code;
>
> (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a

> subcontractor or supplier in accordance with the terms and conditions of the subcontract . . .

Id.

6. Sedona submitted seven applications for payment prior to October 20, 2000. None of these payment requests complied with FAR 52.232-5(b)(1). Specifically, Sedona's payment applications did not include any data to verify subcontractor payments. On each of its payment applications, Sedona failed to provide a listing of the amount included for work performed by each subcontractor under the Contract, a listing of the total amount of each subcontract under the Contract, or a listing of the amounts previously paid to each such subcontractor under the Contract. Defendant's Proposed Findings of Uncontroverted Fact ("D. SOF") # 18, D. App. 138-152; Defendant's Brief ("D. Brief") p. 9.

7. In an April 13, 2000 letter to Sedona, the Government acknowledged that Sedona's payment applications did not contain the proper documentation to substantiate subcontractor payment necessary to satisfy the Contract's payment requirements, but it nevertheless approved payments to Sedona for payment applications numbers one through seven without receiving any subcontractor payment information. Plaintiff's Appendix ("P. App.") 3-4.

8. The Contract also required that Sedona submit an approved schedule in order to receive progress payments. Paragraph 3.5 of Specification 1320, entitled "Basis for Payment," provides in part:

> The schedule shall be the basis for measuring Contractor progress. Lack of an approved schedule, scheduling personnel, or approved periodic schedule updates shall result in an inability of the Contracting Officer to evaluate Contractor progress for the purposes of payment. In this event, progress payments will not be made until corrective action or additional

> information is provided which is determined sufficient in the judgment of the contracting officer to analyze progress.

P. App. 28.

9. The Government expressly notified Sedona during the pre-construction meeting that no payments would be made during the first 60 days of work without an approved preliminary project schedule, nor after the first 60 days without an approved and tested complete project schedule. P. App. 11.

10. Sedona's initial progress schedule was not approved by the Government until July 27, 2000. D. App. 257.

11. The Government processed Sedona's first three payment applications without having an approved schedule in place to measure Sedona's progress. D. App. 138-142, 455.

12. By October 20, 2000, the Government had released $2,361,641 in Contract funds to Sedona in derogation of the Contract's payment provisions. D. App. 154.

13. During the period in which the Government was not enforcing the contractual payment requirements, Sedona was able to divert a substantial amount of the funds paid by the Government to Sedona away from the Project instead of making contractually required payments to appropriate Project subcontractors and suppliers. D. SOF # 24; D. App. 196-245.

14. The Contract required Sedona to submit a Contractor Quality Control Plan ("CQC Plan") to the Government within five (5) days of its receiving the Notice to Proceed. D. App. 99-100. The requirements for this CQC Plan are set forth in the Contract at Specification Section 01451. D. App. 99-119. According to Paragraph 3.2.3

of Specification Section 01451, the Government's acceptance of Sedona's CQC Plan or, alternatively, an interim plan covering the specified portion of the work to be immediately performed, was a prerequisite to the start of construction. D. App. 99-100. Specifically, Paragraph 3.2.3 provides:

> The Contractor shall furnish for review by the Government, not later than 5 days after receipt of notice to proceed, the Contractor Quality Control (CQC) Plan proposed to implement the requirements of the Contract Clause titled "Inspection of Construction." The plan shall identify personnel, procedures, control, instructions, test, records, and forms to be used. The Government will consider an interim plan for the first 60 days of operation. Construction will be permitted to begin only after acceptance of the CQC Plan or acceptance of an interim plan applicable to the particular feature of the work to be started. Work outside of the features of work included in an acceptable interim plan will not be permitted to begin until acceptance of a CQC Plan or another interim plan containing the additional features of the work to be started.

Id.

15. As part of the CQC Plan, the Contractor was required to designate a qualified CQC Systems Manager to oversee all matters pertaining to quality control on the Project. Paragraph 3.2.3 of Section 01451 stipulates that "[t]he CQC Systems Manager shall be a graduate engineer, graduate architect, or a graduate of construction management, with a minimum of two years construction experience on construction similar to this contract or a construction person with a minimum of five years in related work." D. App. 101-102.

16. The Contract's CQC provisions do not provide authority for the Government to grant interim acceptance to a deficient CQC Plan nor do they allow conditional acceptance of a CQC Plan Manager. D. App. 99-119.

17. Sedona submitted its initial CQC Plan on December 2, 1999, almost two weeks after it was required to submit its plan under the Contract. D. App. 55-76.

18. By a letter dated December 8, 1999, the Government purported to give Sedona's proposed CQC plan "interim acceptance." D. App. 55. However, the Government noted twenty-six deficiencies with the proposed plan including the fact that it could not determine whether Sedona's proposed CQC Plan Manager had the contractually required experience to qualify for the position. D. App. 55-57.

19. Sedona substituted Mr. Arthur Perez for its initial proposed CQC Manager by letter to the Government dated January 21, 2000. D. App. 82. Mr. Perez did not satisfy the contract's requirement that the CQC Manager "be a graduate engineer, graduate architect, or a graduate of construction management." D. App. 83-84.

20. On January 26, 2000, the Government purported to "conditionally accept" Sedona’s proposed CQC System Manager, Arthur Perez, due to his “marginal performance” on a previous project. D. App. 79. As a condition of acceptance of Mr. Perez as CQC System Manager, the Government promised that Mr. Perez' "performance and this project will be monitored closely and action taken as deemed necessary." The Government’s January 26, 2000 letter also noted “that in the area of Contractor Quality Control several items remain outstanding as of the date of this letter,” such as Sedona’s revised CQC Plan addressing the Government’s review comments on quality control, scheduling, and the submittal register. D. App. 79-80.

21. Despite Sedona's failure to meet its CQC prerequisites, the Government continued to make progress payments to Sedona and allowed Sedona to perform the work without the proper adherence to the Contract’s quality control requirements. D. App. 138-177.

22. In a letter dated December 22, 2000, the Government informed Sedona of its concern "with the lack of quality control on this project and the indifference being demonstrated by Mr. Jake Trinidad towards quality and contract compliance." D. App. 122. The Government noted numerous instances of Sedona's failure to follow the Contract requirements and quality control procedures. D. App. 122-125. Although this letter specifically noted examples of Mr. Perez's failures as CQC System Manager and threatened to order his removal from the Project, the Government never took any such action to rescind its prior, improper "conditional acceptance" of Mr. Perez as CQC System Manager or to otherwise support its self-imposed obligation of closely monitoring the Project. Id.

C. The Government's Notice of Irregularities in Sedona's Progress Payment Requests

23. Although the Government's maladministration of the payment process had allowed Sedona's diversion of funds to go undetected for many months, the government began receiving notices of nonpayment from Sedona's subcontractors and suppliers beginning in May 2000. D. App. 196. On May 15, 2000, a Project subcontractor notified the Government that Sedona had not paid for materials acquired for use on the Project. Id. On August 24, 2000, another subcontractor notified the Government of "Sedona's lack of payment, to Concord Services for work performed, billed for by Sedona, and paid to Sedona by the Government." P. App. 17-18. Yet another subcontractor informed the Government of Sedona's non-payment on October 15, 2000. D. App. 207. On November 1, 2000, Sedona's structural steel subcontractor notified the Government that it was owed $463,000 by Sedona for prior billings. D. App. 204.

24. The Government continued to receive numerous notices from unpaid subcontractors and suppliers through June 7, 2001, the date on which it terminated Sedona's Contract. D. App. 196-245. At least eleven subcontractors and material suppliers contacted the Government regarding Sedona's nonpayment for materials and/or services provided on the Project. Id., D. SOF #25.

25. By letter dated November 8, 2000 F&D informed the Government that it had received payment bond claims from subcontractors and suppliers. F&D further stated that it "is exposed to potential losses under its payment and performance bonds furnished for this Project." F&D demanded that the Government release no further funds without F&D's written consent and direction. P. App 19-20.

26. By letter dated December 1, 2000, F&D notified the Government that F&D had failed to pay its subcontractors and suppliers. D. App. 268-273. F&D informed the Government that it had already sustained payment bond losses in excess of $200,000. F&D again demanded that the Government not release further Contract funds to Sedona. Id.

D. The Government's Decision Not to Terminate Sedona's Contract for Default in November 2000 Despite its Knowledge of Sedona's Financial Instability

27. On November 8, 2000, F&D submitted a notice to the Government advising the Government that Sedona was in default and that it was voluntarily defaulting under the Contract in order to allow F&D to take over and complete the work. D. App. 178. F&D obtained this letter from Sedona in consideration for its agreement to provide bonds to Sedona for the Project. D. App. 178.

28. The Government had a duty to examine Sedona's financial capacity to complete the work and in a letter dated November 8, 2000, F&D notified the Government

that it had "become aware of circumstances that Sedona Contracting, Inc. is financially unable to pay for the completion of the [Vehicle Operations/Maintenance] project." P. App. 19-20.

29. On November 9, 2000, a Government engineer issued an internal memorandum to the Corps resident office regarding the Project. The engineer noted that Project "progress is very slow." P. App. 21. The engineer further expressed that the Contract duration was extremely long for the Project, noting, "a construction period of 669 days for this relatively unsophisticated facility is excessive." Id.

30. On November 16, 2000 the Government informed F&D that it would not terminate Sedona for default. D. App. 282. In a November 16, 2000 letter to Sedona, the Government informed Sedona that it would continue to make payments to Sedona despite F&D's request that the Contracting Officer withhold payments to Sedona. P. App. 22-23.

31. Despite the Government's knowledge that Sedona would not be able to submit a compliant pay application due to its diversion of Project funds and its precarious financial situation, on November 27, 2000, the Government informed Sedona that it would not accept and process its Pay Request number eight because Sedona had failed to provide the subcontractor payment information. P. App. 30. The Government also informed Sedona that it would withhold over $234,000 due to Sedona's nonpayment of subcontractors. Id.

32. By letter dated November 29, 2006, the Government informed Sedona that it had "noted several construction activities with negative total float indicating that [Sedona's] progress on this project is less than satisfactory." D. App. 266-267.

33. By letter dated December 1, 2000, F&D informed the Government that F&D's financial situation was precarious and that F&D's consultants had investigated Sedona's financial situation and had determined that Sedona would be unable to complete the Project with the remaining Contract funds. D. App. 268-273. F&D informed the Government that it was F&D's position that the Government's failure to terminate Sedona was an abuse of discretion and that the Government was failing to take the interests of the surety into account. Id. F&D noted that the Government had failed to investigate Sedona's capacity and intent to complete the Project and the Government was ignoring the fact that Sedona was failing to pay its subcontractors. Id.

34. The Government responded to F&D's December 1, 2000 letter with a letter dated December 8, 2000. D. App. 274-280. Despite its letter to Sedona less than two weeks earlier expressing concern with Sedona's unsatisfactory progress, the Government defended its decision not to terminate Sedona on the grounds that Sedona was allegedly on schedule. D. App. 274. Attempting to justify its decision to continue making payments to Sedona, the Government noted that "[t]he Courts have recognized that it is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract." D. App. 276.

35. On December 19, the Government approved Sedona's payment application number eight in the partial amount of $45,851. D. App. 153. Sedona submitted the application in the total amount of $284,158. Id.

36. On December 20, 2000, F&D provided the Government with a summary of F&D's outside accountant's evaluation of Sedona's financial condition based on documents and information received from Sedona's bookkeeper. D. App. 288-293. The

evaluation revealed that as of September 30, 2000, Sedona had a negative net worth of approximately $1,400,000, not including Sedona's liability for Project payment bond losses and future payment bond losses on other Projects. D. App. 289.

37. In a letter dated December 22, 2000, the Government notified Sedona that "[w]e have been advised by your structural steel supplier that Sedona has billed the Government $233,000.00 for structural steel and has failed to make payment to the supplier after receiving payment from the Government. D. App. 294. We have further been advised by F&D that they have paid the structural steel supplier $200,000.00 under their Miller Act Payment Bond." Id. The Government requested that Sedona provide "documentation that your company has sufficient financial resources to complete the project and that your company intends to complete the project." Id.

38. In a February 8, 2001 letter to F&D's counsel, the Government asserted that Sedona was in breach of its contractual obligations for its failure to pay subcontractors. P. App. 26-27. Nevertheless, the Government attempted to support its lack of decisive action by noting, "other than the failure to pay subcontractors, they are not in breach of their contractual obligations." Id. The Government stated that it would continue to make payments to Sedona. Id.

39. By February 2001, The Government had concluded that, as F&D had previously informed, Sedona had no ability to complete the Project. In February 2001, a Government legal advisor acknowledged in an internal memorandum that based upon his experience, "Sedona will not complete the project." D. App. 194. The memorandum further notes, "Sedona has no assets other than the unpaid contract balance to finance the Lackland job." Id. Despite the Government's accurate assessment of the Project's status,

the Government continued to ignore F&D's takeover request even though the Government was not making further payments to Sedona and was aware that Sedona had no other assets. As a result, the Project deteriorated and subcontractors left the site due to nonpayment. D. App. 318.

40. In a March 22, 2001 letter to Sedona's counsel, the Government stated, "[w]e have been advised that several subcontractors are either refusing to return to work until they are paid or have threatened to walk off the job unless they are paid by a specific date." D. App. 314. The Government further noted that F&D was willing to take over the Project if Sedona agreed to the Government's offer of a no-cost termination. D. App. 315. The Government noted the "deterioration of the situation at the job-site." Id.

E. The Government's Show Cause Notice and Default Termination of Sedona's Contract

41. The Government again notified Sedona that it was in default of its obligations under the Contract in a May 7, 2001 letter, belatedly citing concerns raised by F&D in November 2000. D. App. 318-319. The Government stated, "[t]he failure of Sedona to make timely payment to its subcontractors and suppliers is a breach of Sedona's contractual obligations." D. App. 318. The letter also notes that little work was being performed at the site, which the Government attributed to subcontractors that left the project due to Sedona's failure to make payment. Id. The Government further stated its belief that Sedona's ability to complete the remaining work within the remaining Contract duration was doubtful. Id. Finally, the Government directed Sedona to show cause as to why its Contract should not be terminated for default. D. App. 319.

42. On June 7, 2001, the Government terminated Sedona's Contract for default. D. App. 352-360. The Government cited the same reasons F&D had made clear

seven months earlier in November 2000, namely, Sedona's "failure to employ subcontractor's [sic] who are critical to the completion of key activities, their failure to obtain critical equipment . . . which has a long lead time, and their failure to man the project with a work force which is capable of completing the project in a timely manner." D. App. 351.

43. In response to the Government's default notice and demand on the Bond and under a full reservation of rights, F&D immediately commenced performance of Sedona's obligations. F&D entered into a Takeover Agreement with the Government on June 26, 2001, in order to complete the work remaining on the Contract. D. App. 44.

44. F&D contracted with W.G. Yates & Sons Construction Co. to complete the work on the Project. Although the subject of F&D's damages is beyond the scope of Defendant's motion, F&D incurred substantial additional costs in completing the work as a result of the Government's pre-termination failure to adhere to the Contract's payment provisions, the Government's departure from the Contract's quality control procedures and improper administration of those procedures, and the Government's delay in terminating the Contract until June 7, 2001.

Dated September 21, 2006

Respectfully Submitted,

/s/ Christopher J. Brasco

CHRISTOPHER J. BRASCO
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
Counsel for the Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2006, a copy of Plaintiff's Proposed Additional Findings of Controverted Fact was filed electronically. I understand that notice of filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Christopher J. Brasco